## IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ESTATE OF PATRICK BURNS, DECEASED, BY RICHARD BURNS, EXECUTOR, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Law No. 11-cv-03020-TSH |
| NEIL WILLIAMSON, as Sheriff of Sangamon County, in his Official Capacity; LT. BRIAN BRESSAN, in both his Official Capacity and in his Individual Capacity; DEPUTY ANDREW BRASHEAR, in both his Official Capacity and in his Individual Capacity; DEPUTY MICHAEL HARTH, in both his Official Capacity and in his Individual Capacity; DEPUTY JOHN OSMER, in both his Official Capacity and in his Individual Capacity; DEPUTY TERRENCE RODERICK, in both his Official Capacity and in his Individual Capacity; UNIDENTIFIED SANGAMON COUNTY DEPUTIES; SANGAMON COUNTY; and LIFESTAR AMBULANCE SERVICES, INC.; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MOTION FOR SUMMARY JUDGMENT

NOW COME the Defendants, NEIL WILLIAMSON, LT. BRIAN BRESSAN, DEPUTY ANDREW BRASHEAR, DEPUTY MICHAEL HARTH, DEPUTY JOHN OSMER, DEPUTY TERRENCE RODERICK, and SANGAMON COUNTY, by their attorneys, HEYL, ROYSTER, VOELKER & ALLEN, and pursuant to Federal Rule of Civil Procedure 56 and CDIL-LR 7.1(D), hereby submit their Motion for Summary Judgment, stating as follows:

# I.  <u>INTRODUCTION</u>

On January 23, 2010 at approximately 6:15 a.m., deputies from the Sangamon County Sheriff's Office responded to a reported home invasion at 1401 N. Wesley in Springfield.  The suspect was described as a white male inappropriately dressed for the weather, wearing only a t-shirt and underwear.  Upon arriving, Plaintiff's decedent, Patrick Burns (Burns), a white male, was observed partially clothed, bleeding, and sitting in the ditch.  When deputies engaged Burns, he spoke non-sensically and admitted to taking drugs.  When the Deputies attempted to photograph Burns' injuries, he became violent, striking Deputy Roderick with a closed fist and then engaging in a protracted fight with Deputies Roderick, Harth, Osmer, and Brashear during which multiple Tasers were deployed as the deputies tried to get control of Burns to take him to the hospital for treatment of his injuries.

Deputies were eventually able to place a set of cuffs on each hand and link them together and then connect them to a set that was placed on Burns' ankles.  Burns continued to fight and try to get out of the cuffs.  Burns was then strapped to a gurney for transport to the hospital in an ambulance, all the while screaming and struggling against the cuffs with such force that he bent the pair of cuffs connecting his hands and legs, rendering them inoperable.

Burns was then transported strapped down to the gurney for the approximately six minutes from the scene to Memorial Medical Center (MMC), with paramedic Jamie Rompot and Deputies Osmer and Roderick riding in the back.  Burns vitals were constantly monitored by Rompot, who confirms that Burns was breathing and had a pulse during the transport.  After arrival at the hospital and as Burns was being transferred from the ambulance stretcher to the hospital stretcher, he became unresponsive and went into cardiac arrest.  Burns never regained consciousness and died several days later.

On January 20, 2011, Plaintiff, the Estate of Patrick Burns (hereafter Plaintiff) filed the instant case pursuant to 42 U.S.C. §1983, alleging constitutional and common-law tort claims against Defendants arising out of the arrest and subsequent death of Burns.  Doc 1.  The operative 2nd Amended Complaint alleges the following claims for relief against Defendants herein:  cruel and unusual treatment through excessive force against Defendants herein (Count I); a claim pursuant to <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 691 (1978), against Defendant Williamson as Sheriff of Sangamon County based upon the use of Tasers and conduct during Burns' arrest (Count II); a State law wrongful death claim (Count III); and a State law Survival Act claim (Count IV).  Doc. 47.

For the following reasons, Defendants are entitled to summary judgment.  First, Defendants' use of force on Burns was reasonable and not contrary to clearly established law in light of the severity of Burns' crimes, the risk he posed to the public, and his active resistance to arrest.  Second, Plaintiff has no evidence of any Constitutional violation, much less one the moving force behind which was a custom, policy, or practice of Sangamon County.  Therefore, Defendant Williamson in his official capacity is entitled to summary judgment as to Count II.  Third, because Defendants' actions were objectively reasonable, Plaintiff's wrongful death and survival action claims fail to demonstrate the willful and wanton conduct necessary to avoid immunity under Section 202 of the Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/2–202 (West 2010)).  Finally, Plaintiff has no admissible evidence that the manner of cuffing Burns and placing him the ambulance caused his death.  Therefore, Defendants are entitled to summary judgment on Plaintiff's Wrongful Death claim.

## II.  UNDISPUTED MATERIAL FACTS

1.     On January 23, 2010 at approximately 6:15 a.m., deputies from the Sangamon

County Sheriff's Office responded to a reported home invasion at 1401 N. Wesley in Springfield, Illinois. Doc. 148-7, Harth Deposition, pp. 15-18; Doc. 148-8, Roderick Deposition, p. 12; Doc. 148-9, Osmer Deposition, pp. 13-14; Doc. 148-10, Brashear Deposition, pp. 21-22; Exhibit A, Harth Case Report; Exhibit B, Roderick Case Report; Exhibit C, Osmer Case Report; Exhibit D, Brashear Case Report.

2.      Responding deputies included, John Osmer, Michael Harth, Terry Roderick and Andrew Brashear. Doc. 148-7, Harth Deposition, pp. 15-16; Doc. 148-8, Roderick Deposition, p. 12; Doc. 148-9, Osmer Deposition, p. 14; Doc. 148-10, Brashear Deposition, pp. 21-22.

3.      The dispatcher advised deputies that an unknown male was trying to force his way into a residence and that there may have been juveniles present. Doc. 148-7, Harth Deposition, pp. 15-16.

4.      The description that went out over the radio was of a white male inappropriately dressed for the weather, wearing only a t-shirt and underwear.  Doc. 148-7, Harth Deposition, pp. 15-16.

5.      Deputy Harth was the first officer on the scene.  Doc. 148-7, Harth Deposition, p. 15.

6.      When Deputy Harth arrived he saw a man, later identified as Burns, sitting in a drainage ditch on the east side of the roadway in about three inches of water, wearing only a t-shirt and his underwear with no shoes or socks. Doc. 148-7, Harth Deposition, p. 22; Exhibit A, Harth Case Report, p. 1; Doc. 148-9, Osmer Deposition, pp. 16-17.

7.      The temperature at the time was around 38°F. Exhibit A, Harth Case Report, p. 1.

8.      At this point, probable cause existed to arrest Burns for the home invasion. Exhibit F, Lyman Deposition, pp. 87-88: Doc. 148-7, Harth Deposition, p. 17.

9.      Deputy Harth attempted to speak to Burns, and Burns stated, "[t]hey're after me" and admitted to having ingested cocaine, marijuana, and alcohol.  Doc. 148-7, Harth Deposition, pp. 19-21; Doc. 148-8, Roderick Deposition, p. 18.

10.     Deputy Harth spoke with Burns for 20-45 seconds and observed that he had cuts on him and was not making sense. Doc. 148-7, Harth Deposition, pp. 21-22.

11.     With additional deputies present, Deputy Harth decided to enter the residence to speak to the home invasion victims. Doc. 148-7, Harth Deposition, p. 25.

12.     Present in Burns' immediate vicinity were Deputies Roderick Osmer, and Brashear who approached with a camera to photograph Burns' injuries. Doc. 148-8, Roderick Deposition, pp. 15-16; Doc. 148-9, Osmer Deposition, pp. 18-19; Doc. 148-10, Brashear Deposition, p. 26.

13.     Deputy Brashear was photographing Burns' injuries as part of his official duties to photograph the scene as an evidence technician.  Doc. 148-10, Brashear Deposition, pp. 23-24.

14.     Burns stated, "No you're not" and then stood up. Doc. 148-10, Brashear Deposition, p. 28.

15.     Deputy Roderick told Burns, "Sit down. We have an ambulance on the way to check out your injuries." Doc. 148-8, Roderick Deposition, p. 16.

16.     Burns struck Deputy Roderick in the stomach with a closed fist. Doc. 148-9, Osmer Deposition, p. 22; Doc. 148-8, Roderick Deposition, p. 16.

17.     Deputy Osmer took Burns to the ground so he could place him in restraints. Doc. 148-8, Roderick Deposition, pp. 19-20.

18.     Deputies Osmer and Roderick struggled with Burns on the ground, as Burns continued to fight, despite orders to stop resisting.  Doc. 148-8, Roderick Deposition, p. 20.

19.     Deputy Brashear announced "Taser, Taser, Taser," Deputies Osmer and Roderick disengaged, and Brashear discharged the X-26 Taser in dart mode into Burns' back.  Doc. 148-10, Brashear Deposition, p. 31; Doc. 148-9, Osmer Deposition, p. 25.

20.     Deputy Brashear's Taser resulted in brief neuromuscular incapacitation, and Deputy Brashear asked Burns if he was done fighting and told him to put his hands behind his back. Doc. 148-10, Brashear Deposition, p. 41.

21.     Burns immediately began to move and fight again.  Doc. 148-10, Brashear Deposition, p. 41.

22.     Deputy Brashear deployed his Taser a second time, after which Burns said he was done fighting.  Doc. 148-10, Brashear Deposition, p. 42.

23.     When Deputies Roderick and Osmer went to try and take control of Burns' arms, he began to punch and kick again and causing the wire from Deputy Brashear's Taser to break, and rendering the Taser inoperable in probe mode.  Doc. 148-10, Brashear Deposition, pp. 42-44.

24.     Tasers may be applied in probe mode for neuromuscular incapacitation or in drive stun as a pain compliance too.  Doc. 148-7, Harth Deposition, p. 45; Exhibit F, Lyman Deposition, p. 53.

25.     Deputy Harth left the residence where he had been speaking with the victims and provided additional verbal commands to Burns to stop resisting.  Doc. 148-7, Harth Deposition, pp. 31-32.

26.     When Deputy Harth returned to the scene from speaking with the home invasion victims, Deputy Brashear had already deployed his Taser and Deputies Osmer and Roderick were on the ground trying to restrain Burns.  Doc. 148-7, Harth Deposition, pp. 30-32.

27.     Once Deputy Brashear's Taser wires were broken, Deputy Brashear moved in to

assist Deputies Osmer and Roderick who were struggling with Burns on the ground.  Doc. 148-10, Brashear Deposition, pp. 43-44.

28.     Deputy Brashear attempted to use his Taser in drive-stun mode for pain compliance to complete the circuit with the one probe that was still in Burns.  Doc. 148-10, Brashear Deposition, pp. 44-46.

29.     Burns continued to punch and kick on the ground, and Deputy Brashear then attempted to use the Taser in drive-stun more for pain compliance but Burns continued to punch and kick.  Doc. 148-10, Brashear Deposition, p 47-48, 51-52.

30.     As Burns continued to flail his arms and kick, the struggle moved from the ditch up to the front yard of the house, as the deputies tried to gain control of Burns' arms and legs. Doc. 148-10, Brashear Deposition, pp. 52-53.

31.      The deputies were able to gain control of Burns hands and eventually handcuffed him behind his back using two pair of handcuffs, which were connected. Doc. 148-7, Harth Deposition, p. 47.

32.     One set of cuffs was on each wrist and they were connected together.  Exhibit E, Bressan Affidavit, para. 4.

33.     The double cuffing gave Burns' more slack in the cuffs than if he were single cuffed.  Exhibit E, Bressan Affidavit, para. 4.

34.     After his hands were cuffed, Burns continued to attempt to kick at the deputies, fight to get away, and step through the cuffs to get his hands back in front of his body.  Doc. 148-8, Roderick Deposition, p. 38; Doc. 148-7, Harth Deposition, p. 48; Exhibit E, Bressan Affidavit, para. 3.

35.     Lt. Bressan did not arrive until Burns wrists were already double cuffed and the

struggle had been going on for some time.  Exhibit E, Bressan Affidavit, para. 4.

36.     Lt. Bressan did not deploy a Taser or have any physical contact with Burns.
Exhibit E, Bressan Affidavit, para. 8.

37.     Deputy Roderick deployed his Taser in drive stun on Burns after Burns' hands
were cuffed while deputies were attempting to get control of his feet.  Doc. 148-8, Roderick
Deposition, p. 39.

38.     The deputies were able to place cuffs on Burns ankles.  Doc. 148-8, Roderick
Deposition, p. 39.

39.     After having cuffs placed on his ankles, Burns continued to try and kick back and
forth and roll around on the ground and step through the cuffs to get his hands in front of his
body.  Doc. 148-8, Roderick Deposition, p. 39; Doc. 148-10, Brashear Deposition, pp. 55-56.

40.     Once on the pavement, deputies gained control of Burns' body as Deputy Harth
gave his handcuffs to link Burns hands and feet so Burns could no longer strike at the deputies.
Doc. 148-8, Roderick Deposition, pp. 40, 50.

41.     In total, Burns was restrained with four sets of handcuffs. Doc. 148-8, Roderick
Deposition, p. 67.

42.     Plaintiff's expert agrees that Burns' actions constituted active resistance Exhibit
F, Lyman Deposition, p. 83.

43.     Active resistance occurs when someone tries to escape being taken into custody.
Exhibit F, Lyman Deposition, p. 84.

44.     Plaintiff's expert opined that a reasonable officer had the options of using batons
or OC spray to gain control of Burns after Tasers failed.  Exhibit F, Lyman Deposition, p. 165.

45.     According to Plaintiff's expert, batons are a higher level of force than Tasers.

Exhibit F, Lyman Deposition, pp. 18-19.

46.     After being secured with the four sets of cuffs, Burns continued to struggle against the cuffs while on his belly, spinning on the ground, and rubbing his face on the road. Doc. 148-9, Osmer Deposition, p. 33-34; Doc. 148-10, Brashear Deposition, p. 58-59.

47.     No Tasers were used after Burns' arms and feet were linked together.  Exhibit E, Bressan Affidavit, para. 5.

48.     The deputies picked Burns up and placed him on the ambulance stretcher slightly Doc. 148-8, Roderick Deposition, pp. 41-42; Doc. 148-5, Rompot Deposition, pp. 31-32.

49.     Due to Burns' continuing combativeness and thrashing around, he would not stay in on his side.  Doc. 148-9, Osmer Deposition, pp. 35-36; Doc. 148-10, Brashear Deposition, p. 64; Doc. 148-8, Roderick Deposition, pp. 41-42; Doc. 148-5, Rompot Deposition, p. 31-32.

50.     From the time Burns was placed on the stretcher to the time he was loaded into the ambulance, he was screaming and moving around trying to get out of the handcuffs and the three straps securing him to the stretcher. Doc. 148-7, Harth Deposition, p. 55; Doc. 148-9, Osmer Deposition, p. 37; Doc. 148-10, Brashear Deposition, p. 63; Doc. 148-6, Hampton Deposition, pp. 43, 47; Doc. 148-8, Roderick Deposition, pp. 42-43; Exhibit E, Bressan Affidavit, para. 6.

51.     During the drive to Memorial Medical Center (MMC), Deputy Osmer was located on a bench seat along the right side of the stretcher near the rear of the ambulance.  Doc. 148-9, Osmer Deposition, pp. 39-40; Doc. 148-8, Roderick Deposition, pp. 43-44, 64.

52.     Deputy Roderick was located in a seat at the head of the stretcher, approximately twelve to eighteen inches from Burns' head, and facing the back door.  Doc. 148-9, Osmer Deposition, pp. 39-40; Doc. 148-8, Roderick Deposition, pp. 43-44, 64.

53.     Paramedic Rompot was sitting between the two deputies on the bench seat alongside Burns. Doc. 148-9, Osmer Deposition, pp. 39-40; Doc. 148-8, Roderick Deposition, pp. 43-44, 64.

54.     Burns' transport from the scene to MMC lasted approximately six minutes. Doc. 148-5, Rompot Deposition, p. 37.

55.     During the transport to MMC, Rompot continually checked on Burns' airway and verified that he was breathing and that he had a pulse and a blood pressure. Osmer dep. 41-42, 63.

56.     During the transport to the hospital, Burns was documented as saying "the rapture coming to get us."  Doc. 148-5, Rompot Deposition, p. 76.

57.     Burns continued to struggle against the restraints and yell and spit.  Doc. 148-8, Roderick Deposition, pp. 45-46.

58.     During the transport to MMC, no one present reported that Burns ever complained about having difficulty breathing. Doc. 148-8, Roderick Deposition, pp. 66, 68.

59.     Approximately one minute before the LifeStar ambulance reached MMC, Burns stopped fighting and yelling and became calm. Doc. 148-5, Rompot Deposition, pp. 54-55.

60.     After Burns became calm, Rompot reassessed him and confirmed that he was conscious, had a pulse, and was breathing. Doc. 148-5, Rompot Deposition, pp. 54-56; Doc. 148-8, Roderick Deposition, pp. 47, 65.

61.     Deputy Roderick, who has previously been licensed as an EMT and was sitting near Burns' head, also observed that Burns had an open airway, was breathing, and did not dramatically change in color from the point in time that Burns became calm in the back of the ambulance. Doc. 148-8, Roderick Deposition, pp. 60-61, 64-65, 69.

62.     There were no visible signs Burns was having difficulty breathing during the transport. Doc. 148-5, Rompot Deposition, pp. 39, 56; Doc. 148-8, Roderick Deposition, pp. 46-47, 64-66, 69.

### III.  ARGUMENT

### A.     Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment, the Court must look beyond the pleadings and assess the proof to determine whether or not there is a genuine need for a trial.  If Defendants meet their burden in showing there is an absence of evidence to support Plaintiff's claim, Plaintiff must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324-25, 106 S. Ct. 254, 91 L.Ed.2d 265 (1986).  In determining and evaluating a motion for summary judgment, the Court views the evidence in the light most favorable to the opposing party and draws all justifiable inferences in his favor.  A mere scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material facts.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Summary judgment is proper if the pleadings, answers to interrogatories, depositions, and admissions, along with affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In determining whether there are any

genuine issues of material fact, the court must draw all inferences in the light most favorable to the non-movant.  Bartman v. Allis-Chalmers Corp., 799 F.2d 311, 312 (7th Cir.1986). Yet not every conceivable inference must be drawn, only reasonable inferences.  Bartman, 799 F.2d at 312-13.

In Celotex, 477 U.S. 317, the United States Supreme Court held that summary judgment is mandatory if there is no genuine issue as to any material fact for trial if, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 323.  The Plaintiff must come forward with evidence of a specific factual dispute, evidence that would reasonably permit the finder of fact to find in Plaintiff's favor on a material question; otherwise, the court must enter summary judgment against the Plaintiff.  Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994); International Union of Operating Engineers v. Associated General Contractors, 845 F.2d 704, 708 (7th Cir. 1988).

**B.     Defendants Are Entitled to Summary Judgment on Count I for Excessive Force Because Defendants' Use of Force Was Reasonable in Light of Burns' Active Resistance**

In Count I of the 2nd Amended Complaint, Plaintiff alleges excessive force against Defendants in violation of the Fourth and Fourteenth Amendments.  However, the totality of the circumstances present on the early morning of January 23, 2010, demonstrate that Defendants' use of force was reasonable in light of Burns' resistance.  Excessive-force claims in the context of an arrest are reviewed under the Fourth Amendment's objective-reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989); Cyrus v. Town of Mukwonago, 624 F.3d 856, 861-62 (7th Cir. 2010). This inquiry requires an examination of the "totality of the circumstances

to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government[al] interests at stake." Jacobs v. City of Chicago, 215 F.3d 758, 773 (7th Cir.2000).  The nature and extent of the force that may reasonably be used to effectuate an arrest depends on the specific circumstances of the arrest, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396; Abbott v. Sangamon County, 705 F.3d 706, 724-25 (7th Cir. 2013).  Ultimately, the excessive force inquiry looks to whether the force used to seize the suspect was excessive in relation to the danger he posed to the community or to the arresting officers if he was left unattended. McDonald v. Haskins, 996 F.3d 992, 994 (7th Cir. 1992).

In undertaking this inquiry, the dispositive question is whether in light of all the facts and circumstances that confronted the officer, he acted in an objectively reasonable manner, irrespective of hindsight or the officer's underlying motivation or intent.  Abbott, 705 F.3d at 724.  Because officers often have to make split-second decisions in dynamic situations, courts give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations." Baird v. Renbarger, 576 F.3d 340, 344 (7th Cir.2009); Abbott, 705 F.3d at 724-25, citing Graham, 490 U.S. at 397.

1.      **Defendants' Taser Usage Was Reasonable**

First, there is no doubt Burns would be charged with several violent felonies from the home invasion and battery of Deputy Roderick.  He posed a risk of harm to himself, the public, and the deputies when he was approached by the deputies.  The facts established in discovery show that Defendants responded to an emergency call from dispatch of a home invasion in progress with possible juveniles in the residence.  Upon arriving at 1401 N. Wesley, Defendants

found Burns bloody and sitting in the ditch at that residence.  It was clear that Burns was the individual associated with the home invasion, as he matched the description of an inappropriately dressed and partially clothed white male.  Home invasion is a Class X felony.  720 ILCS 5/19-6(c) (West 2010).  Accordingly, Defendants had probable cause to arrest Burns.  Plaintiff's expert on police practices and use of force, Michael Lyman, agrees that Defendants had probable cause to immediately taken Burns into custody for home invasion.  See UMF 8.

Moreover, it is undisputed that prior officers using any force, Burns disobeyed an order from Deputy Roderick to "sit down."  Burns then punched Roderick in the stomach.  Burns' actions not only constituted aggressive active resistance but provided an independent basis for arrest.  See 720 ILCS 5/12-3.05(d) (West 2010); Exhibit F, Lyman Deposition, pp. 78-79.

Second, there is no doubt that Burns actively resisted arrest.  Based on all the facts available, the only reasonable conclusion Defendants could draw was that Burns posed a risk to his own safety, the public's safety, and the deputies' safety.  Deputies determined that the use of a Taser was necessary to effectuate his arrest.  After punching Deputy Roderick in the stomach with a closed fist, Deputy Osmer tackled Burns to attempt to get him in handcuffs.  Deputies Osmer and Roderick struggled with Burns on the ground, as Burns continued to fight, despite orders to stop resisting.  At this point, Deputy Brashear announced "Taser, Taser, Taser," Deputy Osmer and Deputy Roderick disengaged, and Deputy Brashear discharged the X-26 Taser in dart mode into Burns' back.  The Taser resulted in brief neuromuscular incapacitation, and Deputy Brashear asked Burns if he was done fighting and told him to put his hands behind his back.  Burns began to move and fight again.  Deputy Brashear deployed his Taser a second time, after which Burns said he was done fighting.  However, when Deputies Roderick and Osmer went to try and take control of Burns' arms, he began to punch and kick again, causing the wire from

Deputy Brashear's Taser to break.  Deputy Harth, who had left the scene to interview the victims of the home invasion, returned and provided additional verbal commands to Burns to stop resisting.

Deputy Brashear moved in to assist Deputies Osmer and Roderick who were struggling with Burns on the ground.  Burns continued to kick and punch with the deputies on the ground, and Deputy Brashear attempted to use the Taser in drive-stun more for pain compliance.  This was not effective, as Burns continued to punch and kick. As Burns continued to fight, the struggle moved from the ditch up to the front yard of the house, as the deputies tried to gain control of Burns' arms and legs.  As the struggle continued, deputies were able to get a hold of Burns' arms and place a set of cuffs on each hand, linking them in the middle such that Burns had more slack in the cuffs than if a single set was used. Despite having his hands cuffed, Burns continued to kick.  He then attempted to step over the cuffs to get his hands in front of him. Officers used their Tasers in drive-stun mode as part of their efforts to secure Burns for transport in the ambulance.   These efforts eventually led to the deputies gaining control of Burns by placing handcuffs around his ankles to stop him from kicking.

It is undisputed that the force used in this case was in response to Burns' active resistance.  The actions and efforts of the deputies were focused on securing Burns for transport in the ambulance.  Any use of force was undeniably a response to Burns' repeated efforts to resist voluntary compliance.  Based on all the facts available the only reasonable conclusion Defendants could draw was that Burns had committed multiple violent felonies, posed a risk to his own safety, the public's safety, and the deputies' safety, and had actively resisted arrest.

Moreover, Plaintiff's expert's agreed that even after the third Taser deployment, the deputies were justified in using escalating force, including OC spray or baton strikes.  UMF 44.

Obviously, the deputies were trying to overpower Burns but were unable to do so, as Burns was wet, slippery, and under the influence of a cocktail of illegal substances. Plaintiff's expert agrees that a baton represents a higher level of force than a Taser. UMF 45. It is not a question for the jury to parse and evaluate the specific tactics used by officers when the use of force is clearly warranted. See McCallister v. Price, 615 F.3d 877, 883 (7th Cir. 2010) (court should not engage in second-guessing of the split-second decisions of law enforcement); Padula v. Leimbach, 665 F.3d 595, 605-05 (7th Cir. 2011).

In Abbott, the Seventh Circuit recognized that Courts generally hold that the use of a Taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable. See Abbott, 705 F.3d at 727. Qualified immunity applies unless the official's conduct violated a clearly established constitutional right. Anderson v. Creighton, 483 U.S. 635, 640 (1987); Sutterfield v. City of Milwaukee, 751 F.3d 542, 572 (7th Cir. 2014) (qualified immunity shields a government official from suit when the official is performing a discretionary function and his conduct does not violate clearly established rights of which a reasonable person would have known).

Here, there is simply no evidence that would support a finding that Tasers or unreasonable physical force was used on Burns at a time he was not resisting. It is questionable whether Burns ever stopped resisting. There is no reasonable dispute that Burns' actions constitute, at a minimum, active resistance. Whether Burns' actions are viewed as attempts to elude arrest or as actual assaultive behavior, it is undisputed that he continued to physically and violently resist arrest even after being forcibly placed in cuffs and placed on a gurney. Accordingly, where Burns had committed multiple violent felonies and actively and violently resisted arrest, Defendants use of Tasers in an attempt to subdue him was neither unreasonable

nor in violation of any clearly established law.  To the contrary, it was entirely consistent with what Seventh Circuit and U.S. Supreme Court precedent.  All Defendants are therefore entitled to summary judgment and/or qualified immunity from damages on Count I as it relates to the use Tasers to gain control of Burns.

### 2. There is Insufficient Evidence that Any Deputy Used Excessive Force By Placing a Knee in Burns Back When He Was On The Ground

There is likewise insufficient evidence that excessive force was used by any Defendant by placing significant pressure Burns' torso when he was hogtied and lying in the mud.  Plaintiff has not identified who was responsible for this.  The closest support is the testimony of paramedic Rompot, who saw an officer with his knee on Burns' back; however, her testimony is equivocal and she says was not close enough to see exactly what was happening.  Rompot assumed the deputies were cuffing Burns at the time, because it was immediately before he was put on the stretcher.  There is no dispute that after being secured with the four sets of cuffs, Burns continued to struggle against the cuffs while on his belly, spinning on the ground, and rubbing his face on the road. UMF 46  To the extent a deputy placed a knee in Burns' back in the process of cuffing him or otherwise trying to control him, it would have been reasonable to get control of him and prevent injury to Burns and the deputies.  See Catlin v. City of Wheaton, 574 F.3d 361, 367 (7th Cir. 2009) (knee to back restraint reasonable as a matter of law where suspect struggling to get away).

### 3. The Manner of Cuffing Burns Was Reasonable in Light His Resistance and Was Not Contrary to Clearly Established Law

The manner of cuffing was necessary due to Burns continuous kicking and fighting, even after being cuffed.  The undisputed facts show that after the deputies succeeded in double cuffing Burns' hands behind his back and cuffing his ankles, Burns continued to try and kick back and

forth and roll around on the ground, fighting with the deputies, necessitating the linking of the two sets of cuffs on Burns wrists to those on his ankles.  Even after Burns' wrists were linked to his ankles, he continued to struggle, scooting across the pavement on his face.  This continued after Burns was placed on the gurney, as he struggled and attempted to get free from the straps and cuffs.

The Seventh Circuit has never held that hogtying or hobbling an actively resisting suspect violates the Fourth Amendment.  In <u>Sallenger v. Oakes</u>, 473 F.3d 731 (7th Cir. 2007), the estate of a mentally ill arrestee brought suit claiming excessive force after the suspect died following a struggle with police that included repeated closed fist blows and blows with a flashlight, as well as the use of a hobble restraint.  The hobble restraint was a cord looped around the lower legs and connected to a strap that attached to the handcuffs.  <u>Sallenger</u>, 473 F.3d at 735.  The Seventh Circuit observed that a genuine issue of material fact existed where one of the officers gave conflicting testimony that the suspect had ceased resisting at the time the hobble restraint was applied.  <u>Sallenger</u>, 473 F.3d at 740-41.  The Court stated "[d]epending on the circumstances, hobbling an individual after he had ceased resisting arrest could be objectively unreasonable." <u>Sallenger</u>, 473 F.3d at 741; <u>see</u> <u>also</u> <u>In re Estate of Phillips</u>,123 F.3d 586, 594 (7th Cir. 1997) (placing a person in a prone position while handcuffed on the floor does not, in and of itself, violate the Fourth Amendment); <u>Richman v. Sheahan</u>, 512 F.3d 876 (7th Cir. 2008) (officers not entitled to qualified immunity where they piled on the back of a morbidly obese arrestee).

As the Court observed in <u>Sallenger</u>, "[t]he question is not whether Andrew's right to be free from the officers' use of the hobble was clearly established; rather, the issue is whether Andrew's right to be free from the whole range of excessive force as described by the district court was clearly established."  <u>Sallenger</u>, 473 F.3d at 742.  Viewing the totality of the

circumstances herein, which consisted of a violent felon engaged in a protracted struggle with several law enforcement officers, the attachment of Burns' feet to his hands was reasonable to prevent injury to Burns, the deputies, or the medical personnel who would attempt to treat him. It is unclear what options the deputies had to get Burns transported to the hospital while preventing him from continuing to kick.

Defendants' manner of cuffing Burns was reasonable in light of Burns' resistance. There is no evidence Burns ever stopped resisting until well after he was in the ambulance on his way to the hospital. There is no clearly established law that would put Defendants on notice that they were acting in violation of Burns' Constitutional rights. Accordingly, they are entitled to summary judgment or qualified immunity from damages.

### 4. <u>There is No Evidence That Deputies Osmer and Roderick Restrained Burns in A Manner that Hampered His Airway or Interfered With Ambulance Personnel's Ability to Treat or Assess Him</u>

The undisputed facts show that upon being fully restrained, Burns was placed on a stretcher slightly on his side at the paramedic's request; however, Burns continued to thrash, scream, and struggle, trying and get out of the cuffs and the three straps that secured him to the stretcher. This continued for the majority of the six minute ride to the hospital. During the ride to the hospital, Burns vitals were constantly monitored by Paramedic Rompot, who confirms that Burns had a clear airway, was breathing, and had a pulse. Although Burns became passive near the end of the transport, he remained conscious, had a pulse, and was breathing. None of the individuals in the back of the ambulance heard Burns complain of difficulty breathing or saw him turn blue. There is simply no evidence that (1) Burns was having difficulty breathing on the transport or (2) his care was interfered with by Deputy Roderick or Osmer.

The suggestion that Burns' airway was compromised by the manner in which he was cuffed and placed on the stretcher comes from Plaintiff's expert, John Ralston.  Ralston's opinion that Burns died of an anoxic brain injury due to positional asphyxia is the subject of a Motion in Limine to Bar by Defendants herein and co-defendant.  Docs. 143-44.  The basis of that Motion is that (1) Ralston's opinion on positional asphyxia is based on medical literature that has been discredited so much that its author has now admitted that he was wrong (see Price v. County of San Diego, 990 F. Supp. 1230 (1998)) and (2) Ralston had insufficient evidence to conclude Burns could not "breathe enough" on his transport to the hospital.  Without any evidence that Burns' position interfered with his ability to breathe and in light of the testimony from those in the ambulance that Burns was breathing on the transport, the allegation of excessive force based in the Second Amended Complaint paragraph 44(d) fail as a matter of law.

### 5.  Brian Bressan Did Not Use Force On Burns and is Entitled to Summary Judgment On Count I

In the 2nd Amended Complaint, Plaintiff has named as a Defendant Lt. Brian Bressan; however, Bressan had no involvement in the events alleged to have violated Burns' Constitutional rights.  Section 1983 liability requires personal involvement in the alleged constitutional violation.  Munson v. Gaetz, 673 F.3d 630, 637 (7th Cir. 2012).  Respondeat superior—supervisor liability is inapplicable.  Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir.2001).

While Bressan is alleged in the Second Amended Complaint to have engaged in excessive Taser use, inappropriate cuffing, and inappropriate positioning of Burns in the ambulance, discovery has showed he was not involved in any of this.  Bressan was the shift supervisor and did not arrive on the scene until Burns' hands were already double cuffed and the deputies were struggling with Burns' legs.  Bressan had been attempting to make contact with

individuals at Burns' residence when the struggle began.  Bressan's only involvement was to tell the deputies to put the Tasers away when they said they were not working.  Bressan never used a Taser on Burns and never put his hands on Burns.  Bressan never observed anyone use a Taser on Burns after Burns wrists and ankles were cuffed and attached to one another.  Bressan did not ride in the ambulance with Rompot, Roderick, Osmer, Burns, and Duffy.  Accordingly, no evidence of personal involvement by Bressan in the alleged excessive use of force exists. Therefore, Bressan is entitled to summary judgment and dismissal from this case.

**C.**  **Defendant Williamson is Entitled to Summary Judgment on Count II Because Plaintiff Has No Evidence Any Custom, Policy, or Practice Was the Moving Force Behind a Violation of Burns' Constitutional Rights**

In Count II, Plaintiff alleges that the County had unconstitutional  patterns or practices (1) of deploying Taser guns without providing sufficient training; (2) encouraging the use of Tasers when it is not necessary; (3) deploying Tasers knowing that the use of such weapons can cause permanent and serious bodily harm, especially when combined with force and restraint which restricts respiration; and (4) not disciplining deputies who use Tasers inappropriately. Doc. 47 at 9-10.  However, after adequate time for discovery, Plaintiff has disclosed no evidence to support any such claims.

An official capacity claim is just another way of stating a claim against the principle of which an official is an agent.  See DeGenova v. Sheriff of DuPage County, 209 F.3d 973, 975 n. 1 (7th Cir.2000) (an official capacity suit is the same as a suit against the entity of which the officer is an agent).  For a municipality to be liable, the plaintiff must establish that the municipality acted pursuant to its custom, policy, or practice.  Monell, 436 U.S. at 691; Palka v. City of Chicago, 662 F.3d 428, 434 (7th Cir. 2011). To establish an official custom, policy, or practice, the plaintiff must show that her injury was caused by (1) enforcement of an express

policy of the municipality; (2) a widespread practice so permanent and well settled to constitute a custom or usage with the force of law; or (3) a person with final policymaking authority.  The same requirement of a policy or practice applies to suits against individuals in their official capacities, because a § 1983 suit against an individual in his official capacity is essentially identical to a suit against the entity for which the individual is an agent.  Monell, 436 U.S. at 690 n. 55.

Initially, Plaintiff's Monell claim fails because he suffered no constitutional injury and therefore has no basis to support a Monell claim.  "It is well established that there can be no municipal liability based on an official policy under Monell if the policy did not result in a violation of [a plaintiff's] constitutional rights"  Houskins v. Sheahan, 549 F.3d 480, 493 (7th Cir. 2008); King v. East St. Louis School Dist. 189, 496 F.3d 812, 817 (7th Cir. 2007).

Moreover, there is no evidence that the interaction with Burns, including the Taser usage and cuffing were done pursuant to any official custom, policy, or practice.  Instead, this was a unique and dynamic situation with an extremely violent and agitated individual.  Relative to fault and causation, single instances, random acts and isolated instances are usually insufficient to establish municipal liability.  See Gable v. City of Chicago, 296 F.3d 531, 538 (7th Cir. 2002). A single occurrence will suffice "only where the evidence that the municipality had acted and the plaintiff had suffered a deprivation of federal rights also proved fault and causation."  Currie v. Cundiff, 2012WL996962 (S.D. Ill) * 9.  For example, "one application of [an] offensive policy resulting in a constitutional violation is sufficient to establish municipal liability.  Calhoun v. Ramsey, 408 F.3d 375, 379–380 (7th Cir.2005), citing City of Oklahoma v. Tuttle, 471 U.S. 808, 822, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).  However, where "widespread practices that are not tethered to a particular written policy" are involved, more evidence than a single incident is

needed to establish liability.  <u>Calhoun</u>, 408 F.3d at 380.  "'[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the [omission in the policy] and the constitutional deprivation.'" Calhoun, 408 F.3d at 380–381, quoting <u>Tuttle</u>, 471 U.S. at 824.

Here, there is no causal link between any municipal policy or practice and the alleged constitutional violations.  Plaintiff has had adequate time for discovery and has failed to discover evidence that would suggest any pattern or practice with regard to the events that took place on January 23, 2010.  <u>See</u> <u>Celotex</u>, 477 U.S. at 323.  Therefore, Defendant Williamson is entitled to summary judgment.

**D.      <u>Defendants Are Entitled To Summary Judgment on Counts III for Wrongful Death and Count IV Survival Action Because There is No Evidence of Willful and Wanton Conduct</u>**

In Counts III and IV of the Second Amended Complaint, Plaintiff alleges Wrongful Death and Survival Actions against Defendants based upon the same allegations of excessive force as are pled in Count I.  Doc. 47 at 10.  To recover under the Wrongful Death Act, (740 ILCS 180/0.01 <u>et seq</u>. (West 2010)), the plaintiff must show that: (1) defendant owed a duty to the deceased; (2) defendant breached that duty; (3) the breach of duty was the proximate cause of the deceased's death; and (4) monetary damages resulted to persons designated under the Act. <u>Bovan v. American Family Life Insurance Co.</u>, 386 Ill.App.3d 933, 938, 897 N.E.2d 288, 292 (2008).  If the plaintiff fails to establish any of these elements from the papers on file, summary judgment for the defendants is proper.  <u>Leavitt v. Farwell Tower Ltd. Partnership</u>, 252 Ill. App. 3d 260, 264, 625 N.E.2d 48, 52 (1993).

In state-law claims against police officers such as those brought pursuant to the Wrongful Death Act or Survival Statute, a plaintiff is required to prove willful and wanton conduct. Wilson v. City of Chicago, 758 F.3d 875, 879 (7th Cir. 2014); Medina v. City of Chicago, 238 Ill.App.3d 385, 606 N.E.2d 490 (1992).  Section 2–202 of the Tort Immunity Act states that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2–202.  For an act to be "willful or wanton" under Illinois law, the act "must have been committed with actual or deliberate intention to harm or with an utter indifference to or conscious disregard for the safety of others."  745 ILCS 10/1–210 (West 2010); Nelson v. Thomas, 282 Ill. App. 3d 818, 829, 668 N.E.2d 1109, 1116–17 (1996), quoting Breck v. Cortez, 141 Ill. App. 3d 351, 360, 490 N.E.2d 88 (1986).

As stated more fully above, Defendants' actions in deploying Tasers and the manner of restraining Burns were all done reasonably and in response to Burns' actions in escalating the situation through his own physical violence.  Defendants' actions comply with Illinois' requirements for the use of force, which provides that an officer justified in the use of any force which he reasonably believes to be necessary to effect the arrest and of any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest if he believes both that (1) Such force is necessary to prevent the arrest from being defeated by resistance or escape and (2) the person to be arrested has committed or attempted a forcible felony which involves the infliction or threatened infliction of great bodily harm or is attempting to escape by use of a deadly weapon, or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay.  See 720 ILCS 5/7-5 (West 2010).  Because Defendants' actions were reasonable and do not constitute excessive force as a

matter of law, they necessarily fail under the higher standard of willful and wanton conduct. <u>See</u> <u>Wilson</u>, 758 F.3d at 881 (any error in jury instruction defining willful and wanton conduct harmless where jury found in officer's favor on excessive force claim). Therefore, Defendants are entitled to summary judgment on Counts III and IV.

**E.**     <u>**Defendants Are Entitled To Summary Judgment on Count III for Wrongful Death**</u> <u>**Because There is No Evidence Causation**</u>

As stated above, Defendants have submitted a Motion in Limine to Bar the opinions of Plaintiff's expert, John Ralston, that Burns died from positional asphyxia. Defendants adopt and incorporate the arguments set out in the Motion to Bar (Docs. 143-44) and Co-defendant LifeStar's Motion for Summary Judgment as to causation as if fully set forth herein (Doc. 147). Plaintiff's expert agreed that Burns' anoxic brain injury (injury to the brain from lack of oxygen) he observed on autopsy was equally consistent with a cardiac event. Doc. 148-1, Ralston Deposition, pp. 27, 31-32. Therefore, if the Court grants the Motion to in Limine to Bar the opinion on positional asphyxia, Plaintiff has no causal link between the actions of Deputies Roderick and Osmer, who were in the ambulance, and Burns' death. Therefore, Defendants would be entitled to summary judgment on the wrongful death claim.

<u>**CONCLUSION**</u>

There is no genuine issue as to any material fact surrounding the incident that occurred in the early morning of January 23, 2010. Burns' active resistance and commission of multiple felonies justified the force used in gaining and maintaining control of him by Deputies Brashear, Harth, Osmer, and Roderick. Deputy Bressan had no direct involvement. Defendants are therefore entitled to summary judgment and qualified immunity from damages on the federal claims. Because no individual violated Burns' Constitutional rights, no basis for liability under <u>Monell</u> exists. In addition, Plaintiff has no admissible evidence to support any willful and

wanton conduct by Defendants, as their actions were reasonable.   Finally, Plaintiff has no admissible evidence to link any act of Defendants to Burns' death.   Therefore, Defendants are entitled to summary judgment on all Counts.

WHEREFORE, for the above reasons, Defendants respectfully request this Honorable Court grant their Motion for Summary Judgment.

> NEIL WILLIAMSON, LT. BRIAN
> BRESSAN, DEPUTY ANDREW
> BRASHEAR, DEPUTY MICHAEL
> HARTH, DEPUTY JOHN OSMER,
> DEPUTY TERRENCE RODERICK, and
> SANGAMON COUNTY, Defendants
>
> s/ Joseph N. Rupcich
> Joseph N. Rupcich, IL ARDC #6283899
> Theresa M. Powell, IL ARDC #6230402
> Heyl, Royster, Voelker & Allen
> 3731 Wabash Avenue
> P. O. Box 9678
> Springfield, IL  62791-9678
> Phone: 217.522.8822, Ext. 223/222
> Fax:    217.523.3902
> Email: jrupcich@heylroyster.com
>           tpowell@heylroyster.com

## <u>PROOF OF SERVICE</u>

I hereby certify that on October 31, 2014, I electronically filed the foregoing instrument, MOTION FOR SUMMARY JUDGMENT, with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

David Niel Damick – dnd@damicklaw.com            Attorneys for Plaintiff
James C. Ochs – jochs@ochsklein.com

Thomas H. Wilson – thw@heplerbroom.com            Attorney for Defendant
                    LifeStar Ambulance

and I hereby certify that I have mailed on October 31, 2014, by United States Postal Service the foregoing instrument, MOTION FOR SUMMARY JUDGMENT, to the following non-CM/ECF participants:

None

s/ Joseph N. Rupcich
         Joseph N. Rupcich

JNR/mh (05487-U2568)
25965304_1