IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| Estate of PATRICK BURNS, deceased | ) | |
| By Richard Burns, Executor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 11 CV 03020 |
| | ) | |
| NEIL WILLIAMSON, | ) | |
| AS SHERIFF OF SANGAMON COUNTY, | ) | |
| in his official capacity; et al, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM  IN OPPOSITION TO
THE JOINT MOTION OF DEFENDANTS TO BAR
TESTIMONY OF JOHN RALSTON, M.D.**

**COMES NOW** Plaintiff Richard Burns as the Administrator of the Estate of Patrick

Burns, deceased, and in Opposition to the Joint Motion of Defendants to Bar Opinion Testimony

of John Ralston, M.D., states:

Introduction

While it has become commonplace to file "*Daubert* Motions" as to almost any opposing

expert opinion, the instant Motion requesting this Court to bar the testimony of the prior medical

pathologist for Sangamon County, as being "unscientific" illustrates particularly the use of the

same for tactical purposes, rather than a real intent to keep "junk science" at bay.  It appears there

is no challenge to the first half of the review urged by the Supreme Court in *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  That is, there is no challenge to the underlying

qualifications, background, experience or education of Dr. John Ralston.

There is much to be gleaned from that point, emphasized because Defendants completely

skip over that component.  The fact is that Dr. Ralston is a fully qualified forensic pathologist with considerable experience in the field. Moreover, he was for a short time hired and designated as the coroner's pathologist for Sangamon County.  His duties there, and always, were specifically to testify to his reasonable medical opinion as to the cause of death regarding bodies brought before him.  The government relied on his opinions not only in determining causes of death, but in determining whether criminal charges may be brought in a case. [Ralston Depo., Exhibit 1, 15:13-23; Ralston C.V., Exh.2].

Instead, Defendants have proposed to this Court that because of their expert's alternate views of the case, and the fact that Dr. Ralston cannot regurgitate the data their expert used for a quite limited physiology study on young, healthy volunteers, Dr. Ralston's opinions do not have the rigor expected under Rule 702.  Defendants further suggest that because the conclusions of one prior article (of several) were revised later, this somehow undermines Dr. Ralston's opinion fatally.  This is not a legitimate challenge under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786 (1993) or its progeny.  Defendants truly are asking the Court to weigh their argument and expert against Dr. Ralston's opinion, and that is improper.  Aside from that, Defendants are simply wrong on the medicine.

### Argument

As pointed out very recently by the Seventh Circuit,

**An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in determining any fact at issue in the case**. ...Experts are allowed to posit alternate models to explain their conclusions... "**Where an expert's hypothetical explanation of the possible or probable causes of an**

**event would aid the jury in its deliberations, that testimony satisfies**

***Daubert*'s relevancy requirement.**" **The question of whether the expert's**

**theory is correct given the circumstances of a particular case is a factual one**

**left for the jury to determine.**

*Stuhlmacher v Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014) (internal citations

omitted). This is the current and proper statement of the Court's role under *Daubert*, - not to

determine whether the opinion is right or wrong, but whether it has sufficient basis to aid the

jury. The *Stuhlmacher* court specifically reversed the trial court's striking of that physician

expert testimony, holding that the judge had improperly removed the question of choosing

between alternate theories of the accident from the jury. *Stuhlmacher*, 774 F.3d at 409-10.

An expert may be qualified by "knowledge, skill, experience, training, or education."

*Smith v. Ford Motor Co.*,215 F.3d 713, 718 (7th Cir. 2000), Fed.R.Evid. 702. "Rule 702

specifically contemplates the admission of testimony by experts whose knowledge is based on

experience," *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir.2000); *United States v.*

*Hall*, 165 F.3d 1095, 1101 (7th Cir.1999). See *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.

137, 156, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)("[**N]o one denies that an expert might draw**

**a conclusion from a set of observations based on extensive and specialized experience**.").

Thus, a court should consider a proposed expert's full range of practical experience as well as

academic or technical training when determining whether that expert is qualified to render an

opinion in a given area. *Smith*, 215 F.3d at 718.

The Seventh Circuit has "recognized that there is "nothing controversial" about using

differential etiology to establish legal cause. *Schultz v. Akzo Nobel Paints*, *LLC*, 721 F.3d 426,

433 (7th Cir.2013).   And the Seventh Circuit has also "held on many occasions, an expert need

not testify with complete certainty about the cause of an injury; rather he may testify that one

factor could have been a contributing factor to a given outcome." *Gayton v. McCoy*, 593 F.3d

610, 619(7th Cir., Ill. 2010).  Dr. Ralston has complied fully.

Dr. Ralston has years of specific experience on the very issues of his opinion.  In fact, he

has specific experience with determining cause of death in positional asphyxia cases:

Q.  And with regard to the portion you have marked under "Deaths Ascribed to

Positional Asphyxia," do you find that to be authoritative in the forensic

community?

A. Frankly, no.

Q. Why not?

A. Because I, myself, have seen positional asphyxia deaths that do not fit the

guidelines of Dr. DiMayo's conclusions, I should say.

[Ralston Dep.(1) p. 44 attached as Exh.1].  Further:

However, I have personally seen deaths from that, as well as there are other

sources, such as Werner Spitz's book, Medicolegal Investigation of Death, which

is considered the gold standard in the field, which does support that you can die of

said positional asphyxia due to restraint.

[Ralston Dep.(1) p. 44].

Dr. Ralston's experience includes personal examination of asphyxia of persons resisting

arrest where excessive pressure was placed on them, [Ralston Dep.(1) p. 46], as well as others

"who were either physically or chemically incapacitated who wound up in a position with a

moderate amount of force pinning their movements, and they were unable to

continue to breathe." [Ralston Dep.(1) p. 47].

There is simply no basis under *Daubert* or the many opinions interpreting Rule 702 since,

to exclude a qualified physician's opinion where the physician has direct experience with the

subject matter. Nothing in *Daubert* was intended to do so. The Supreme Court in *Kumho Tire*

*Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (U.S. 1999) specifically stated that

> **[T]he relevant reliability concerns may focus upon personal knowledge or**
>
> **experience**. *Kumho Tire*, 526 U.S. at 150.

"Daubert itself is not to the contrary. It made clear that its list of factors was meant to be

helpful, not definitive. Indeed, those factors do not all necessarily apply even in every instance in

which the reliability of scientific testimony is challenged." *Kumho Tire*, 526 U.S. at 151.

As to Defendant's complaints that Dr. Ralston did not "know" the specific amount of

force exerted by decedent lying on his chest and belly in the hogtied position, or exact

quantitative numbers for the amount of oxygen required to sustain the decedent, Defendant

apparently did not read the record which shows Dr. Ralston did have the very findings required

and used by pathologists to make the determinations at issue.

Q. Okay. Are you aware as to the amount of force at the time that that force was

applied with regard to Mr. Burns as far as anybody on his back or restricting his

breathing?

**A. Well, he had hemorrhages in the paraspinal muscles along his lumbar**

**spine in his lower back indicating that a substantial amount of force was**

**placed there;** but I can't say for certain how much force was there and how long it

was applied. But **he did have hemorrhages there and hemorrhage within the spinal column itself showing that there was substantial pressure over his lower back and abdomen.**

[Ralston MD Dep. 47:12-24].

Defendants' do not challenge Dr. Ralston's opinion that decedent died from anoxic brain injury, that is, from a lack of oxygen to the brain at the time of his transport to the hospital. Defendants note that Dr. Ralston specifically did the autopsy himself, and in that process specifically observed "evidence of an anoxic brain injury that caused cerebral edema." [Def Memo. p.9, citing Ralston MD Dep.1 at 26]. Defendants themselves note Dr. Ralston's testimony that he personally observed "flattening and swelling of the brain tissue" which is "a phenomena that you observe with anoxic brain injury..."[Def Memo. p.9-10, citing Ralston MD Dep.1 at 30-31]. Defendant then outright concedes: "The presence of an anoxic brain injury was objectively verifiable by Dr. Ralston on autopsy as something that a forensic pathologist can observe by looking at the brain." [Def. Memo. p10]. And further that "Dr. Ralston's opinion that Patrick Burns' cause of death was an anoxic brain injury is not in dispute..." [Def. Memo. p.15].

Defendants appear only to ask that this Court elect their expert's opinions as to the cause, rather than that of Dr. Ralston. As in almost every case that goes to trial with medical testimony, there is indeed a difference of opinion as to the likely cause of injury. Contrary to Defendants' assertions, however, Dr. Ralston's medical opinion on causation is supported both by his long and specific experience with similar injuries, his background and knowledge, his viewing of the circumstances of the case, the dominant literature, and his medical opinion as to what is more likely true than not.

Here, Dr. Ralston repeatedly testified that he did consider the alternatives, (that is, the differential factors), and found that it was the combination of the decedent's utter exhaustion from "excited delirium" (likely from a drug reaction)[Ralston MD Dep. 57,61-64] and the fight with the police, [Ralston MD Dep. 55] and being outside in the freezing cold, and being tazered numerous times, [Ralston MD Dep. 56] and existing heart conditions of cardiomegaly and arteriosclerosis, [Ralston MD Dep. 57] and then being hog-tied, forced to a prone position, and transferred prone without airway protection, that caused his death. [Ralston MD Dep. 75[1]].  Dr. Ralston also testified it didn't matter whether the exertion and hypoxia from the events at issued stopped the heart first or destroyed the brain first, they both would cause death.[Ralston MD Dep. 65].  Far from failing to consider alternatives, Dr. Ralston considered every alternative put forth or known, and still believes that but-for the treatment he received -*given the other conditions* - he would have lived.

There is no requirement in Illinois nor in the federal courts that an expert testify as to absolute certainty as to causation. *Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir.2010) ("...he may testify that one factor could have been a contributing factor to a given outcome.").  Rather, the requirement is that there be sufficient experience and foundation for the opinion to assist the jury in making its choice.   A casual thought would show how grotesquely foolish such a standard requiring "scientific testing" for cause of death would be, because the method of testing of a cause of death in humans would require putting humans at risk of death or actually killing

---

[1] Q. Okay. Dr. Ralston, I noticed in your conclusion you said that, "Burns' death was due to anoxic brain injury in the prone position while hog-tied. Significant contributing factors: Physical subdual, multiple application of Taser, devices, and chronic cocaine abuse."
A. Yes.

some and measuring how many of the test group survived compared to the control group.  This is not done.

Indeed, buried within Defendant's brief is the proper statement that a professional expert "adhere to the same standards of intellectual rigor that are demanded in their professional work." [Def. Memo. p.8].  In *Banister v Burton*, 636 F.3d 828 (7ᵗʰ Cir. ,Ill. 2011), this Court analyzed almost the identical issue, explaining why a physician's opinion testimony on the type of knowledge within the purview of his field was proper, despite not having separate expertise or having done testing in the specific subject.  The determination of cause of death, including the likely causes of the brain damage found here based on the circumstances surrounding the death, is precisely the field and purview of a pathologist.  *Banister* also properly distinguished  *Rosen v. Ciba–Geigy Corp*., 78 F.3d 316 (7th Cir.1996), cited by Defendants, noting that the physician in *Rosen* merely offered a "hunch" concerning the cause of a heart attack, without any theoretical reason or factual information to support that hunch.  That is not the case here.

As to whether the asphyxiation was due to his position and restraint, whether decedent's head was turned to the side or not, Dr. Ralston considered this and stated:

Q.      If he was not facedown but had his head turned to the side, would you change your opinion?

A.      Again, given his physical subdual and the injuries occurred through that, it's still enough to complicate his respirations. So I would still be willing to stick with the opinion that he died due to this physical restraint following that extensive physical subdual. [Ralston MD Dep. 50].

On cross examination, Dr. Ralston set out the physiological reasons as to how this occurs:

A.      Frankly, through shear muscle exhaustion, through muscle fatigue,

because of the extreme stress put on his muscles throughout his body, including

his chest, in the physical restraining process, as well as the application of Taser

devices which are known to cause muscular contractions.  That -- And following

that, to put someone in a hog-tied or restrained position where they're not freely

able to breathe normally is enough to cause muscle fatigue and eventual

respiratory collapse. [Ralston MD Dep. 51].

Defendant is just wrong in selecting testimony to imply that Dr. Ralston had no basis to

choose between the possibility of a heart attack or respiratory distress as a cause of decedent's

brain damage.  This is because in this case it doesn't matter significantly, in that to a reasonable

degree of medical certainty, the acts or omissions complained of contributed to one or both.  On

point, Dr. Ralston describes in some detail the medical and mechanical basis for those opinions

further, set out here because they appear to have been missed by Defendant:

 A.   Yes.  Well, as I mentioned earlier, when you have somebody that's in a

prone position with physical restraints binding them and keeping them from being

able to breathe normally and breathe properly, you're putting them in a precarious

position.  And anything that you do that adds to that; if you place additional

weight on them, that would add to that.  If they are already exhausted.

        For example, the mechanism of death in a crucifixion is not the fact that

you've got stakes  driven into you.  It's that you cannot support your weight

indefinitely, and your chest organs will sink down, and you cannot fully breathe in

and inspire, so it's a suffocation-type death.

So anything that adds to that, whether it be a weakened physical condition due to prolonged entanglement or conflict with police officers, whether it be pre-existing stress on your system due to chronic drug abuse which is weakening your heart and weakening your ability to keep going, or muscle weakness due to application of Tasers, all of those are contributing factors which are adding onto his already compromised position.

[Ralston MD Dep. 75-6].

The relevant issues in <u>this</u> case for Dr. Ralston's medical testimony are whether *either* the actions of the police arrest including taser use and hogtying, *or* the acts or omissions of the paramedics in failing to properly transfer, monitor and protect the airway, <u>contributed</u> to cause the death of Patrick Burns.   This is, in fact, what Dr. Ralston has established firmly through all of his testimony: that these actions caused decedent's death by positional and exhaustive asphyxia *either* by causing irreversible brain damage resulting in heart stoppage, *or* by causing heart stoppage resulting in irreversible brain damage.

The Illinois standard on causation is "proximate cause" and it is defined in the Illinois Pattern Instructions as:

"[A]ny cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury."  I.P.I 15.01. Thus, Defendant's attempts to show that Dr. Ralston cannot respond to random quiz questions on precisely the volume of oxygen that is needed by various persons in various states of health or distress are simply disingenuous.

Further, Defendant's claim that the "theory of 'positional asphyxia" ...has been tested-and repeatedly disproven" is an outright and apparently reckless misrepresentation to this court. [Def. Mot. p. 11].  Defendants' comment appears to, incorrectly, suggest that since Dr. Donald Reay, withdrew his conclusions regarding a 1992 article speculating that the hog-tie restraint - on its own - could cause hypoxia, then there is no support for positional hypoxia as a hazard to life or health. [Def. Mot. p. 12].  With extreme misunderstanding of the scientific method, Defendant asserts that a study by Dr. Neuman in 1997 is the sin qua non proof that there is no clinical effect on oxygenation from being hogtied and left on one's belly during exhaustion for an extended period.  Contrary to the bald allegations in Defendants' Motion, the studies of Thomas Neuman did not alter medical or scientific opinion, except on the limited, (and irrelevant here), issue of whether hog-tying prone young, healthy, volunteers in a lab setting would show clinical harm from being in that position.  As noted in the cases and authorities below, Neuman's work did not involve middle aged persons, exhaustion, delirium, struggle, pre-existing heart disease or effects of drug use, nor did they involve impaired individuals.  Rather, Neuman tested only very healthy young adults after controlled "exercise."   It is Defendants' own evidence that the decedent here was not at all an unimpaired, young, healthy adult, but was a middle-aged individual with cardiomegaly,  coronary heart vessel occlusion, prior medical issues, suffering from cocaine delirium, complete muscle exhaustion, and on medication known to impair oxygenation.  That is precisely the situation that Dr. Ralston analyzed.

Despite Defendant's representation that the deadly effects of positional asphyxiation have been "disproved," the Tenth Circuit in *Cruz v. City of Laramie, Wyo*., 239 F.3d 1183 (10th Cir. ,2001) somehow found that hogtying a suspect and maintaining him prone was a potential cause

of death.  "The conduct at issue involves the tying of the decedent's arms behind his back, binding his ankles together, securing his ankles to his wrists, and then placing him face down on the ground."  *Cruz*, 239 F.3d at 1188.

> We do not reach the question whether all hog-tie restraints constitute a
> constitutional violation per se, but hold that <u>officers may not apply this technique</u>
> <u>when an individual's diminished capacity is apparent</u>. This diminished capacity
> might result from severe intoxication, the influence of controlled substances, a
> discernible mental condition, or any other condition, apparent to the officers at the
> time, which would make the application of a hog-tie restraint likely to result in
> any significant risk to the individual's health or well-being. <u>In such situations, an</u>
> <u>individual's condition mandates the use of less restrictive means for physical</u>
> <u>restraint.</u>  *Cruz*, 239 F.3d at 1189.

In light of Defendant's "*Daubert*" challenge here, alleging that no real medical evidence supports

Dr. Ralston's testimony on causation, the Tenth Circuit's analysis is interesting:

> A review of the known dangers of the hog-tie restraint supports this position.
> Initially, case law informs of tragic examples of positional asphyxia stemming
> from the hog-tie restraint, especially in instances involving individuals of
> diminished capacity. In *Gutierrez v. San Antonio*, discussed below, the Fifth
> Circuit found that a 1992 San Diego Police Study presented sufficient evidence
> that hog-tying may create a substantial risk of death or serious bodily injury... In
> *Johnson v. City of Cincinnati*, the Southern District of Ohio found sufficient
> information existed in the law enforcement community to put the authorities on

notice that positional asphyxia was a problem nationwide.... In the civil arena, a

Michigan jury awarded a significant verdict to the family of a mentally ill patient

who died after officers applied a "kick—stop restraint" analogous to a hog-tie.

*Swans v. City of Lansing*, 65 F.Supp.2d 625 (W.D.Mich.,1998).  We recognize

that in *Price v. San Diego,..* the district court rejected the validity of a popular

study connecting positional asphyxia with placement in a prone restraint. Instead,

the court relied on another study, one by appellants' expert herein, concluding that

hog-tying does not result in positional asphyxia. <u>That study, however, is not</u>

<u>persuasive herein for it focused on healthy adult males</u>. **Our holding today**

**relates to individuals with an apparent and discernible diminished capacity.**

*Cruz*, 239 F.3d at 1188-1189.  Indeed, other courts have noted pointedly that the Tom Neuman

study cited by Defendants was quite limited, making "questionable" its application to other cases.

"The University of San Diego study was restricted to healthy subjects. It did not attempt to

duplicate field conditions. Finally, the study admitted that underlying medical conditions,

intoxication, agitation, delirium, struggle, and body position could all affect respiration in a way

that the study could not detect. Chan, Vilke, Neuman, & Clausen, <u>Restraint Position and</u>

<u>Positional Asphyxia</u>, Annals of Emergency Medicine, November 1997."  *Johnson v City of*

*Cincinnatti,* 39 F.Supp.2d 1013, 1017 (S.D.Ohio 1999).  As the *Johnson* court noted, this just

creates the "classic battle of the experts." *Id.*

Dr. Ralston discussed the well-known flaws in the earlier studies, including the ones that

Defendant wrongly puts forth as the only acceptable analysis. [Ralston MD Dep. 45].   However,

Dr. Ralston did not rely on the conclusions of Dr. Reay, as Defendants allege.  Within his first

deposition alone, he cited DiMayo & DiMayo, <u>Forensic Pathology</u>, Second Edition, identified

(and not challenged) as a "standard text in the forensic community." [Ralston MD dep. 43-4].

Dr. Ralston also clearly identified the text <u>Medicolegal Investigation of Death</u>, edited by

Werner Spitz and Russell Fisher, as the "gold standard" in the filed of forensic pathology.

[Ralston MD dep. 44].   No one disputes this label nor the authority of that text.  There is good

reason that Defendants have not followed up on that reference, because within its chapter on

"Asphyxia" the "gold standard" text specifically isolates Defendants' "Neuman" studies exactly

as Dr. Ralston (and all of the courts cited below) have done:

> "The Neuman studies were performed on healthy male volunteers, between the
>
> ages of 18 and 40 with a BMI less than 30, who were hogtied after they had
>
> exercised on a bicycle, were not subjected to any type of pressure while restrained,
>
> and were not under the influence of any drug or alcohol.  **In fact, the Neuman**
>
> **group, at the conclusion of their study acknowledged that they had not**
>
> **attempted to duplicate the conditions under which restraint position deaths**
>
> **had occurred. ...Additionally, in the real world, individuals in prone restraint**
>
> **tend to become increasingly agitated and panic because they cannot breathe**
>
> **normally.**" [Medicolegal Investigation of Death, p.832; attached as Exh. 3].

Further, in the unchallenged gold standard text of forensic pathology, the very mechanism

described by Dr. Ralston is set forth:

> **A struggling, agitated individual breathes faster, has a faster heart beat,**
>
> **elevated blood pressure, and heightened metabolism.  Such an individual**
>
> **requires more air and more oxygen.  Immobilization of the chest, even if only**

**partially reducing the ability to maintain vital functions, culminates in**

**cardiac arrythmia.** [Medicolegal Investigation of Death, p.832; attached as Exh.

3].

The International Association of Chiefs of Police (IACP) vehemently opposes the use of

prone restraint, stating that many deaths had occurred of individuals who, while in police

custody, had been restrained in this position. [Medicolegal Investigation of Death, p.832;

attached as Exh. 3].

A ritualized form of ligature strangulation (incaprettamento), similar to hogtying

has been associated with the Italian Mafia and involves binding the wrists and

ankles, then tying them together with the body in prone position with an

additional ligature encircling the neck attached to the extremities... Pollanen

reported a similar case in East Timor.  [Medicolegal Investigation of Death, p.832;

attached as Exh. 3].

It is beyond reasonable argument for Defendants to assert that this cause of death has been

"disproven" when it is foremost in the authoritative literature, and their only source is one

isolated study already considered, incorporated and set aside by the mainstream community.  The

mechanism is clear:

Postural asphyxia, known also as positional asphyxia, occurs when the head and

neck are turned or situated so as to obstruct the upper airway, and the reflex drive

to right the head is dulled by intoxication, concussion, or neurological disease.

[Medicolegal Investigation of Death, p.433; Trauma and Disease; V. Adams,

M.Flomenbaum et al.; attached as Exh. 3]

Disingenuously, Defendants point to a District Court finding in California in 1998 which found the Neuman study convincing, but fail to acknowledge the many cases in federal courts since that time which have found the opposite.  In *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998), the court noted particular concern over this dangerous method of restraint, saying "The question thus becomes whether hog-tying in these circumstances creates a substantial risk of death or serious bodily injury, and hence, becomes deadly force."  *Guiterrez*, 139 F.3d at 446. The  *Guiterrez*, court then found specifically that the studies before it showed "**sufficient evidence that hog-tying may create a substantial risk of death or serious bodily injury in these circumstances and thereby become deadly force**." *Guiterrez*, 130 F.3d at 446, citing *Chew v. Gates*, 27 F.3d 1432 (9th Cir.1994). As that case noted twenty years ago: "Both the San Diego Study and the Criminal Law Update article point out common and inexpensive alternatives to hog-ties. One device, called the RIPP Hobble, consists of a Velcro strap to restrain the arrestee's feet and a cord to connect the handcuffs and the Velcro strap. Since the arrestee's feet are restrained, the arrestee cannot kick and must sit upright, a position that allows normal breathing. This device sells for approximately eight dollars."  *Guiterrez*, 130 F.3d at 450, fn 6.

Significantly, the Fifth Circuit in *Price v. San Diego*, 990 F.Supp. 1230 (S.D.Cal.1998) discussed the study which Defendant presents to this Court as being the final word on the subject, but found that "both the San Diego Study[2] and Criminal Law Update article suggest hog-tying may present a substantial risk of death or serious bodily harm in a limited set of circumstances-

---

[2] See San Diego Police Department, Final Report of the Custody Death Task Force (unpublished, June 1992) ("San Diego Study"). This Study finds SCDS to be caused by the combination of (1) drug use, (2) positional asphyxia, (3) cocaine psychosis, and (4) hog-tying or carotid choke holds. *Id.* at 6–12; as set out in Guiterrez v City of San Antonio, 139 F.3d 441, 446 (5th Cir. 1998).

ie, **when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position**." *Guiterrez*, 139 F.3d at 451.  These are the very circumstances here. And all of these circumstances were know to both the deputies and the paramedics who are defendants here.  Indeed, the Seventh Circuit has cited *Price* recently for the proposition that the problem of compression of the lungs of a compromised person is so obvious, any "reasonably trained police officer would know" this can kill them.  *Richman v. Sheahan*, 512 F.3d 876, 883 (7th Cir. 2008).

Moreover, it is not necessary for an arrestee to have their face fully buried downward to be in danger of asphyxiation, since the SCDS report notes the fact that "all of their weight is concentrated on their chest, thereby interfering with the mechanical process of inhalation and exhalation" is the problem. *Id Guiterrez*, 139 F.3d at 448.  This Court should note that, contrary to the assertions of Defendants, no federal Circuits have found positional asphyxia from hogtying to be free from blame in death or excessive force cases.  In *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997), this Circuit found officers did not use excessive force specifically because they did "not hog-tie, choke or transport Mr. Phillips." *Id*. at 594.  In 2004, the Sixth Circuit still opined that leaving an arrestee "on his stomach, but without applying pressure to his back" was a cause of the arrestee's "positional asphyxia." *Champion v Outlook Nashville, Inc*., 380 F.3d 893, 904 fn2 (6th Cir. 2004).  Indeed, in *Champion* the Court discussed that the Officers were trained and aware of the "potential danger of putting pressure on an individual's back or diaphragm. J.A. at 305 (Woodside Test).  *Champion*, 380 F.3d at 904.

The same argument proposed by Defendants here was rejected in *Lewis v City of Hayward*, 2006 WL 436134 (N.D. Cal. 2006), where the court correctly noted that this approach

"attacks a strawman."  Just as in this matter, the physician expert in *Lewis* did not say that the

state of being prone and restrained in general was enough to kill a person, but rather under the

circumstances of the case, the particular restraint of an exhausted and delirious person, left on

their chest for 7 or 8 minutes, contributed to cause the death.  *Id.* at p.8.

As recently as this month, the Tenth Circuit again noted that hogtying may indeed

constitute a deadly and constitutionally improper technique in particular circumstances

remarkably similar to these- that is, since a "2009 notice issued by Taser International warned

law enforcement officers using electronic control devices "to pay special attention to

'physiologically or metabolically compromised' suspects, including those with cardiac disease

and the effects of drugs," since their bodies are at a greater risk of harm from such devices."

*Aldaba v. Pickens*, 2015 WL 451227, p.6 (10th Cir. Feb. 2015).    And in *Mingo v City of Mobile

Ala.*, 2014 WL 6435116 (11th Cir 2014), the Eleventh Circuit looked at quite similar testimony as

that challenged here, holding that expert testimony relating the prone hog-tie position to death of

an arrestee was proper where it was found deadly in combination with drug induced delirium and

exhaustion.  *Mingo*, at p.8-9. (acknowledging the danger of the "four-point restraint" but finding

in *Lewis* that the officers were adequately trained in its use on impaired individuals).  The Third

Circuit has recognized that positional asphyxia is a cause of death associated with hog-tying.

*Gunter v. Township of Lumberton*, 535 Fed Appx. 144, 148 (3rd Cir. 2013).  The Sixth Circuit

recognizes that police training in positional asphyxia is proper in that the danger of death is well

noted for restrained individuals who are experiencing "excited or agitated delirium."  *Martin v.

City of Broadview Heights,* 712 F.3d 951, 956 (6th Cir, 2013)("The officers' failure to adhere to a

departmental policy that explained the grave dangers of positional asphyxia verifies the

unreasonableness of their actions."). In *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (9ᵗʰ Cir. 2003) the Ninth Circuit held that "[t]he **officers—indeed, any reasonable person—should have known** that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." *Abston v. City of Merced,* 506 Fed.Appx. 650, p.3 (9ᵗʰ Cir. 2003).

The single study relied on by Defendants to challenge the lack of admissibility of Dr. Ralston's testimony has been rightfully recognized as limited, involving only young, healthy, unimpaired, men and lacking all relationship to field conditions. This should, given its widest berth, be only a challenge to the opinions, not the admissibility of the same. Defendants' motion fails in that Dr. Ralston's causation testimony does not allege that positional asphyxia due to the hog-tie restraint alone was the cause of death, but was a but-for cause given the circumstances in this individual. Defendants' Motion fails also because Dr. Ralston did not rely on a single study, but on a number of other sources, some unassailable and unchallenged here, and upon his direct and specific experience with the subject matter.

As to that experience, Dr. Ralston cites his personal experience with forensic pathology dealing specifically with asphyxia, brain damage due to asphyxia and positional asphyxia and trauma or inhibiting pressure on the chest of victims while resisting arrest. [Ralston MD, Dep. 46]. He has personally done autopsies and pathologic studies on persons who "were either physically or chemically incapacitated who wound up in a position with a moderate amount of force pinning their movements, and they were unable to continue to breathe." [Ralston MD, Dep. 47]. He identified the specific evidence of restraint and pressure on this decedent's chest, abdomen and back, discussed above. [Ralston MD, Dep. 47].

These are indeed the factual components of the restraint and positioning of Patrick Burns and they go far beyond the simple "prone position" argument raised by Defendants.  These physical facts cannot be refuted, nor can the physics and science of them that demonstrates restricting pressure on decedent's *back* as well as chest and abdomen.  The sources cited by Defendants, and at least 200 cases discussing deaths from restraint state that it is the combination of the excited state from drugs or mental illness or pressure on the back along with the hogtie or restrictive restraint that leads to oxygen deficiency and death.

Moreover, Defendant makes almost wholly indefensible statements on the supposed scientific standards within the forensic pathology profession or on this case.  Defendant asserts that "someone who is qualified in exercise physiology and pulmonology" would be capable to calculate the exact quantity of oxygen that Patrick Burns needed in his excited state, the rate of metabolism his cells were exhibiting in the state of excited delirium and after hours of exertion, naked in freezing weather after an all-out fight with multiple officers, and how much air Mr. Burns was "capable of breathing in one minute ...while in an unrestrained, sedentary position." [Def. Memo p.17].  Indefensible may be too light a term.  It is understood that Defendants expect to rely on the work of Dr. Thomas Neuman whose work in exercise physiology with unimpaired, young, healthy volunteers under zero pressure is the entire basis for this motion.  Defendants make the bald statement that Dr. Neuman can provide the above numbers.  Noone can ever do this, because no one has ever tested Mr. Burns, nor anyone in a like condition under restraint.

Defendants put forth, at best, only an opposing expert position, and not likely an admissible one at that, as its relevance has continually been limited and distinguished from real life arrest and restraint conditions in the cases above, and in the medical literature around the

world.  The following brief review is not to present the following as proofs in this case, but to show that Dr. Neuman's limited work in no way challenges the field of analysis in positional restraint cases.  With full knowledge and presentation of the "Neuman" study:

-    In May 2001, a peer review journal, the American Journal of Emergency Medicine, Bol. 19, No. 3, published <u>Factors Associated with Sudden Death of Individuals Requiring Restraint for Excited Delirium</u>, S.Stratton, MD, MPH, C.Rogers, MD, et al., reviewing 18 "excited delirium sudden deaths after struggle and physical restraint." [Exh.4, p187].  This study found "All victims struggled with law enforcement personnel before being restrained and all had superficial abrasions and contusions of the body, including the head.  Without exception, all cardiopulmonary arrests were unanticipated and preceded by a short period (estimates 5 minutes or less) during which the victim ceased in struggling against restraints ..." *Id.* at 189.   All the deaths involved the "hobble" or "hogtie" restraint. *Id.* at190.  The study authors, fully aware of the Chan and Neuman work, note that those studies were limited to healthy, exercised volunteers, and **did in fact show "a significant decrease in both static and dynamic pulmonary function measurements"**, but did not show that the restraint position did so to the degree of showing hypoxia in those healthy volunteers. [Exh.4, AJEM p. 190].

-    In 2008, <u>Conditions and Circumstances Predisposing to Death from Positional Asphyxia in Adults</u>, R.Byard, MBBS, MD, R.Wick MD et al, was published in the peer reviewed Journal of Forensic and Legal Medicine. [Exh. 5].  While Defendants are pushing the views of one doctor, here again the medical and science community sets out descriptions of positional asphyxia deaths including the victim being "in a position that

does not allow for adequate respiration" including "restrictive or confining positions."
[Exh.5, JFLM, p. 417].

- In 1999, responding to a discussion of the cardio-pulmonary effects of hobble restraints several years after Dr. Neuman's study, Dr. Georg Roeggla, MD published his work as he set out in a letter to Academic Emergency Medicine, October 1999, Vol.6, No. 10; showing: "After use of the hobble restraint in the prone position, mean forced vital capacity decreased by 39.6%, mean forced expiratory volume decreased by 41%, mean end-tidal carbon dioxide increased by 14.7%, mean heart rate decreased by 21.3%, meant systolic blood pressure decreased by 32.3%..." and so on concluding: "**The hobble restraint in the prone position clearly leads to a dramatic impairment of hemodynamics and respiration**." [Exh.6, AEM, p. 1076]. Notably, in reply, the original authors state "There does not seem to be any debate over the fact that prone or hobble positioning impedes respiratory function..."

- In 2011 the Effect of Position and Weight force on inferior vena cava diameter-implications for Arrest-related Death; J.D.Ho,MD, D.M.Dawes, MD et al, was published in the Forensic Science International journal, and set out a prospective, rather than retrospective study on arrest-related positional asphyxia on human subjects. [Exh. 7]. These authors found that there was a clinically significant decrease in the size of the blood vessel that returns blood to the heart just from moving from a standing to prone position, and further decreased with each level of restriction imposed on top of that.

- A multitude of scientific peer reviewed literature and studies exist from the anesthesiology point of view, because the anesthesiologist is confronted commonly by the

problem of keeping adequate oxygenation to a patient in the prone position for surgery.

These studies universally state there is a reduction in heart efficiency and a rise in

systemic vascular resistance (difficulty in getting blood to body tissue) where the patient

had a pre-existing heart disease, simply from the placement in the prone position, and this

reduction in blood flow was almost equal to that caused by injection of propofol.   See

Exh. 8, Hemodynamic effects of the prone position; P.S. Sudheer MD et al., Anesthesia,

2006, 61, and the bibliography showing similar studies.

The supply of peer-reviewed articles and comments on this subject is vast, and none of it states

or implies that the prone, hog-tie restraint does not decrease the ability of the human body to

supply oxygen to tissues, nor that it is not a cause of death in excited delirium or impaired

individuals.  Dr. Ralston is squarely in the mainstream of the medical and scientific literature, as

well as the equally vast legal opinions and law enforcement regulation.

<u>CONCLUSION</u>

The Motion to bar Dr. Ralston's testimony is not well taken.  Rather than demonstrate

any deficiency in the forensic pathology methodology used by Dr. Ralston, Defendants ignore his

statements, findings, and supporting documentation and instead complain that Dr. Ralston does

not have the same opinion as their expert(s).  If their experts qualify to testify at all, the jury will

rightfully be able to compare the opposing opinions.

WHEREFORE, for the reasons stated above, Plaintiff prays this Court DENY

Defendants' Joint Motion to bar the testimony of Dr. John Ralston, and allow this matter to

proceed to trial, and for such other relief as this Court deems just and proper.

The Law Offices of David N. Damick


/s/ David N. Damick
David N. Damick, #06208797
One Metropolitan Square, Suite 2420
211 North Broadway
St. Louis, Missouri 63102-2733
TEL: (314) 231-0570
FAX: (314) 621-8639
dnd@damicklaw.com
Co-counsel for Plaintiff

OCHS & KLEIN, ATTORNEYS, P.C.

/s/ James C. Ochs
JAMES C. OCHS, ARDC #6141902
149 n. Meramec, 2nd Floor
Clayton, MO 63105
TEL: (314) 727-2111
FAX: (314) 727-2110
Co-Counsel for Plaintiff

<u>CERTIFICATE PURSUANT TO LOCAL RULE 7.1(B)</u>

The undersigned hereby certifies that the foregoing document complies with the type

volume limitation in Local Rule 7.1(B)(4)(b)(1) in that according to the word and character count

function of the word processor used (WordPerfect), the document contains 6921 words inclusive

of all captions, footnotes, signature and certificate of service.


_____/s/ David Damick_____

Certificate of Service

The undersigned certifies on the 23rd day of February 2015,  I caused to be electronically

filed the foregoing document with the Clerk of the Court using the CM/ECF system, which by

rule shall serve by email the following counsel of record:

Thomas H, Wilson
thw@heplerbroom.com
Attorney for Defendant Lifestar

James C. Ochs
jochs@ochsklein.com
spd@ochsklein.com
Co-counsel for Plaintiff

Theresa M. Powell
Joseph N. Rupcich
tpowell@heylroyster.com
jrupcich@heylroyster.com
Counsel for Sangamon County

/s/ David Damick_____