IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| Estate of PATRICK BURNS, deceased | ) | |
| By Richard Burns, Executor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 11 CV 03020 |
| | ) | |
| NEIL WILLIAMSON, | ) | |
| AS SHERIFF OF SANGAMON COUNTY, | ) | |
| in his official capacity; et al, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
THE MOTION FOR SUMMARY JUDGMENT OF
LIFESTAR AMBULANCE SERVICE, INC.**

**COMES NOW** Plaintiff Richard Burns as the Administrator of the Estate of Patrick

Burns, deceased, and in Opposition to the Motion for Summary Judgment of Lifestar Ambulance

Service, Inc., states:

**A.**                                 **INTRODUCTION**

In brief summary, the claims against Defendant Lifestar Ambulance Service, Inc.

("Lifestar") are directed solely to the acts or omissions of Defendant's paramedics from the time

they picked up Plaintiff's decedent to his death.  Defendant seeks Summary Judgment asserting

two points: first that, <u>if</u> this Court grants their separate motion barring the testimony of Plaintiff's

forensic pathologist Dr. John Ralston,  there is "no evidence" showing the cause of death, and

thus no ability to show that any act or omission by the paramedics caused damages; and second

that unless Plaintiff's expert testifies that the acts or omissions of the paramedics were "willful or

wanton" then there is insufficient evidence for a jury to make such a finding.

Both assertions are incorrect, as set out below.  The factual events of the evening in question are again briefly summarized here:

 On January 23, 2010, at approximately 6:30 p.m., Defendant Lifestar Ambulance Service, Inc. ("Lifestar") responded to a request for emergency ambulance services in Springfield, Illinois, related to a person acting erratically and in the process of being subdued by police.  Paramedics  Rompot and Guffey drove to the site and waited, as instructed by police, off-scene, until they could approach.  At that time, the paramedics saw decedent Patrick Burns being "hogtied" and subdued by the Sangamon County Deputies.  The paramedics were aware that Burns had been extensively shocked with tasers (approximately 24 discharges were recorded), and had been involved in an extended struggle with the deputies in freezing weather.

Nevertheless, the paramedics allowed Burns to be placed on their stretcher in the prone (face down) position, still handcuffed in the "hogtie" position - meaning his legs were cuffed together, his hands were cuffed together, and a pair of cuffs was placed linking the leg and hand cuffs together behind his back with a single length of handcuff, forcing an arching of the back and stretching of the chest with any movement.  The paramedics then placed Burns in their ambulance in that position, and transported him to the hospital, in that position.

During transport, little was done to either monitor Burns, nor assure his oxygen intake was adequate.  The paramedics later testified that this was because they were afraid of him.  When nearing the hospital, Burns was noted to become quiet, and to have quit struggling.  No further airway or oxygen management or monitoring was performed, nor was his position altered.  Burns remained in this quiescent state as he was removed from the ambulance, and then wheeled into the Emergency Department of Memorial Hospital.  No monitoring nor care was provided

during this period.  There is testimony from one source that a deputy held Burns' head down.

After being wheeled into the Emergency Department, the paramedics encountered the "charge nurse" of the department, who directed them to an examination room down the hall. However, when the hospital staff began to transfer Burns to the hospital bed, they noted that he was not breathing.  Resuscitation was delayed an unknown amount of time as the deputies had to then remove the hogtying handcuffs.  Emergency Resuscitation was begun.  Burns never regained significant brain function, and he died on January 28, 2010.

The former Sangamon County medical examiner, Dr. John Ralston, has been deposed and has opined that the stresses of the confinement by hogtying along with the excited delirium state, the fight with police, and prior heart issues, more likely than not caused death by asphyxiation and/or a heart attack.  Defendant has cited their experts to assert that Burns died purely of a condition termed "excited delirium."  Plaintiff has offered the testimony of Dr. Walter Stoy, a professor and instruction of paramedics, who opined that the actions of the paramedics were below the standard of care, at least, and caused or contributed to cause the death of Burns. Defendants have not countered this testimony, apparently conceding negligence, but rely solely on the protection of 210 ILCS 50.3.150(a) to assert it doesn't matter because the standard for paramedic liability is willful misconduct.  The potential deadly effect of the prone position with a "hobble" restraint, where the patient is impaired by drug induced or other delirium, exhaustion, body habitus or medical condition is well known and established in the medical and legal world. No reasonable paramedic could fail to be aware of this particular danger of death, and acted to monitor and assure adequate oxygenation.

The cause of action at issue here is brought by the family survivors of Patrick Burns, and

based upon the blatant disregard for standards of care of a patient in the care of the paramedics, allowing Burns to remain without oxygen monitoring or respiratory assistance in the stressed condition, hogtied, on his chest, throughout the transfer and while being wheeled through the hospital.   The Motion for Summary Judgment at issue here confuses a disputed factual issue, or the disagreement of experts, with "undisputed" fact, and asserts immunity claims as well.  These claims are not well founded, and are not matters of law for determination absent the determination of the disputed fact.  This Motion should be Denied and the matter allowed to proceed to its scheduled trial.

**B.**      **PLAINTIFF'S RESPONSE TO UNDISPUTED MATERIAL FACTS**

(1) UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 7(D)(2) Plaintiff lists the following facts from Defendant's Section B which are conceded to be undisputed and material:

1.      It is agreed that Lifestar, at all relevant times, was an Illinois corporation doing business in Sangamon County, providing emergency medical care and ambulance services.

2.      It is agreed that, at all relevant times, Jaime Rompot was a licensed EMT-Paramedic employed by Lifestar.

3.      It is agreed that, at all relevant times, Barbara Guffey (now Hampton) was a licensed EMT-Paramedic employed by Lifestar.

4.      It is agreed that Rompot and Guffey were in the course and scope of their duties for Lifestar at the relevant times.

5.      It is agreed that Patrick Burns was a resident of, and died within, Sangamon County.

6.     It is agreed that Sangamon County deputies were dispatched to the scene in the early morning of January 23, 2010, inclusive of Deputies Brashear, Harth, Osmer, and Roderick.

8.     It is agreed that Patrick Burns was found in shorts and a t-shirt, covered in mud, bleeding and sitting in a roadside ditch partially filled with water.

9.     It is agreed that the deputies reported that Patrick Burns told them he was under the influence of cocaine, marijuana, and possibly Prozac and/or Wellbutrin.

10.    It is not disputed that Burns was combative and a physical altercation between Burns and the deputies began that included the use of multiple Tasers® and concluded with Burns being "hogtied" by the deputies.

11.    It is agreed that the deputies "hogtied" Burns by handcuffing his hands behind his back with two sets of handcuffs, handcuffing his ankles, and then linking the handcuffs securing his hands to the handcuffs securing his ankles with another set of handcuffs.

12.    It is agreed that after Burns was secured by the deputies, he continued to yell and struggle against his restraints. It is agreed that later on, the handcuffs were found to be damaged.

14.    It is agreed that the LifeStar paramedics did not participate in any way in restraining Burns in the "hogtied" position, as Burns was subdued and restrained by the deputies prior to the paramedics being allowed to approach.

16.    It is not disputed that the deputies picked Burns up and placed him on the ambulance stretcher prone.  The remainder of number 16 is discussed below.

17.    It is agreed that the paramedics were informed by the deputies that Burns had admitted to using alcohol and drugs, including possibly "crack," cocaine, methamphetamine, and marijuana.

18.     It is agreed only that Defendant Rompot testified that she considered the patient a danger.

19.     It is agreed that decedent continued to struggle after being hog-tied and placed on the stretcher, and as the stretcher was moved to the ambulance.

20.     It is agreed that the paramedics chose to take Burns to MMC because it was the closest Level 1 trauma center.

22.      It is agreed that Guffey (now Hampton) drove the ambulance to the hospital and Defendant Rompot was in the back with Burns and deputies Osmer and Roderick.

25.     It is agreed that Defendant Rompot assessed Burns as they began to drive to the hospital, and that she reported a respiration rate of 20 breaths per minute, a pulse of 120 beats per minute, and contusions to his thoracic region, abrasions to his head, and lacerations to his wrists and ankles from the handcuffs.  It is also agreed that Rompot did not measure Burns' blood pressure, and that Burns was irrational.

29.     It is agreed only that while en route to MMC, Rompot made a cellular telephone call to MMC  in order to advise that she was transporting a patient to their hospital and that the patient was restrained, and had been tazed multiple times.

30.     It is agreed that at about one minute before the ambulance reached MMC, Burns stopped fighting and yelling and became quiet and his muscles relaxed.

35.     It is not disputed that Barbara Guffey drove the ambulance and at the hospital went around to the back and assisted with removal of the stretcher from the ambulance.  The remainder is disputed.

39.     It is agreed that Burns was restrained in the "hogtied" position and prone on the

ambulance stretcher as he was wheeled into the emergency room at MMC.

40.    Undisputed for the most part is that " after Burns was brought into MMC, the ambulance crew and deputies were met by Betty Retherford, the charge nurse on duty that day, who observed Burns lifting his head off the stretcher and moaning and who led the paramedics and deputies to a treatment room. (Rompot dep. 60 61; Retherford dep. 17 19, 55).  Disputed is the word "immediate."

## (2) DISPUTED MATERIAL FACTS:

Pursuant to Local Rule 7(D)(2)(b)(2), Plaintiff lists here Defendants' claimed <u>material</u> undisputed facts which are in fact disputed, with citation.

12.    Although it is undisputed that two sets of handcuffs were damaged, there is no evidence to distinguish whether they were damaged during the initial struggle, before the struggle, by the deputies, by the straps in the ambulance, or by Burns.   The deputies used considerable force to handcuff Burns. [Roderick Dep. 39:14-40:13; Osmer 25:14-22; Rompot Dep.29:11-30:2].  They lifted him kicking and screaming onto the stretcher. [Roderick Dep. 41:1-13]. They strapped him in while hogtied. [Roderick Dep. 40:22-41:16].  Roderick indicates the handcuffs were damaged in the initial struggle. [Roderick Dep. 54:10-16].  This is listed as a material fact here because the degree of force exerted by Burns was an indication of his excited delirium.

15.    Part of this point- as to whether the paramedics could have changed the restraint, straps, or position of Burns, is material.  The way the "fact" is stated is immaterial as discussed in Section 3 below.  Material to the case is whether a different method of positioning the patient

was required and could be accomplished by the paramedics, but that does not involve removing

the handcuffs.  The paramedics have control and are responsible for the health of their patient.

[Dr. Stoy Dep. 76:17-23]. The paramedics cannot - and <u>did not</u> delegate the control of the patient

to the deputies. [Dr. Stoy Dep. 77:19-25].  Once Burns was on the stretcher, he became

Defendant's patient. [Rompot Dep. 31:10-19].

      16.     With apology to the Court, categorization of the response to Defendant's 16th

"fact" is complicated because there are three separate alleged "facts" therein.  As to the allegation

that decedent was "repositioned to lie "slightly on his side", there are disputed issues.

Specifically, Rompot has indicated uncertainty as to what part of the body was actually shifted:

"I remember the legs, but I don't remember it a hundred percent.  I just remember being at the

feet and seeing the knees and seeing the legs and the waist and that was like okay, he's on his

side, let's get going now." [Rompot Dep. 32:6-20].

      16.     The statements in Defendant's number 16 regarding consistency of the protocols

with national standards are wholly unsupported by anything cited by Defendant or in the record.

In fact, Defendant's cited portion of Dr. Stoy's deposition, at pages 81-82 says the opposite, ie:

that the prone position is known to be dangerous to a patient in this condition:

    A.   So, the issue is that over the years, we've learned that patients that are face

    down have problems with breathing.  We particularly know that patients that are

    hogtied definitely, because of just the physiology of the diaphragm and the other

    components with that, that there's just more and more prisoner/patient events that

    result in a patient ending up having the demise of their life contributed to

    positional asphyxia. [Dr.Stoy Dep. 82-3, on questioning by defense counsel].

Nothing else is cited as to any reference to national standards. It is manifestly unfair to force opposing counsel to search through the record for citations to fight citations that are not relevant. Nevertheless, the court may observe that Dr. Stoy does indeed point to his opinion that the acts here <u>were in violation</u> of the National and local standards. [Stoy Dep. 67:2-69:3].

      19.    That Burns continued to thrash and speak loudly and incoherently is not disputed, as stated above. Defendant's argumentative speculation as to the thoughts and motives of Burns are disputed. The fact is that Burns was incoherent, irrational and "out of his mind." [Hampton Dep. 47:14-17; Rompot Dep. 37:6-8]. He remained securely strapped in during transport. [Rompot Dep. 36:10-13].

      21.    Defendant does not cite fact here, but statements of opinion from an expert. Nevertheless, the statement that "Plaintiff's expert, Walt A. Stoy, PhD, agrees that the LifeStar paramedics made an appropriate, reasonable choice to transport Burns to the Level 1 trauma center restrained as he was by the deputies rather than spend time arguing with the deputies about the manner in which Burns was restrained," is wholly unsupported by the citation given, and is disputed. There is zero discussion on the cited page of "Stoy dep. 74" as to whether the paramedics should have "argued with the deputies" instead of transporting to the ER. Defendant's question was whether the paramedics should have "spent time calling medical control to argue" for different restraints, to which Dr. Stoy said "they might have." [Stoy Dep. 74:4-10].

      25.    Disputed here are the conclusory statements that "Rompot "was unable to take a manual blood pressure with a sphygmomanometer," and as to whether Rompot ever "determined" anything about the airway, pulse, or pressure. These are material only as to the

assertions as to the level of proof of the "reckless" nature of LifeStar's actions.   It is undisputed

that Rompot did not do these things.  However, the ambulance was indeed equipped with all that

was needed to make these measurements and none were used. [Hampton Dep. 58:2-60:2].  The

heart monitor could be used in the position Burns was in. [Hampton Dep. 58].  The pulse

oximeter just takes a clip onto a finger but wasn't used. [Hampton Dep. 59:15-60:2].

26.     Disputed is that "Rompot continually checked on Burns' airway and determined

that he was breathing and that he had a pulse."  The cited portions of Deputy Osmer's deposition,

at page 41-42, actually shows him denying that he actually saw Rompot checking on Burns' vital

signs. "Q.  How did she check on the vitals?   A.  I don't --" [Osmer Dep. 41:21-22].  What

Osmer recalls is only that Rompot said the patient was breathing. [Osmer Dep. 42:1-3].  He does

not recall ever seeing Rompot physically check Burns' vital signs. [Osmer Dep. 42:4-7].  There is

a far cry from noting that there will be "some" evidence of a point (which would be proper), and

alleging that the point is "undisputed" when the same witness indicates uncertainty.

27.     Disputed is that "During the transport to MMC, Burns never complained about

having difficulty breathing."   This is an argumentative and improper statement of "fact" because

all of the witnesses riding in the back of the ambulance have indicated that Burns was irrational,

"out of his mind", not making any sense, and incapable of complaining of anything.[Roderick

Dep. 68:20-25]. The only thing he said at all was "drugs are bad, drugs are good." [Roderick

Dep. 68:12-19].

28.     Disputed here is the statement that Rompot tried to "provide him with additional

medical treatment."  Whether Rompot spoke to Burns during transfer is neither disputed nor

material.  The cited part of Rompot's deposition actually says the opposite- that she was unable

to provide any other treatment due to the time constraints. [Rompot Dep. 37]. There is nothing in the record anywhere that would indicate Rompot was trying to provide "additional medical treatment."

31.    Disputed is whether Dr. Stoy had criticisms of Rompot's care prior to the change in condition of Burns. Dr. Stoy had numerous criticisms during that period, but none rising to the level of causing the death. These included improper transport and allowing the deputies to assume control of the manner of transport, [Stoy Dep. 67:2-69:3], failing to assume control of their patient [Stoy Dep. 75:15-76:23], transporting this patient torso-down [Stoy Dep. 82:21-83:6].

32.    Disputed is the statement that Rompot reassessed Burns after he became calm. First, Burns didn't become "calm", he collapsed suddenly, became passive and stopped all activity. Deputy Osmer reported first hand: Q. -- I believe you used the term all of a sudden -- I'll say it exactly. A. You have it marked here. Q. Okay. **"All of a sudden Mr. Burns became very passive as he stopped speaking, yelling, and tensing his muscles**." Did you write that? A. I did. [Osmer Dep. 42:15-22]. Burns stopped all activity and became "very passive." [Osmer Dep. 43:4-6]. Deputy Osmer did not see Rompot touch the patient after he collapsed. [Osmer Dep. 45:3-4]. He does not recall Rompot checking any vitals on Burns before exiting the vehicle. [Osmer Dep. 46:6-10].

33.    Disputed is whether Roderick or anyone actually checked Burns, or whether there were significant changes in Burns' breathing or condition when he became suddenly passive. It is clear that no one is actually checking Burns when he suddenly became passive and stopped talking still a block from the hospital. [Roderick Dep. 46:22-47:5]. All Roderick did was look at

his face and saw he was breathing. [Roderick Dep. 47:6-11].  Roderick doesn't even recall if he

had his eyes open the whole time. [Roderick Dep. 65:2-4].

34.      Disputed is whether Rompot adequately checked Burns at all, let alone after he

collapsed and became passive. Rompot was never seen to touch Burns after he became passive.

[Roderick Dep. 47:12-16] Nor did any EMT check his vital signs unloading or while wheeling

him into the hospital. [Roderick Dep. 51:17-52:3; Osmer Dep. 49:17-21].  Rompot was observed

not doing anything to check on Burns other than talk to him and observe. [Osmer Dep. 41:21-

42:7].   In fact, at the point Burns became passive, Osmer did not see her touch or check any

vital signs. [Osmer Dep. 44:23-45:4].  Rompot's credibility on her monitoring is suspect, as she

describes monitoring vitals going into the hospital that neither Roderick nor Osmer observed

(noted above) and which were not physically possible given her position at the stretcher.

[Rompot Dep. 56:14-57:3].

35.      It is disputed as to whether Guffey (Hampton) really or adequately checked on

Burns at the time of his removal from the ambulance, and it is disputed as to what condition he

could have been in, considering he was found without a heart beat about two minutes later.  The

citation provided by Defendant discusses a different time than indicated in the proposed "fact"

and indicates that Guffey assumed Burns was breathing because he was not cyanotic (blue).

[Hampton Dep. 95:8-15].  Burns wasn't breathing on the handoff to the hospital. [Hampton Dep.

71:18-24].

36.      Disputed here is only the phrase "became passive within one minute of arriving at

MMC." [Def. Mot. Suggested Undisputed Facts No. 30; Rompot Dep. 54-5].  The facts

demonstrate that Burns became passive one block before reaching the hospital and at least one

minute <u>before</u> reaching the parking lot at MMC. [Roderick Dep. 46:22-47:1].  It takes several minutes to unload a patient and get them into the hospital from there. [Retherford Dep. 30:2-12]. The remainder of this paragraph is discussed under undisputed immaterial facts below.

38.    It is highly disputed that "None of the three medically trained individuals (Rompot, Guffey, and Roderick) observed any sign that Burns was having difficulty breathing or a change in his skin color evidencing hypoxia."  First, Deputy Roderick was no more medically trained than present counsel, and any basic certification he had is long expired.  Second, this is not a "fact" but rather it is understood that Guffey and Rompot *believed* they did not observe signs of difficulty in breathing.  However the facts show unequivocally that Burns' condition crashed drastically during their care, and he had a severe change in his breathing and the effectiveness of his breathing.  [Stoy Dep. 126:11-20;Osmer Dep. 42:15-22; and  43:4-6; Roderick Dep. 46:22-47:1; Rompot Dep. 54-5].  Thus, the paramedics did indeed observe a change indicating difficulty in breathing, but did not recognize it or ignored it.

41.    Disputed as highly unlikely, is Rompot's statement that she continued to monitor his breathing in the treatment room at MMC.  It was the charge nurse Retherford who noted Burns was silent and directed them to check on his pulse. [Retherford Dep. 36:12-19].  The record of the people in the room indicates a very full room with no mention of Rompot. [Retherford Dep. 47:1-15].  It was a nurse who was putting on a blood pressure cuff who announced no pulse.  [Roderick Dep. 53:1-9].

42.    Highly disputed is the absolute speculation that "As Burns was being transferred from the ambulance stretcher to a hospital stretcher, he became unresponsive and went into cardiac arrest."  This statement is self-serving and not supported in the record at all.  Burns was

noted to become "silent" at the point of transfer to the hospital stretcher, but whether his heart

had stopped just prior to that is not indicated anywhere. [Retherford Dep.  21:2-7].  Nurse Miller,

cited by Defendant, clearly did not enter the room until the resuscitation efforts had already

begun. [Miller Dep. 29-30].

(3) DISPUTED IMMATERIAL FACTS:

Pursuant to Local Rule 7(D)(2)(b)(3), Plaintiff lists here Defendants' claimed immaterial

undisputed facts which are in fact disputed, with citation.

15.    Defendant's declaration that "Had the LifeStar paramedics requested the

Sangamon County deputies to remove the handcuffs with which Burns had been restrained so

that a different set of restraints could be applied, the deputies would have refused to do so." is

sharply disputed here, in part because it is wholly speculative in that the paramedics never asked,

in part because it is immaterial in that no one suggests that the "handcuffs" should have been

removed, and also because this is not the standard that is applied to the paramedics.  For the

material aspect of this, please see section 2 above.  There is a material issue in this case as to

whether a different method of positioning the patient was required, but that does not involve

removing the handcuffs, and nor is it referenced in any way in the Motion for Summary

Judgment and so is immaterial here.  The paramedics have control and are responsible for the

health of their patient. [Dr. Stoy Dep. 76:17-23]. The paramedics cannot - and did not delegate

the control of the patient to the deputies. [Dr. Stoy Dep. 77:19-25]. Thus what the deputies would

have done if asked to remove the handcuffs of a delirious arrestee is immaterial.

24.    The time it took for transport "to MMC" is unclear and disputed.  First, this "fact"

is stated in vague terms.  There is an issue here as to how long the ambulance took to arrive at the

parking lot outside the MMC Emergency Department.  Then there is a dispute as to how long it took to remove Burns from the ambulance and enter the facility. The time report relied on by all parties is disputed, first because it records the time of dispatch *before* the time the call was received. [Hampton Dep. 20:1-21:4].  The time of arrival at the hospital is not automatically recorded, but the driver is told what to record later by the dispatcher. [Hampton Dep. 34:17-4]. And that time is not the hand-off, but is just when the driver stopped the ambulance in the parking lot. [Hampton Dep. 54:12-24].  <u>After</u> that recorded time, the driver had to unbuckle, get out, go to the back of the vehicle, and assist with removal of the stretcher. [Hampton Dep. 56]. There is a discrepancy of several minutes between the time recorded by CMED and the time the hospital records receiving the patient. [Hampton Dep. 64:3-12; Rompot Dep. 67:4-11].  It is not recorded how much time was spent in removing the patient from the ambulance or whether time was spent checking his restraint in the parking lot. [Hampton Dep. 63:20-61:2].   Overall, the amount of time before hand-off to the hospital staff, when Burns was found  pulseless was from 7-8 minutes, but certainly more than 6 minutes.

37.     It is undisputed that in response to defense questioning, Dr. Stoy agreed that visual observation can be used to observe cyanosis, and that the pulse should be checked. [Stoy Dep. 125-7].  This is immaterial because these were a discussion <u>only</u> of the "visual observations that a paramedic can make." [Stoy Dep. 125:17-21].  There is no testimony whatsoever that the visual observations are sufficient, exclusive, or even significant.  Indeed, within that very part of his testimony, Dr. Stoy indicates the need for <u>proper</u> visual inspection for cyanosis, which involves examination of the lips. [Stoy Dep. 126:4-6].  And notes "But just rate and quality of the respirations is not going to demonstrate whether a patient necessarily is hypoxic or not." [Stoy

Dep. 126:11-20]. What "can" be done and what is "adequate" or "proper" are vastly different, and the first is both irrelevant and immaterial to the issues in this case and this Motion.

### (4) UNDISPUTED IMMATERIAL FACTS:

Pursuant to Local Rule 7(D)(2)(b)(4), Plaintiff lists here by number Defendants' claimed material undisputed facts which are undisputed though believed to be immaterial, with reason.

7.      Sangamon County also dispatched the LifeStar ambulance crewed by Rompot and Guffey to the reported home invasion at 6:19 a.m., and pursuant to instructions from dispatch, the ambulance "staged" a short distance from the scene until the law enforcement officers had secured the scene.

> Comment: The actions of the ambulance prior to encountering the patient have no bearing on the claims or defenses. It is not disputed that the ambulance waited before approaching the scene, but there are argumentative notes here as to whether the scene was "secured" or the fact that CMED dispatched the trip, and none of that has bearing on this case.

10.      While there is no evidence to dispute the Deputy's description of events, it is immaterial to these issues as to whether Burns punched a deputy first or whether Deputies mishandled him. The instant motion regards what happened with the paramedics and it is undisputed that they knew there had been a physical altercation but were not present at all when it began. There is no point in raising this here other than to attempt to sway the Court as to how badly decedent acted.

22.      The locations, measured by inches, of each of the persons riding in the ambulance

is immaterial to any issue in the case, and is not relevant, material, nor relied on in the Motion for Summary Judgment.

23.     It is agreed that Dr. Stoy stated, to the degree that she was not involved in the care of this patient, he "has no criticisms of any of Paramedic Guffey's actions during the morning of January 23, 2010. (Stoy dep. 38 39)."   However, this has no relevance, let alone materiality, to any of the issues raised in the Motion for Summary judgment.  Ms. Guffy is not a party at this time.

33.     Undisputed but immaterial is the statement that Deputy Roderick had once been a "basic" EMT.  He was not qualified as an expert, his work as an EMT was temporary and over 10 years prior, and any licensing had expired.

36.     It is undisputed that Dr. Stoy listed, at request of defense counsel, that there were other possible reasons Burns became passive including (1) he was "wore out" because he had been "kicking and screaming and fighting" for fifteen to twenty minutes; (2) the illegal drugs he had reportedly taken might have been having an effect on him; (3) he could have had internal bleeding leading to hypovolemia; (4) he could have been diabetic; (5) he could have had difficulty breathing and became hypoxic. (Stoy dep. 114 15).  All of these are immaterial to the standard of care and the fact that several of these, and the additional one of hypoxia, required intervention immediately.  That there could have been other factors means nothing, and has not even been raised in defense.

## (5) ADDITIONAL MATERIAL FACTS:

Pursuant to Local Rule 7(D)(2)(b)(5), Plaintiff lists here additional facts material to the determinations in this case, with citation.

43.    In the ambulance, Burns suddenly became very passive, stopped speaking, stopped yelling, and stopped tensing his muscles. [Osmer Dep. 42:18-22].

44.    Rompot did not report the trauma that Burns had suffered when she called ahead to the hospital, and if she had, the hospital would have prepared a c-collar and backboard. [Retherford Dep. 68:16-69:1].

45.    Rompot acknowledged that she lost control of the scene, and she should have had control of the patient. [Retherford Dep. 67:18-68:15; 64:6-12].

46.    The charge nurse of the receiving hospital, certified as a paramedic, told Rompot the patient should not have been on his stomach, that he should have had a c-collar and a backboard, and she should have radioed ahead that he was on his belly. [Retherford Dep. 68:5-15].

47.    The charge nurse at the hospital reported the improper transfer with the patient on his belly and no protected airway, without a c-collar and backboard to the EMS coordinator. [Retherford Dep. 64:13-24].

48.    EMT training includes training on keeping the airway open and to avoid transport of a patient on their belly. [Retherford Dep. 70:21-71:12].

49.    As Burns was wheeled into the emergency department desk, he was moaning with his head moving slightly up and down, and one of the persons walking with him put their hand on his head. [Retherford Dep. 73:2-9].

50.    Burns was heard moaning during the radio call from the ambulance to the hospital. [Retherford Dep. 13:7-9].

51.    Burns was not moving when being wheeled into the emergency department except

for moaning and trying to put his head up. [Retherford Dep. 16:19-23; 55:16-22].

52.     The ambulance was a block or two away from the hospital when Burns became silent, passive, and stopped tensing his muscles. [Osmer Dep. 63:9-16].

55.     The ambulance was equipped with blood pressure monitors, EKG, pulse oximeter, and none of them were used on Burns. [Hampton Dep. 57:2-60:2].

56.     The EKG leads could be placed on a patient's back. [Hampton Dep. 58:15-22].

57.     In the ambulance, Burns was irrational and unable to speak coherently. [Roderick Dep. 68:20-25]. The only thing he said at all was "drugs are bad, drugs are good." [Roderick Dep. 68:12-19].

58.     There is competent testimony a reasonable EMS provider would know that the change in Burns' status when he became passive in the ambulance was an indication that the lack of oxygen was reaching critical levels. [Stoy Dep. 128:9-129:6].

59.     The EMS providers here were obligated to assess the patient throughout the transfer to determine what is going on. [Stoy Dep. 131:2-12].

60.     Positional asphyxia takes place because of inadequate ability for the patient to breathe. [Stoy Dep. 138:9-11].

61.     Rompot failed to adequately or properly reassess Burns when he had a change in status. [Stoy Dep. 138:15-25].

62:     The EMS protocols applicable here require the EMS provider to assess behavioral changes considering hypoxia, and this was not done. [Stoy Dep. 140:24-142:3].

63.     The EMS protocols applicable here require the EMS provider to provide oxygen, assisted ventilations, or other treatment, which would have been needed if the assessment had

been done, but were not provided. [Stoy Dep. 144:3-145:22].

64.    A nurse began putting a blood pressure cuff on Burns as soon as he was transferred to the hospital bed. [Roderick Dep. 52:23-25].

65.    The nurse putting on the blood pressure cuff reported could not get a pulse. [Roderick Dep. 53:1-9].

66.    After it was determined Burns had no pulse, it still took some time for the deputies to remove the handcuffs which had been damaged in the arrest struggle. [Roderick Dep. 54:10-16].

67.    The paramedics have control and are responsible for the health of their patient. [Dr. Stoy Dep. 76:17-23].

68.    The paramedics cannot - and did not delegate the control of the patient to the deputies. [Dr. Stoy Dep. 77:19-25].

69.    Once Burns was on the stretcher, he became Defendant's patient. [Rompot Dep. 31:10-19].

70.    Paramedics particularly know that prisoner/patients that are  hogtied definitely are more likely to result in the demise of their life contributed to by positional asphyxia, because of just the physiology of the diaphragm and the other components.  [Dr.Stoy Dep. 82-3].

71.    Rompot was not seen physically checking Burns' vital signs. [Osmer Dep. 42:4-7; 46:6-10].

72.    No paramedic, nor anyone, checked Burns' vital signs unloading or while wheeling him into the hospital. [Roderick Dep. 51:17-52:3; Osmer Dep. 49:17-21].

73.    It takes several minutes to unload a patient and get them into the hospital from

there. [Retherford Dep. 30:2-12].

74.     Rompot was observed not doing anything to check on Burns other than talk to him and observe. [Osmer Dep. 41:21-42:7], and at the point Burns became passive, Osmer did not see her touch or check any vital signs. [Osmer Dep. 44:23-45:4].

75.     John Ralston, MD, has dealt with hypoxia due to positional asphyxia or restraint. [Ralston Dep.(1) p. 44].

76.     Positional asphyxia in compromised or impaired patients, particularly with excited delirium, is a well known contribution to death. [Ralston Dep. 43:15-44:24; Stoy Dep. 82:21-83:6].

## ARGUMENT

**A.     DEFENDANT'S MOTION SHOULD BE DENIED BECAUSE PLAINTIFF HAS PRESENTED PROPER AND SUFFICIENT ADMISSIBLE TESTIMONY WITH REGARD TO BOTH CAUSATION AND THE ALLOWABLE TESTIMONY ON THE STANDARD OF CARE; BECAUSE DEFENDANT HAS ONLY PRESENTED ITS CLOSING ARGUMENT AND NOT THE FACTS SUPPORTING THE NON-MOVING PARTY'S CASE; AND BECAUSE DEFENDANT HAS NO LEGAL FOUNDATION WHATSOEVER FOR ITS ARGUMENT THAT AN EXPERT MEDICAL WITNESS CAN PRESENT TESTIMONY ON THE WILLFUL OR WANTON NATURE OF THE CASE.**

Unfortunately, Section "A" of Defendant's argument reflects a growing trend in legal argument, that is, throwing a number of varied legal arguments together, citation to authority not at all on point, and hoping that the overall spirit of the issue will spur the Court to pick out

something.  There appear to be a number of issues lumped together here, and most can be addressed summarily and easily.

First, within this section, Defendant argues that if this Court strikes Plaintiff's two medical professional witnesses, then Defendant is entitled to its Summary Judgment.  That is, essentially and obviously, correct, though not for many of the reasons cited.  Clearly if the separate Motions to strike the testimony of Dr. John Ralson and of Dr. Walter Stoy are both sustained, Plaintiff will not have the requisite standard of care testimony in what is essentially a medical negligence claim (Dr. Stoy being the standard of care witness), nor the medical causation testimony in a disputed cause of death case (Dr. Ralston being the causation witness).  It would be wasteful to debate that point.  The Motions to Strike are poorly taken, lack proper support, and are addressed separately in Plaintiff's responses to each, filed simultaneously herewith, and the same are incorporated here by reference.  For some reason, Defendant LifeStar fails to cite any authority in support of this section.  As such, this Court should at a minimum strike the arguments in Section A.


**II.     THE COUNTS AGAINST LIFESTAR AMBULANCE SERVICE, INC. ARE PROPERLY PLEADED AS INCLUDING WILLFUL AND/OR WANTON BEHAVIOR, THERE ARE SUFFICIENT FACTS TO PRESENT TO THE JURY ON THAT ISSUE, AND THE DETERMINATION OF THAT ISSUE IS FOR THE JURY, NOT EXPERT WITNESSES**.

Defendant further argues that the Illinois Emergency Medical Services Systems Act ("EMS Act") 210 ILCS 50/3.150 cloaks Defendant Lifestar with immunity.  Defendant is

incorrect, and has failed to provide this Court with sufficient showing that "no possible set of facts" exists to establish Lifestar's liability.

However, Defendant blatantly errs and over-reaches in making its argument to this Court that expert testimony is required to specifically state that the acts or omissions of Defendant through its staff were "willful and wanton." [LifeStar MSJ, p.16, 28]. That is simply improper. Defendant cites not a single case to support this proposition, and ignores the volume of case law in the federal courts and in Illinois which say or suggest that such testimony would not even be allowed, as invading the province of, and suggesting a legal conclusion to, the jury.

While Defendant Lifestar is correct that under applicable Illinois law, Plaintiff must prove to the jury that Lifestar's[1] acts or omissions rose to a willful and wanton level, the actual authority on this point indicates this is wholly a fact determination, given all of the circumstances, for the jury and not a subject for medical expert testimony.

Indeed, in the case most discussed by Defendant, *Fagocki v. Algonquin/Lake In The Hills Fire Protection District*, 496 F.3d 623 (7th Cir. 2007), the Seventh Circuit spent the major portion of the opinion discussing - without resolution - the difficulty in determining exactly what the "willful and wanton" standard of the EMS Act means.

"So Illinois has decided to restrike the balance by exempting licensed providers of emergency medical treatment from liability for negligence. They remain liable if they are "willful and wanton," but what does that doublet mean? The definitions in the Illinois cases are not very helpful, in part because general statements often

_____

[1] For all purposes, Defendant Lifestar or "Lifestar" is intended to refer to the company and its staff, including Defendants Rompot and Guffey. Unless reference to specific acts by these employees is made, their names will not be continually set out.

make a poor match with specific facts and in part because the definitions are not

uniform." *Fagocki*, 496 F.3d at 627.

Judge Posner, in *Fagocki*, then recited numerous Illinois cases interpreting the term "willful and

wanton" as everything from a deliberate infliction of unreasonable risk of harm, to simple "gross

negligence." *Fagocki*, 496 F.3d at 627.  And specifically, the *Fagocki* court then reviewed the

specific Illinois holdings on what constitutes "willful and wanton" liability as to paramedics,

noting that two "failed-intubation" cases cited the higher standards, but three other cases held the

paramedics were liable where the defendants knew of a possible danger but acted in disregard of

the same.  *Id.*   While this discussion is supportive of the claims of Plaintiff in this case,[2]

---

[2] In *American National Bank & Trust Co. v. City of Chicago*, 192 Ill.2d 274, 735 N.E.2d

551 (Ill.,2000) paramedics were held liable for walking away after knocking on the door of a

woman who had called 911 reporting  she was having an asthmatic attack and thought she was

dying. The door was unlocked, but they had not bothered to turn the doorknob. She died. In

*Prowell v. Loretto Hospital*, 339 Ill.App.3d 817, 274 Ill.Dec. 850, 791 N.E.2d 1261, 1262

(2003), summary judgment for the defendant was reversed because of evidence that the

paramedics "knew that [the plaintiff's decedent, killed when the stretcher she was on collapsed]

was not secured to the stretcher, that the stretcher's legs were not locked, that the [paramedics]

placed the stretcher on a pothole, making it highly unstable, and that, despite their knowledge of

the instability of the stretcher, [they] did not maintain physical contact with the stretcher." In

*Kirwan v. Lincolnshire-Riverwoods Fire Protection District*, 349 Ill.App.3d 150, 811 N.E.2d

1259 (Ill.App. 2 Dist.,2004), allegations that paramedics had knowledge "that decedent was

having difficulty breathing and her throat was closing due to an allergic reaction, and despite

including cases where clearly the paramedics simply used bad judgment in potentially fatal circumstances, it is not the sole reason why Defendant's argument is disingenuous.  In **none** of the cases cited in *Fagocki*, nor in that case, is there any cited testimony by any expert as to the acts or omissions being "willful and wanton."

This is because <u>no</u> medical expert is, in general, competent to testify as to the willful and wanton standard, but this is a matter for the jury given all evidence of the circumstances. "Whether willful and wanton conduct has been committed in any given case requires close scrutiny of the facts as disclosed by the evidence." *Kirwan*, 811 N.E.2d at 1264.  "Thus, "[u]nder the facts of one case, willful and wanton misconduct may be only degrees more than ordinary negligence, while under the facts of another case, willful and wanton acts may be only degrees less than intentional wrongdoing." *Ziarko v. Soo Line R.R. Co.*, 161 Ill.2d 267, 275, 204 Ill.Dec. 178, 641 N.E.2d 402 (1994). " <u>Whether a defendant's breach of a legal duty amounts to willful and wanton conduct is ordinarily a question of fact</u>." *Calloway v. Kinkelaar*, 168 Ill.2d 312, 326, 213 Ill.Dec. 675, 659 N.E.2d 1322 (1995).

The federal courts have held that testimony that "seeks to direct the result in the case" is inadmissible because it is detrimental to the trial process." *Specht v Jensen,* 853 F.2d 805 (10th Cir. 1988).  An expert's testimony that an act was "willful or wanton" would be improper because it "impermissibly seeks to direct the result in this case." *Specht*, 853 F.2d at 808; see *Smith v. Colorado Interstate Gas Co.*, 794 F.Supp. 1035, 1044 (D.Colo.,1992).  In *Smith*, the

---

their training and standard operating procedures and accepted emergency practices, they waited between seven and eight minutes to administer two of the necessary medications and never administered the third," were sufficient to show conscious disregard for another's safety.

court barred an expert from testifying that the reason for the defendant's actions were based on race and gender discrimination, because such testimony would be attempting to direct the jury as to how to rule. *Id.*   Such testimony falls outside of the allowable scope of Fed. Rule of Evidence 702 and 704.   Barring a witness from testifying that defendant's actions were "manipulative", the Second Circuit observed "The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions.... Thus the question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution would be allowed. *U.S. v. Scop*, 846 F.2d 135, 140 (2ⁿᵈ Cir. 1988) citing McCormick § 12 Fed.R.Evid. 704 advisory committee's note.

Further, the Northern District of this very Court has dealt with and rejected the proposition that an expert is needed to testify as to "willful and wanton" behavior. *Robinson v Thomas, M.D.*, 1995 WL 608525, p.4 (N.D.Ill 1995).   As noted there, "The question of whether a defendant is liable for willful and wanton behavior is usually a question for the jury", and rejecting the need for expert opinion on the same, that Court reviewed the facts that might be considered at trial. *Id.* at p.5.

Plaintiff's have presented before the Court, by Defendant's own admission, evidence of the breach of the standard of care by Defendant through Dr. Stoy, a fully qualified expert in the field of paramedic practice and training. [Def. MSJ p. 3, and discussion in Plaintiff's Response to Motion to Strike].   That is what is required under Illinois law, and it is the limit of what a medical expert may testify upon.

Therefore, the only remaining argument raised is Defendant's assertion that no reasonable

jury could find "willful and wanton" conduct under the facts of this case. This Court should first note that the "facts" upon which Defendant relies are those supporting its defenses, many of which are set forth in an argumentative manner. Defendant fails to cite the facts supporting Plaintiff's case.

### Sufficiency of the Evidence

The Illinois courts hold: "The determination of this issue is generally a question of fact for the jury to decide." *Boyd v Bulala*, 877 F.2d 1191, 1198 (4th Cir. 1989), citing *Oelze v. Score Sports Venture, LLC,* 401 Ill.App.3d 110, 123, 339 Ill.Dec. 596, 927 N.E.2d 137 (2010). In Illinois, a plaintiff's burden of proof for willful and wanton misconduct requires that the "plaintiff establish that the defendant[s] had knowledge of a situation requiring due care to avert injury, the ability to avoid the harm, and an omission to use care and diligence to avert the harm." *Ferguson v. Kasbohm,* 131 Ill. App. 3d 424, 429 (1st Dist. 1985).

However, a sufficient showing of wilful and wanton misconduct has been found where there is **"a failure after knowledge of impending danger, to exercise ordinary care to prevent [injury or harm] or a failure to discover the danger through recklessness or carelessness when it could have been discovered by ordinary care."** *Jackson v. Chicago Board of Education,* 192 Ill. App. 3d 1093, 1100 (1st Dist. 1989) (quoting *Lynch v. Board of Education, Collinsville Community Unit School District 10,* 82 Ill. 2d 415, 429 (1980)); *see also Beasley v. St. Mary's Hospital of Centralia,* 200 Ill. App. 3d 1024, 1036 (5th Dist.) *cert. denied,* 135 Ill. 2d 554 (1990); *Koh v. Village Greens,* 158 Ill. App. 3d 226, 231 (2d Dist. 1987). *Robinson v Thomas, M.D.*, 1995 WL 608525, p.5 (N.D.Ill 1995).

Defendant argues that there is a "lack of evidence in the record to support a finding that the actions of the LifeStar paramedics constituted "willful and wanton" misconduct." [Def. MSJ p.17]. Defendant then proceeds with 15 more pages of what amount to closing argument. Defendant does not dispute that this patient was transported, by Defendant's paramedics, in a hogtied position, prone, with his weight on his chest and belly. Defendant does not dispute that the paramedics knew decedent was in that position before being placed in the ambulance, nor that they had responsibility for controlling the situation and the care of their patient at that point. Defendant acknowledges that its paramedics had actual and specific knowledge that decedent had been "tazered" many times- over 20- and would be exhausted by his excitation, fighting with police, and the extreme cold along with his lack of adequate clothing. Defendant acknowledges that the trip to the hospital took at least 6 minutes with their patient in this position, and although not noted in Defendant's facts, an additional amount of time was spent getting decedent out of the ambulance and set up in the parking lot outside the hospital, and this time is not even recorded. Defendant cannot dispute that no efforts were made to warm decedent, nor to stabilize him during transport. Defendant does not dispute that decedent was then wheeled into the Emergency Department still prone (face down) and still hogtied, and up to that point without any mechanical or direct monitoring of oxygen level or heart rate. Defendant does not dispute (and likewise did not note in its facts) that during transport into the E.D., an officer walking alongside decedent pushed his head down to the gurney. Defendant does not dispute that almost immediately upon transfer of care to the hospital nurses it was noted that decedent was not breathing and had no pulse.

It is not Plaintiff's position that there is no possible argument in defense of these claims.

However, that is not at all the standard to be applied when asking for summary judgment.
Indeed, the only argument made by Defendant is that this Court should determine itself the
weight to give each of the relevant facts, and determine itself whether the "defendant[s] had
knowledge of a situation requiring due care to avert injury, the ability to avoid the harm, and an
omission to use care and diligence to avert the harm." *Ferguson,* 131 Ill. App. 3d at 429. The
standard of course is whether "there is no genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law. " Fed.R.Civ. Pro. 56(a). This must be done construing
all facts and drawing all reasonable inferences in the light most favorable to plaintiffs (the
non-moving party). *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (C.A.7 (Ill.)
2014). Defendant's argument stands this standard asks the Court to assume all reasonable
inferences only in Defendant's favor, standing the process on its head.

      The facts, and reasonable inference therefrom, are these: Defendant's paramedics knew
first hand and accurately that their patient was exhausted, impaired, and at very high risk in his
condition. They knew this specifically because they saw and were told at the scene that their
patient (decedent) was in a roadside ditch, bleeding from both arms, and was intoxicated by one
or more substances. [LifeStar MSJ p.20, citing Osmer Dep. 21; Roderick Dep. 15]. Defendant
knew that decedent had just engaged in a "prolonged struggle" with multiple police, was "tazed
multiple times" before being subdued and hogtied with handcuffs. [LifeStar MSJ. 20, citing
Osmer Dep. 22-34; Roderick Dep. 16-39; Rompot Dep.48-49]. The paramedics saw decedent
with an officers knee on his back. [" Q...You did see an officer with his knee on Mr. Burns's
back to hold him down. Right? A. Yes. Like I said, I don't know if it was to hold him down. I
saw that position." Rompot Dep. Exh.1. 29:22-30:2] The paramedic notes a concern that it was a

cold January day with snow on the ground and decedent was near naked. [Rompot Dep. 17:10-21].  Defendant's paramedics knew they had responsibility for the patient, but allowed the deputies who had just fought with decedent to take control and place decedent on his belly and chest with hands and feet locked behind him. [" He was secured in a position with his hands  and his feet cuffed and intertwined in a quote, hogtied position. There would be no way that he would be able to probably really pull his hands away from his ankles the way they were secured." Rompot Dep. 28:10-14, Exh. 1].

The paramedics knew firsthand that the patient was not responding to pain stimuli. [Rompot Dep. 42; "Q.   Unless I misunderstood what you said, he didn't alter his behavior at all when he was tazed.  A.   Correct."].  Defendant's supervisor had the paramedic revise her report afterward to alter the statement that decedent's face was "in the mud" which is what she had originally reported. [Rompot Dep. 45].  Defendant's paramedics were aware of injuries to decedent's ribs, back, and head, as well as lacerations to the feet and ankles. [Rompot Dep. 52, 53 and Transport Report, Exhibit 1 to said Dep.].  Defendant's paramedic admitted that she "lost control of the scene," allowing the deputies to determine the transport method. [Rompot Dep. 50-51; Retherford Dep. 64].

Defendant's paramedic saw that her patient calmed suddenly, his muscles relaxed and he stopped acting out as the ambulance approached the hospital. [Rompot Dep. 54:11-23]. Decedent had become quiet by the time they entered the E.R. [Rompot Dep. 58:6-10]. Defendant's paramedic did not report the trauma or injuries to the hospital ahead of time. [Rompot Dep. 78].  The experienced charge nurse at the hospital recognized that patients should not be transported to the ER "on their stomach and no airway." [Retherford Dep. 64:9-20].  The

charge nurse at the ER testified that any patient who had been in an altercation must have a backboard and c-collar, and this patient did not. [Retherford Dep. 64:20-24]. Defendant Rompot was upset that she lost control of the patient, and he should not have been on his stomach. [Retherford Dep. 68]. If the trauma had been called in, more steps would have been taken before the patient arrived. [Retherford Dep. 68]. The E.R. charge nurse was concerned enough to call the EMS coordinator to report the improper handling of this patient. [Retherford Dep. 69]. The charge nurse was EMT trained and knows they are required to protect the airway and not transport on the belly. [Retherford Dep. 70-71]. Decedent was observed moaning and tried to move his head, but was held down. [Retherford Dep. 55, 73].

There are an additional 6 to 7 minutes from the time the ambulance arrived to the time the paramedics delivered the decedent to triage that are unexplained. [Retherford Dep. 33-34]. The decedent is recorded as having "coded" about one minute after arrival. [Retherford Dep. 42].

The entire argument of Defendant here is over whether any reasonable interpretation of the facts could be construed as willful and wanton conduct. Thus, the issue of whether Defendant's conduct was negligent is assumed. (As Defendant puts it, the negligence issue is "irrelevant." [MSJ p. 16]). Nevertheless, it is significant to note that Dr. Ralston has testified that he has personally observed positional asphyxia deaths from restraint, as well as having documented the same in the medical literature. [Ralston Dep. 44]. His testimony, as a pathologist, is that Plaintiff's decedent died as a result of the effects of asphyxia. Dr. Walter Stoy has testified that the failure to adequately assess this patient during the transfer was negligent and deprived the patient from the opportunity to obtain life supporting treatment. [Stoy Dep. 138]. Dr. Stoy also noted the paramedic's failure to follow the applicable protocols. [Stoy

Dep. 141].  It is established in the testimony that the standard of care required, and the protocol

in effect required, to secure and maintain an airway, and to provide adequate oxygenation. [Stoy

Dep. 142-143].  It is also admitted by Defendant that they did not do this.  The failure to assess,

for whatever reason, contributed to cause this patient's death. [Stoy Dep.151].

There should be no dispute that it is the Illinois courts who define the breadth and scope

of the EMS Act.   In *Kirwan v. Lincolnshire-Riverwoods Fire Protection Dist.*, 349 Ill.App.3d

150, 811 N.E.2d 1259 (Ill.App. 2 Dist.,2004) the Illinois courts found that almost exactly the

same  acts or omissions alleged herein to be sufficient to reach the jury under remarkably similar

circumstances.

As observed in *Kirwan*, In Illinois there are two varieties of willful and wanton conduct,

intentional and reckless.  *Kirwan,* 349 Ill.App.3d at 155, citing  *Poole v. City of Rolling

Meadows*, 167 Ill.2d 41, 48, 212 Ill.Dec. 171, 656 N.E.2d 768 (1995). These two types of willful

and wanton conduct are distinguished by the actor's mental state. *Id.*

Although reckless willful and wanton conduct is not committed intentionally, it is

nonetheless, at least in theory, determined based on the actor's "real or supposed

state of mind." W. Keeton, Prosser & Keeton on Torts § 34, at 212 (5th ed.1984).

Specifically, both the legislature and the supreme court have defined reckless

willful and wanton conduct as conduct committed with "utter indifference" to or

"conscious disregard" for the safety of others. 745 ILCS 10/1–210 (West 2002);

*Pfister v. Shusta*, 167 Ill.2d 417, 421, 212 Ill.Dec. 668, 657 N.E.2d 1013 (1995).

The supreme court has also described the required mental state as a "reckless

disregard" for the safety of others. *American National Bank & Trust Co. v. City of*

*Chicago*, 192 Ill.2d 274, 285, 248 Ill.Dec. 900, 735 N.E.2d 551 (2000). Further,

**"[i]ll will is not a necessary element of a wanton act [ i.e., reckless willful and**

**wanton conduct]. To constitute an act wanton, the party doing the act or**

**failing to act must be conscious of his conduct, and, though having no intent**

**to injure, must be conscious, from his knowledge of the surrounding**

**circumstances and existing conditions, that his conduct will naturally and**

**probably result in injury."** *Bartolucci v. Falleti*, 382 Ill. 168, 174, 46 N.E.2d

980 (1943). It is reckless willful and wanton conduct that is at issue in this case.

[*Kirwan*, 349 Ill.App.3d at 155].  Just as in Kirwan, the matter before this Court involves <u>not</u> the

intentional harm to a patient, but rather the awareness based on the existing conditions that the

conduct of the Defendants would naturally and probably result in injury.

The Illinois Supreme Court has provided two examples, at least, of conduct from which

"reckless disregard" can be inferred, and both are applicable here.  The first is  **"a failure, after**

**knowledge of impending danger, to exercise ordinary care to prevent it."**  *American*

*National Bank,* 192 Ill.2d at 285, 248 Ill.Dec. 900, 735 N.E.2d 551. The second is  **"a failure to**

**discover [a] danger through recklessness or carelessness when it could have been**

**discovered by the exercise of ordinary care."**  *American National Bank*, 192 Ill.2d at 285, 248

Ill.Dec. 900, 735 N.E.2d 551.  Notably, whether a defendant's breach of a legal duty amounts to

willful and wanton conduct is  a question of fact for the jury in Illinois, not a question of law.

*Calloway v. Kinkelaar*, 168 Ill.2d 312, 326, 213 Ill.Dec. 675, 659 N.E.2d 1322 (1995).

Interpreting this standard, the *Kirwan* court looked at very similar facts and found them

sufficient to go to the jury for determination.  In *Kirwan,* the defendant paramedics were aware of

the patient's difficulty in breathing, and it was alleged that the paramedics knew for a period of time at least six minutes after their arrival that the patient was stable and could have been saved, but that they failed to monitor and administer care until only seven minutes later when it was alleged to have been too late. *Kirwan*, 811 N.E.2d at 1262. The *Kirwan* plaintiff alleged that the failure to administer care for those 7 minutes was "a violation of all applicable emergency medical standards of care and/or standard operating procedures and training" and was "indicative of an utter disregard of those standards and an utter indifference for the life of [decedent]." *Id.*

This case involves almost exactly the same allegation of a failure to recognize the obvious danger to the patient, and to administer care, over the same seven minute period of time (and perhaps more) - with the same resulting brain damage leading to death. Despite Defendant Lifestar's attempt to compare this matter with *Fagocki v. Algonquin/Lake In The Hills Fire Protection District*, 496 F.3d 623 (7th Cir. 2007), that case is readily distinguishable and was determined primarily on the factual issue of whether the failures of the paramedics would have made a difference *regardless of negligence*; that is to say, a causation issue and not primarily on the standard of care. In fact, the *Fagoki* court specifically set aside the issue of "willful and wanton, deciding the issue on causation alone. ["But the defendant can be liable only for the aggravation, and not for the consequences of the original injury-the consequences the victim would have suffered even if the defendant had committed no tort." *Fagocki*,496 F.3d at 629; "...we find no evidence that administering epinephrine at the first opportunity would have made a difference to Johnson's breathing.." *Id.;* "There is no evidence that that minute or two [for intubation] would have prevented her descent into a vegetative state." *Id.* ; Argument of plaintiff was "again skirting the issue of causation." *Id.* at 630.].

Clearly, one reasonable interpretation of the facts of <u>this</u> case is that the paramedic Defendants abandoned their duty almost entirely, allowing specifically prohibited or dangerous techniques in transport to be used and failing to put even the most basic monitoring protocols into place to assure oxygenation when a reasonable person should know that oxygenation is specifically what this patient required for life or brain function.  There are other reasonable interpretations, some which would invoke liability under the law and some which would not.  Choosing among those is not the role of this Court here.  Rather, acknowledging that there is <u>some</u> set of facts that would support <u>some</u> theory of liability under the law, allows this matter to proceed to a jury, as intended by our legal system.

**CONCLUSION**

WHEREFORE, for the reasons stated above, Plaintiff prays this Court DENY Defendant LifeStar and Defendant Rompot's Motion for Summary Judgment and allow this matter to proceed to trial, and for such other relief as this Court deems just and proper.

The Law Offices of David N. Damick


/s/ David N. Damick
David N. Damick, #06208797
One Metropolitan Square, Suite 2420
211 North Broadway
St. Louis, Missouri 63102-2733
TEL: (314) 231-0570
FAX: (314) 621-8639
dnd@damicklaw.com
Co-counsel for Plaintiff

OCHS & KLEIN, ATTORNEYS, P.C.

/s/ James C. Ochs
JAMES C. OCHS, ARDC #6141902
149 n. Meramec, 2nd Floor
Clayton, MO 63105
TEL: (314) 727-2111
FAX: (314) 727-2110
Co-Counsel for Plaintiff

<u>CERTIFICATE PURSUANT TO LOCAL RULE 7.1(B)</u>

The undersigned hereby certifies that the Argument section above complies with the type volume limitation in Local Rule 7.1(D)(5) in that according to the word and character count function of the word processor used (WordPerfect), the document contains 4398 words inclusive of all captions, titles and footnotes.

<u>        /s/ David Damick        </u>

<u>Certificate of Service</u>

The undersigned certifies on the 2nd day of March 2015,  I caused to be electronically

filed the foregoing document with the Clerk of the Court using the CM/ECF system, which by

rule shall serve by email the following counsel of record:

Thomas H, Wilson
thw@heplerbroom.com
Attorney for Defendant Lifestar

James C. Ochs
jochs@ochsklein.com
spd@ochsklein.com
Co-counsel for Plaintiff

Theresa M. Powell
Joseph N. Rupcich
tpowell@heylroyster.com
jrupcich@heylroyster.com
Counsel for Sangamon County


/s/ David Damick