IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ESTATE OF PATRICK BURNS, Deceased, by Richard Burns, Executor, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 11-cv-3020 |
| NEIL WILLIAMSON, as Sheriff of Sangamon County, Illinois, in his Official Capacity, LT. BRIAN BRESSAN, in both his Official Capacity and in his Individual Capacity; DEPUTY ANDREW BRASHEAR, in both his Official Capacity and in his Individual Capacity; DEPUTY MICHAEL HARTH, in both his Official Capacity and in his Individual Capacity; DEPUTY JOHN OSMER, in both his Official Capacity and in his Individual Capacity; DEPUTY TERRENCE RODERICK, in both his Official Capacity and in his Individual Capacity; UNIDENTIFITED SANAGAMON COUNTY DEPUTIES; SANAGAMON COUNTY; and LIFESTAR AMBULANCE SERVICES, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) | |

**<u>OPINION</u>**

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Page **1** of **19**

This matter comes before the Court on Defendants' Joint Motion to Bar Opinion Testimony of Dr. John Ralston Pursuant to Federal Rule of Evidence 702 (d/e 143) (Motion 143); Defendant Lifestar Ambulance Service, Inc.'s (Lifestar) Motion to Bar Opinion Testimony of Walt A. Stoy, Ph.D., Pursuant to Federal rule of Evidence 702 (Motion 145); and Defendants' Motion for Evidentiary Hearing on Joint Motion to Bar Testimony of John Ralston, M.D. (d/e 175) (Motion 175). The parties consented to have this matter proceed before a United States Magistrate Judge. <u>Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered June 13, 2014 (d/e 133)</u>.

The Defendants ask for an evidentiary hearing in Motion 175 because Plaintiff Estate of Patrick Burns (Estate) submitted published scientific articles to oppose Motion 143 which the Estate's expert Dr. John Ralston, M.D., did not identify as a basis for his expert opinions. The Defendants ask for an evidentiary hearing to examine Dr. Ralston about these published authorities "if the Court intends to consider" those authorities in resolving Motion 143. Motion 175, ¶ 6. The Court will not consider these published authorities in resolving Motion 143. Therefore, Motion 175 is MOOT.

For the reasons set forth below, Motions 143 and 145 are DENIED.

BACKGROUND

The Estate brings this action against former Sangamon County, Illinois, Sheriff Neil Williamson; Officers of Sangamon County, Illinois, Sheriff's Department (Department), and Lifestar. The action arises from an incident on January 23, 2010, and the subsequent death of Patrick Burns (Burns) on January 28, 2010. Second Amended Complaint (d/e 47) (Complaint).

On January 23, 2010, Department Deputy Sheriffs (Deputies) responded to a report of a home invasion at 1401 North Wesley, Springfield, Illinois. The dispatcher advised Deputies that an unknown male was trying to force his way into the residence. The person was described as a white male who was inappropriately dressed, wearing only a t-shirt and underwear. When the Deputies arrived, Burns was sitting in a ditch by the side of the road wearing only a t-shirt and underwear. The temperature was 38° F at the time. Burns was injured. Burns told the Deputies that he had been drinking alcohol, smoking crack cocaine and marijuana, and taking Prozac and/or Wellbutrin. Defendants' Summary Judgment Exhibits (d/e 148), Exhibit 8, Deposition of John Osmer (Osmer Deposition), at 21; and Exhibit 7, Deposition of Terry Roderick (Roderick Deposition), at 18-19.

One of the Deputies tried to take photographs of Burns' injuries. Burns became violent and attacked the Deputies. Burns punched one of the Deputies

in the stomach. The Deputies tried to subdue Burns, but he kept fighting and trying to get away. The Deputies used Tasers multiple times on Burns and ultimately restrained him with handcuffs in a hogtie position. Burns continued writhing and spinning on the street even after being hogtied. Osmer Deposition, at 22, 25-27; Roderick Deposition, at 16, 19-20, 30-31, 40.

Lifestar personnel Emergency Medical Technician (EMT)-Paramedic Jamie Rompot and EMT Barbara Guffey (now Hampton) arrived at the scene in an ambulance. Once Burns was hogtied, the Deputies put Burns onto a Lifestar ambulance stretcher and strapped him to the stretcher. Burns kept writhing and fighting. He was placed in a prone position or semi-prone position with his head turned to one side. Burns kept fighting and resisting. See Osmer Deposition, at 35-36; Roderick Deposition, 41-42; Defendants' Summary Judgment Exhibits (d/e 148), Exhibit 4, Deposition of Jamie Rompot (Rompot Deposition), at 31-32.

Lifestar personnel took Burns in the ambulance to a hospital emergency room. Defendant Deputy Sheriffs John Osmer and Terrence Roderick rode in the back of the ambulance with Burns and EMT Rompot. EMT Guffey drove the ambulance. Rompot did not put any monitors on Burns because he continued to writhe, speak incoherently, spit, and resist his restraints. Osmer Deposition, at 37; Defendants' Summary Judgment Exhibits (d/e 148), Exhibit 5, Deposition of Barbara Hampton (Hampton Deposition), at 43, 47. Rompot took Burns' pulse

and timed his respiration at the beginning of the transport. Rompot reported that Burns was breathing at a rate of 20 breaths per minute, and that his pulse was 120 beats per minute. During the trip, Rompot checked on Burns' airway and determined that he was breathing, and Rompot also checked to confirm that Burns had a pulse. Osmer Deposition, 41-42, 63.

About one minute before the ambulance arrived at the emergency room, Burns became passive and stopped speaking, yelling, and tensing his muscles. Osmer Deposition, at 42. Rompot testified that she checked after Burns became passive and determined that Burns was breathing, had a pulse, and his eyes were equal and reactive. Rompot Deposition, at 54-56. Roderick testified that Rompot looked at Burns' face to determine whether Burns was breathing. Roderick Deposition, at 47. Roderick also testified that Burns had an open airway and was breathing at this time. Roderick Deposition, at 60-61, 64, 69. Osmer testified that during the last minute of the ride Rompot checked that Burns was breathing, but he did not see Rompot touch Burns. Osmer Deposition, at 47.

Once at the emergency room, Burns was wheeled out of the ambulance. Burns was still hogtied, strapped to the stretcher in a prone, or semi-prone, position on his stomach. The emergency room charge nurse Elizabeth Retherford observed that Burns was moaning, rolling, and moving his head

slightly up and down.  Plaintiff's Summary Judgment Exhibits II (d/e 174), Exhibit 2, Deposition of Betty Retherford (now Stewart) (Retherford Deposition), at 16, 55, 73.  According to Retherford, one or more persons put their hands on Burns to steady him.  Retherford Deposition, at 73.  Hampton testified that Burns was still breathing, was moving, and had good color.  Hampton Deposition, at 95.  Burns was taken into ER Room 16.

Once in Room 16, Burns was transferred from the ambulance stretcher to a hospital stretcher.[1]  According to Retherford, Burns became still while he was being transferred from the ambulance stretcher to the hospital stretcher. Retherford Deposition, at 21. Burns was not breathing.  Hospital personnel called a code; Burns had gone into cardiac arrest.  The handcuffs were removed, and hospital emergency room personnel resuscitated Burns and placed him on life support, but he never regained consciousness.  Retherford Deposition, at 20-21, 36; Roderick Deposition, at 54; Osmer Deposition, at 52.  Burns died on January 28, 2010.

Dr. Jessica H. Bowman, M.D., performed an autopsy on behalf of Sangamon County, Illinois' Coroner's Office.  Dr. Bowman noted that the hospital testing autopsy showed the presence of cocaine, marijuana, Prozac, and Wellbutrin in Burns' system.  Dr. Bowman opined that Burns died of excited

---

[1] Some witnesses characterized the stretcher as a hospital bed.  See e.g., Rompot Deposition, at 57.

delirium due to cocaine abuse.  Defendants' Summary Judgment Exhibits (d/e 148), Sangamon County Coroner's Autopsy Report No. CC-26-10 dated March 17, 2010, at 1-2.

The Estate disclosed Dr. Ralston as its medical expert witness. Dr. Ralston is a pathologist.  Dr. Ralston performed a second autopsy on Burns. Dr. Ralston opined that Burns' death was "due to anoxic brain injury due to restraint in a prone position while hogtied." Defendants' Summary Judgment Exhibits (d/e 148), Exhibit 1, Deposition of John W. Ralston, M.D., dated November 28, 2012 (Ralston Deposition I), attached Deposition Exhibit 2, Report of Postmortem Examination of Patrick Burns dated August 20, 2010.

At his depositions, Dr. Ralston testified that Burns died from an anoxic brain injury caused by a lack of oxygen to the brain. Ralston Deposition I, at 26-27.  Dr. Ralston opined hogtying a person and placing such a person face down will cause interference with the person's ability to breathe.  Dr. Ralston opined that this positional interference in breathing would be aggravated if the person was in a weakened condition.  Ralston Deposition I, at 49-52.  In this case, Burns was weakened physically by drugs, the lack of clothing in cold temperatures, shocks from the Tasers, and the struggle with the officers.  Dr. Ralston opined that the combination of the drugs and alcohol, the cold weather, the struggle with the officers, the shocks from the Tasers, and the restriction on his ability to

breathe caused by the hogtying and placement in a prone position all contributed to causing Burns' death.  Dr. Ralston opined that these factors caused Burns to suffer either: (1) a cardiac arrest which caused the lack of oxygen to the brain, and the resulting anoxic brain injury; or (2) a lack of oxygen to the brain which caused the anoxic brain injury and the resulting cardiac arrest.  See Ralston Deposition I, 52-58, 75-84, 120-24, 134-35.  Dr. Ralston testified that he could not tell which came first, the anoxic brain injury or the cardiac arrest.  Ralston Deposition I, at 26-27, 65.

     Defense counsel examined Dr. Ralston at his depositions about the basis for his opinion that hogtying a person and then placing the person face-down can cause asphyxiation.  Dr. Ralston testified that a person in a hogtied, prone position experiences pressure on his chest which does not allow the person to use his chest muscles to inhale and exhale.
Dr. Ralston testified that he has had experience with a person who suffered from similar positional asphyxiation; however, the person was not hogtied, but was at the bottom of a "dogpile" of individuals.  Ralston Deposition I, at 45.  Dr. Ralston also testified that he had experience with persons who have been hogtied, but had not previously seen a case in which a person suffered both hogtying and positional asphyxiation.  Ralston Deposition I, at 41-42, 46-47.

Dr. Ralston cited some scientific literature that supported his opinion that hogtying and placing a person in a face-down position can cause positional asphyxiation. He cited a study by a Dr. Reay. He testified that Dr. Reay had admitted that some of his conclusions were wrong. Ralston Deposition I, at 46. He also cited a treatise on forensic pathology, Medicolegal Investigation of Death, by Werner Spitz (Spitz Reference Book). Dr. Ralston characterized Spitz Reference Book as the "gold standard" in the field. Ralston Deposition I, at 46.

The Spitz Reference Book stated that positional asphyxia "occurs when the head and neck are turned or situated so as to obstruct the upper airway, and the reflex drive to right the head is dulled by intoxication, concussion, or neurologic disease." Plaintiff's Summary Judgment Exhibits I (d/e 172), Exhibit 3, Spitz Reference Book, at 443. The Spitz Reference Book further stated that deaths while in restraints in a prone position "occur from time to time in the course of police arrests. . . . Such situations usually involve young or middle-aged individuals, many times overweight, psychotic or under the influence of drugs." Spitz Reference Book, at 830. The Spitz Reference Book stated that a hogtie or hobble device is sometimes used to subdue a person in a face down, or prone, position. The Spitz Reference Book stated that the individual subdued in this manner is often held down with some force applied to his back in order to put the

person in the hogtie position.  The Spitz Reference Book opined that this type of restraint can interfere with breathing and result in a cardiac event:

> [P]inning down the shoulders or forcefully pressing down the arms is equivalent to *loading* the back.  A struggling, agitated individual breathes faster, has a faster heart beat, elevated blood pressure, and heightened metabolism.  Such an individual requires more air and more oxygen.  Immobilization of the chest, even if only partially reducing the ability to maintain vital functions, culminates in cardiac arrhythmia.

Spitz Reference Book, at 833 (emphasis in the original).

Dr. Ralston testified that he had not conducted any independent research on the question of positional asphyxiation.  Defendants' Summary Judgment exhibits (d/e 148), Exhibit 2, Deposition of John Ralston, M.D. dated February 28, 2014 (Ralston Deposition II), at 42.  Dr. Ralston further testified that he could not calculate (1) the amount of oxygen (calculated in liters per minute) an individual in Burns' position would need to live; (2) the amount of air Burns had to breathe to obtain the necessary amount of oxygen to live; and (3) the quantitative restriction on Burns' breathing due to his position and method of restraint.  Dr. Ralston testified that formulae existed to calculate these numbers, but he did not have a reference material available to look up the information.  Ralston also testified that several different variables would affect the calculations.  Ralston Deposition II, 26-30.

The Estate's second expert witness Dr. Walt Stoy, Ph.D., is an expert in emergency medicine. He opined, "The paramedics failed to follow applicable protocols and appropriately treat the patient, thereby failing to meet their standard of care with respect to providing emergency medical services to Patrick Burns." Defendants' Summary Judgment Exhibits, Exhibit 3, Deposition of Walter Stoy, Ph.D. (Stoy Deposition), attached Deposition Exhibit B, Expert Report of Walt A. Stoy, Ph.D., EMT-P (Stoy Report), at CM/ECF #148-4 page 70 of 72.[2] Dr. Stoy opined further,

> At the point the patient became passive, a reasonable EMS provider would know that he had likely been exhausted by his struggle, including a fight with law enforcement, being exposed almost naked in freezing weather, and by the heightened metabolic activity stimulated by drug use. At that point, with restraints holding his arms back, with legs pulling backward against his chest, and in even a modified prone position, it would be likely that the patient was not receiving adequate oxygenation to his blood, and the change in mental status and activity is a gross indicator that the lack of oxygen was reaching critical levels. While hands on monitoring may have been impractical before that point, simply looking at the patient's face would not have been an adequate way to determine his condition at the point of passivity. Had the patient been properly evaluated at that point or shortly thereafter, it is far more likely than not that it would have been determined that his blood oxygenation was inadequate and emergency measures would have been instituted. With that information, the Paramedic could have adjusted the patient's position, would have been able to provide supplemental oxygen by various delivery devices including that of manual bag value mask (BVM) ventilation to improve the effects of the positional stress, and could certainly have provided the proper information to the ED personnel so

---

[2] The Court is using the pagination from the Court's CM/ECF system because the pages of Dr. Stoy's report are not numbered.

    that resuscitation efforts or other measures would have been available and provided immediately by the hospital personnel.

Stoy Report, at CM/ECF #148-4 pages 71-72 of 72.  Dr. Stoy opined that, "Springfield Lifestar Ambulance and the EMS providers were negligent in the care and transportation and their actions contributed to his death." Stoy Report, at CM/ECF #148-4 page 72 of 72.

    Dr. Stoy at his deposition agreed with defense counsel that Rompot did not control how Burns was restrained because the Deputies hogtied him before she was allowed to arrive on the scene, and the Deputies kept Burns in the hogtied position.  See Stoy Deposition, at 67-68, 78-79. Dr. Stoy also testified that the standards of care protocols for EMTs did not discuss the position that a patient should be in for transport.  Stoy Deposition, at 82.  Dr. Stoy relied on Dr. Ralston's opinion that Burns' position caused positional asphyxia.  Stoy Deposition, at 83, 138.

    Dr. Stoy further stated that, based on available information, he did not have any criticisms of Rompot's actions while Burns was actively resisting his restraints during most of the ambulance ride.  Stoy Deposition, at 92.  Dr. Stoy opined that once Burns became quiet for the last minute of the ambulance ride, Rompot should have performed a more thorough assessment of Burns, rather than just visually determining that he was breathing.   Rompot should have determined if Burns was alert and oriented; if not, she should have determined if

he was responsive to pain.  She also should have assessed Burns' vital signs more thoroughly to assess matters such as pulse, respiration rate, and temperature.  Stoy Deposition, at 97, 108, 110-12.

Dr. Stoy testified that if Rompot would have done a more thorough assessment of Burns in the ambulance once Burns became passive, she would have learned that Burns was hypoxic and would have administered oxygen while still in the ambulance.  Stoy Deposition, at 135-36.

> If she would have determined that there was a change in the respiratory rate and quality and needed to intervene on that, whether it would be to any number of things:  One, simply supplement him with oxygen by a variety of devices that was, I assume, available to her on the EMS system that she works; or, if need be, even to intervene with a bag value mask, which I allude to in my report, to be able to bag the patient, and whether it's blow-by or an additional supplemental intervention of the ventilation and oxygenation of the patient.

Stoy Deposition, at 139.

Dr. Stoy stated that he did not have any criticisms of Hampton's actions. Stoy Deposition ,at 38-39.

## ANALYSIS

The Defendants jointly move to bar the expert opinion testimony of Dr. Ralston, and Lifestar moves to bar the expert opinion testimony of Dr. Stoy.  Expert opinion evidence is admissible if:

(a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)   the testimony is based on sufficient facts or data;

(c)   the testimony is the product of reliable principles and methods; and

(d)   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In applying this Rule, this Court performs a gate-keeping function to determine whether a party's proposed expert is qualified and whether his opinions have a proper basis and will assist the trier of fact.  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593 (1993).  An expert is not required to opine with complete certainty about causation; an expert opinion may assist the jury even if the expert validly opines that an action "could have been a contributing factor to a given outcome."  Gayton v. McCoy, 593 F.3d 610, 619 (7th Cir. 2010).

In this case, Dr. Ralston's opinion that positional asphyxia contributed to Burns' death is admissible.  Dr. Ralston is a qualified forensic pathologist. Sufficient facts and data exist to support the factual premise that Burns was in a weakened state due to the cold weather, his drug use, and his altercation with the Sheriff's deputies.  Sufficient facts and data also exist that Burns was hogtied

and placed in at least a semi-prone position on his stomach with his head turned to the side. Sufficient facts and data also exist that Burns suffered a cardiac arrest and an anoxic brain injury. The Spitz Reference Book relied on by Dr. Ralston provides a reliable scientific basis for the proposition that hogtying can cause positional asphyxia in physically weakened individuals. The Spitz Reference Book states that hogtying can interfere with breathing and result in cardiac arrhythmia, especially when a person is agitated, as Burns was. The Spitz Reference Book states that deaths from such restraints often are associated with individuals who are physically compromised by drug use. Dr. Ralston further had some experience with individuals who died from positional asphyxia in a "dogpile" situation. Dr. Ralston applied the information set forth in the Spitz Reference Book and his experience to the facts in a reliable manner to reach his opinion. Dr. Ralston's opinion is admissible.

The Defendants complain that Dr. Ralston did not conduct any research or refer to any peer-reviewed studies or perform any original research in the matter. The Supreme Court identified various types of sources in a non-exhaustive list of possible means to test the reliability of scientific principles. Daubert, 509 U.S. at 593. The list is only illustrative of the types of sources that can provide indicia of reliability to a scientific opinion. See Kumho Tire, 526 U.S. at 151. Here, the Spitz Reference Book supports this conclusion.

Dr. Ralston's opinion, if believed, would help the trier of fact. Dr. Ralston opined that positional asphyxia from the hogtying contributed to Burns' death. The Defendants' expert physician, Dr. Tom Neuman, has opined that hogtying does not cause positional asphyxia. See <u>Defendants' Joint Memorandum of Law in Support of Motion to Bar Opinion Testimony of Dr. John Ralston Pursuant to Federal Rule of Evidence 702 (d/e 144)</u>, at 14. If a jury found Dr. Ralston's opinion more credible, then his opinion would assist the jury in evaluating whether the Defendants' actions contributed to Burns' death. The credibility of the dueling experts is properly left to the trier of fact. <u>Wipf v. Kowalski</u>, 519 F.3d 380, 385 (7th Cir. 2008).

The Defendants cite persuasive authority that rejected the proposition that hogtying can cause positional asphyxia. <u>Price v. County of San Diego</u>, 990 F.Supp. 1230 (S.D.Cal. 1998). The Court in <u>Price</u> reached this conclusion after a bench trial. <u>Id.</u> at 1234. The opposing opinion that hogtying could cause asphyxia was admitted into evidence at trial. <u>See id.</u> at 1237. The <u>Price</u> opinion at this procedural juncture, therefore, would weigh in favor of admitting Dr. Ralston's opinion into evidence.

Moreover, the Estate cites contrary persuasive authority that accepted the opinions that hogtying can cause positional asphyxia over the contrary opinion

championed by the Defendants' expert.  Cruz v. City of Laramie, Wyo, 239 F.3d 1183 (10th Cir. 2001); see also e.g., Johnson v. City of Cincinnati, 39 F.Supp.2d 1013, 1017 (S.D. Ohio 1999).  These cases also considered both sides' opposing opinions regarding hogtying and positional asphyxia.  The cases cited by both parties support letting the trier of fact decide between the dueling experts' opinions.  Dr. Ralston's opinion meets the requirements for admissibility under Rule 702.  The trier of fact may consider his opinion.

    Lifestar moves to bar Dr. Stoy's opinions because he relies on Dr. Ralston's opinions.  Lifestar does not dispute Dr. Stoy's qualifications or his methodology, other than his reliance on Dr. Ralston's opinions.  An expert may rely on another expert's admissible opinion as a basis for forming his own opinions.  See NutraSweet Co. v. X-L engineering Co., 277 F.3d 776, 790 (7th Cir. 2000); Loeffel Steel Products, Inc. v. Delta Brands, Inc., 387 F.Supp.2d 794, 825 (N.D. Ill. 205); see also Walker v. Soo Line R. Co., 208 F.3d 581, 588 (7th Cir. 2000).  Dr. Stoy, therefore, may rely on Dr. Ralston's opinions.

    Lifestar also argues that Dr. Stoy's opinion would not aid the finder of fact.  Dr. Stoy opined that Rompot was negligent.  Lifestar argues that this opinion will not aid the trier of fact because the Estate must show that Lifestar employees acted willfully and wantonly to recover under Illinois law.  See Illinois Emergency

Medical Services Systems Act, 210 ILCS 50/3.150.  The Estate counters that experts may not opine that conduct was willful and wanton.

Dr. Stoy may not opine to a legal conclusion or offer a legal opinion.  See Jimenez v. City of Chicago, 732 F.3d 710, 721 (7th Cir. 2013).  He therefore may not opine that Rompot was either negligent or willful and wanton.  Either opinion would be improper.

Dr. Stoy can opine that Rompot breached her professional standards of care for emergency medical personnel.  A qualified expert opinion that a person breached her professional standards of care may aid the trier of fact in this case.  To prevail against Lifestar, the Estate must establish the elements of "an aggravated form of negligence."  Jane Doe-3 v. McLean County Unit Dist. No. 5 Bd. of Directors, 2012 IL 112479, ¶ 19, 973 N.E.2d 880, 887 (Ill. 2012).  The Estate must establish duty, breach of duty, proximate cause, injury, respondeat superior, and also that Lifestar personnel did so in willful and wanton manner.  Id. Dr. Stoy's expert opinion of a breach of the standard of care goes to the elements of duty and breach of duty.  The opinion tends to show the nature of Rompot's duty to Burns to provide proper emergency medical services, and that she breached that duty.  Dr. Stoy, therefore, may opine regarding whether Rompot met the standard of care in her treatment of Burns.

THEREFORE, Defendants' Joint Motion to Bar Opinion Testimony of Dr. John Ralston Pursuant to Federal Rule of Evidence 702 (d/e 143); and Defendant Lifestar Ambulance Service, Inc.'s Motion to Bar Opinion Testimony of Walt A. Stoy, Ph.D., Pursuant to Federal rule of Evidence 702 (Motion 145) are DENIED.  Defendants' Motion for Evidentiary Hearing on Joint Motion to Bar Testimony of John Ralston, M.D. (d/e 175) is DENIED as moot.

ENTER:	July 21, 2015

          *s/ Tom Schanzle-Haskins*
          UNITED STATES MAGISTRATE JUDGE