**E-FILED**
Tuesday, 21 July, 2015  04:51:52 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ESTATE OF PATRICK BURNS, Deceased, by Richard Burns, Executor, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 11-cv-3020 |
| NEIL WILLIAMSON, as Sheriff of Sangamon County, Illinois, in his Official Capacity, LT. BRIAN BRESSAN, in both his Official Capacity and in his Individual Capacity; DEPUTY ANDREW BRASHEAR, in both his Official Capacity and in his Individual Capacity; DEPUTY MICHAEL HARTH, in both his Official Capacity and in his Individual Capacity; DEPUTY JOHN OSMER, in both his Official Capacity and in his Individual Capacity; DEPUTY TERRENCE RODERICK, in both his Official Capacity and in his Individual Capacity; UNIDENTIFITED SANAGAMON COUNTY DEPUTIES; SANAGAMON COUNTY; and LIFESTAR AMBULANCE SERVICES, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) | |

## <u>OPINION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE

This matter comes before the Court on Defendant Lifestar Ambulance Service, Inc.'s (Lifestar) Motion for Summary Judgment (d/e 147) (Motion 147) and Defendants former Sangamon County, Illinois, Sheriff Neil Williamson; Sangamon County Lieutenant Sheriff Brian Bressan; Sangamon County Deputy Sheriffs Michael Harth, John Osmer, and Terrence Roderick; and Sangamon County (collectively the Sangamon County Defendants) Motion for Summary Judgment (d/e 149) (Motion 149).  The parties consented to have this matter proceed before a United States Magistrate Judge.  Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered June 13, 2014 (d/e 133).

This case arises from the death of Patrick Burns (Burns) that occurred after his arrest on January 23, 2010, in Sangamon County, Illinois.  The Plaintiff Richard Burns, Executor of the Estate of Patrick Burns, deceased (Estate), alleges claims against the Sangamon County Defendants under 42 U.S.C. § 1983, based on allegations that Defendants Bressan, Harth, Osmer, and Roderick (Individual Sangamon County Defendants) used excessive force when Patrick Burns was arrested.  Second Amended Complaint (d/e 47), Counts I and II. For the reasons set forth below, the Court finds that the Sangamon County Defendants are entitled to summary judgment in their favor on these § 1983 claims.

The Estate also alleges state law claims for wrongful use of excessive force, wrongful death, and personal injury claims under the Illinois Survival Act, 755 ILCS 5/27-6, against the Defendants.  Second Amended Complaint, Counts III, IV, and V.[1]  This Court has supplemental jurisdiction over Counts III, IV, and V.  28 U.S.C. 1367.  The Second Amended Complaint erroneously attempted to allege diversity jurisdiction.  Second Amended Complaint, ¶ 1.  The Court lacks diversity jurisdiction because the decedent Burns was a citizen of Illinois and the Defendants are all citizens of Illinois.  Second Amended Complaint, ¶¶ 4, 9.  The Executor Richard Burns is deemed to be a citizen of Illinois for purposes of diversity jurisdiction because the decedent was a citizen of Illinois. 28 U.S.C. § 1332(c)(2).  Thus, none of the parties are diverse.

The Court will, in its discretion, exercise supplemental jurisdiction over the remaining state law claims because of considerations of judicial economy and fairness.  Wright v. Associated Ins. Cos., 29 F.3d 1244, 1251 (7th Cir. 1994); 28 U.S.C. § 1367(c)(3).  Retaining jurisdiction will promote judicial economy.  This matter has been pending since 2011.  Dismissal would require re-filing the action in state court and starting over again, resulting in significant redundant use of judicial resources.  Fairness also weighs in favor of retaining jurisdiction.  The Estate's counsel has sought to withdraw from this proceeding, and the Executor

---

[1] The Estate voluntarily dismissed the claims alleged in Count VI and VII.   Stipulation for Dismissal As to Defendants Jamie Rompot and Barbara Guffey Only (d/e 115); Text Order entered August 2, 2013.

has indicated that he has been unable to find other counsel.  The Executor also cannot proceed pro se on behalf of the Estate.  See Ratcliffe v. Apantaku, 318 Ill.App.3d 621, 625-26, 742 N.E. 843, 846-47 (Ill. App. 1st Dist. 2000); see Opinion entered February 5, 2015 (d/e 170), at 5-10.  If this Court declines jurisdiction over the state law claims, the current counsel will not be likely to represent the Estate in any state court action, and the Estate will likely be unable to secure a resolution of its state law claims on the merits.  Under these peculiar circumstances, the Court determines, in its discretion, to retain supplemental jurisdiction over the state law claims.

For the reasons set forth below, the Court finds that the Defendants' request for summary judgment on the state law claims in Counts III, IV, and V are ALLOWED in part and DENIED in part.

## STATEMENT OF FACTS

On January 23, 2010, at approximately 6:15 a.m., Sangamon County Sheriff's Office law enforcement officials responded to a reported home invasion at 1401 N. Wesley in Springfield, Illinois.[2]  The dispatcher advised officers that an unknown male was trying to force his way into the residence.  The person was described as a white male who was inappropriately dressed, wearing only a t-

---

[2] The statement of facts comes, in part, from the accompanying Opinion on the Defendants' pending Motions in Limine (d/e 143 and 145) issued the same day as this Opinion.

shirt and underwear.  The temperature was 38°F at the time.   Motion 149,

Statement of Undisputed Facts (Motion 149 SUF), ¶¶ 1-4, 7.[3]

Defendant Deputy Harth was the first officer that arrived at the scene.

Harth saw the decedent Burns sitting in a ditch in about three inches in water

wearing only a t-shirt and his underwear.  Harth spoke to Burns, but Burns'

responses made no sense.  Harth observed that Burns had cuts on his body.

Burns told Harth that he had been drinking and using cocaine and marijuana.

Harth had probable cause to arrest Burns for home invasion.  Motion 149 SUF ¶¶

5, 8-10.

Shortly after Harth's arrival, Defendants Roderick, Osmer, and Brashear

appeared at the scene.[4]  Harth left Burns and went to speak to the victims of the

reported home invasion.  The other Defendants at the scene questioned Burns.

Burns told Roderick and Osmer that he had been drinking, had smoked crack,

and had taken Prozac and Wellbutrin.   Defendants' Summary Judgment Exhibits

(d/e 148), Exhibit 8, Deposition of John Osmer (Osmer Deposition), at 21; and

Exhibit 7, Deposition of Terry Roderick (Roderick Deposition), at 18-19.  During

the questioning, Brashear approached Burns with a camera to photograph Burns'

---

[3] For purposes of this Opinion, the Court only relies on Statements of Undisputed Facts and Statements of Additional Material Facts that the parties agree are undisputed.
[4] A  Deputy Sweeney also arrived at the scene. Sweeney left Burns' presence after arriving and was not directly involved in the encounter with Burns.  See Defendants' Summary Judgment Exhibits (d/e 148), Exhibit 7, Deposition of Michael Harth, at 26.

injuries.  Burns reacted violently at the attempt to photograph him.  Burns punched Roderick in the stomach.   Motion 149 SUF ¶¶ 12-16.

After Burns punched Roderick, Osmer took Burns to the ground to place Burns in restraints.  Burns resisted the Officers' efforts to restrain him.  Osmer and Roderick fought with Burns on the ground.  The Defendants ordered Burns to stop resisting, but Burns continued to fight them.  Motion 149 SUF ¶¶ 16-18.

Brashear then drew his X26 Taser (Taser).  A Taser is a non-lethal weapon that can be used two different ways.  An officer can fire darts from the Taser into a person.  The darts are connected to the Taser by wires.  Once the darts have penetrated the person's skin, the officer can pull the Taser trigger to send an electrical shock through the person, incapacitating the person temporarily.  The parties refer to this immobilizing effect as "neuromuscular incapacitation." Alternatively, an officer can drive prongs on the Taser into the person and pull the trigger to shock the person.  The latter method is called "drive stun."  The drive stun shock causes pain, but does not incapacitate the person.  The euphemism for the latter use of the Taser is "pain compliance."  Motion 149 SUF ¶¶ 19, 20, 24.

When Brashear drew his Taser, he announced, "Taser, Taser, Taser."  At that point, Osmer and Roderick moved away from Burns.  Brashear shot the Taser darts into Burns' back and shocked Burns.  Burns fell incapacitated to the

ground.  Brashear asked Burns if he was finished fighting and told Burns to put his hands behind his back.  Burns recovered from the Taser shock and started fighting again.  Brashear pulled the Taser trigger again, shocking Burns a second time.  Burns then said that he was finished fighting.  Motion 149 SUF ¶¶ 19-22.

Roderick and Osmer attempted to take hold of Burns' arms.  Burns resumed fighting, punching and kicking Roderick and Osmer.   Burns broke the Taser wires attached to the darts in his body.  Once the wires were broken, Bashear joined Roderick and Osmer in their efforts to subdue Burns.  Bashear attempted to drive the prongs on the Taser into Burns in the drive stun use of the device.  Burns kept fighting and attempting to get away.  Motion 149 SUF ¶¶ 23-24, 27.

Harth returned to the scene while Burns was fighting with the other officers.  Harth commanded Burns to stop fighting.  Burns did not follow the command.  The officers managed to put a handcuff on each of Burns' wrists from two different sets of handcuffs.  The officers then linked the two sets of handcuffs together behind Burns' back.  Burns kept fighting and trying to get away.  The officers put a third set of handcuffs on Burns' ankles.  Burns kept fighting.  The officers used a fourth set of handcuffs to link the handcuffs on Burns' ankles to the two sets of handcuffs on his wrists, placing Burns in a hogtied position.  Even after being hogtied, Burns kept writhing on the roadway on his belly, spinning on

the ground, and rubbing his face on the roadway.  Motion 149 SUF ¶¶ 25-33, 37-43, 46-47

All four officers used their Tasers during this fight.  The Tasers' internal computers recorded at total of twenty-one deployments of the Tasers during the struggle.[5]  The officers did not use the Tasers after Burns was hogtied.  Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Response 178) Additional Material Fact (AMF) ¶¶ 67-70; Motion 149 SUF ¶ 47.

Defendant Bressan arrived at the scene during the struggle sometime after Burns' wrists were in handcuffs.  Bressan did not touch Burns or use his Taser or any other weapon.  Motion 149 SUF ¶¶ 35-36.

Lifestar personnel Emergency Medical Technician (EMT)-Paramedic Jamie Rompot and EMT Barbara Guffey (now Hampton) arrived at the scene in an ambulance.  Rompot and Guffey waited a short distance from the incident until the Deputies had control of Burns.  Rompot and Guffey then drove the ambulance up to the scene.  Once Burns was hogtied, the Deputies put Burns onto a Lifestar ambulance stretcher and strapped him to the stretcher.  Burns kept writhing and fighting.  He was placed on the stretcher hogtied, stomach

---

[5] A "deployment" means that the Taser trigger was pulled.  Pulling a Taser trigger may or may not mean that an electric shock was delivered to a person.  The Taser may not be charged when the trigger is pulled.  The Taser wires to the darts may be broken.  The prongs used for the drive stun may not be in contact with the individual's body.  See Roderick Deposition, at 62.  As a result, twenty-one deployments may or may not indicate twenty-one electric shocks to Burns.  For purposes of summary judgment only, the Court views the evidence in the light most favorable to the Estate and assumes Burns was shocked twenty-one times.

down, in a prone position or semi-prone position with his head turned to one side. Burns kept fighting and resisting.  See Osmer Deposition, at 35-36; Roderick Deposition, 41-42; Defendants' Summary Judgment Exhibits (d/e 148), Exhibit 4, Deposition of Jamie Rompot (Rompot Deposition), at 31-32.

Lifestar personnel took him in the ambulance to a hospital emergency room (ER).  Defendant Deputy Sheriffs John Osmer and Terrence Roderick rode in the back of the ambulance with Burns and Rompot.  Guffey drove the ambulance. Rompot did not put any monitors on Burns because he continued to writhe and struggle against his restraints.  Osmer Deposition, at 37; Defendants' Summary Judgment Exhibits (d/e 148), Exhibit 5, Deposition of Barbara Hampton (Hampton Deposition), at 43, 47.  Burns' speech was largely incoherent.  The only thing Burns said that Roderick understood was, "Drugs are bad, drugs are good."  Roderick Deposition, at 68.  At the beginning of the trip, Rompot took Burns' pulse and timed his respiration.  Rompot reported that Burns was breathing at a rate of 20 breaths per minute, and that his pulse was 120 beats per minute.  During the trip, Rompot checked on Burns' airway and determined that he was breathing, and Rompot also checked to confirm that Burns had a pulse.  Osmer Deposition, 41-42, 63.

About one minute before the ambulance arrived at the ER, Burns became passive and stopped speaking, yelling, and tensing his muscles.  Osmer

Deposition, at 42.  Rompot testified that she checked Burns after he became passive and determined that Burns was breathing, had a pulse, and his eyes were equal and reactive.   Rompot Deposition, at 54-56.  Roderick testified that Rompot looked at Burns' face to determine whether Burns was breathing. Roderick Deposition, at 47.  Roderick also testified that Burns had an open airway and was breathing at this time.  Roderick Deposition, at 60-61, 64, 69. Osmer testified that during the last minute of the ride Rompot checked that Burns was breathing, but he did not see Rompot touch Burns.  Osmer Deposition, at 47.  For purposes of summary judgment only, the Court credits Osmer's testimony to indicate that Rompot did not touch Burns after he became passive. The Lifestar records shows that the ambulance ride took six minutes, from 6:40 a.m., to 6:46 a.m. Plaintiff's Summary Judgment Exhibits II (d/e 174), Exhibit 2, Deposition of Betty Retherford (now Stewart) (Retherford Deposition), at 28-29.

Once at the ER parking area, Burns was wheeled out of the ambulance. Hospital records state that Burns was brought into the ER at 6:53 a.m.  See Hampton Deposition, at 64; Retherford Deposition, at 22.  The clocks used by Lifestar were not coordinated with the hospital clocks used in the ER.  See Hampton Deposition, at 54, 64; Retherford Deposition, at 22.  Burns was still hogtied, strapped to the stretcher in a prone, or semi-prone, position on his stomach.  The emergency room charge nurse Elizabeth Retherford, observed

that Burns was moaning, rolling, and moving his head slightly up and down. Retherford Deposition, at 16, 55, 73.  According to Retherford, one or more persons put their hands on Burns to steady him.  Retherford stated that one or more persons probably put their hands on Burns' head because Burns' head was going up and down.  Retherford Deposition, at 73.  Guffey testified that Burns was still breathing, was moving, and had good color.   Hampton Deposition, at 95.  Burns was taken into ER Room 16.

Once in Room 16, Burns was transferred from the ambulance stretcher to a hospital stretcher.[6]  According to Retherford, Burns became still while he was being transferred from the ambulance stretcher to the hospital stretcher. Retherford Deposition, at 21. Burns was not breathing.  Hospital personnel called a code; Burns had gone into cardiac arrest.    Roderick and Osmer removed the handcuffs, and hospital emergency room personnel resuscitated Burns and placed him on life support.  The ER records show that the ER doctor began resuscitation at 6:54 a.m.  Retherford Deposition, at 40.  Burns remained on life support for several days, but never regained consciousness.  Retherford Deposition, at 20-21, 36; Roderick Deposition, at 54; Osmer Deposition, at 52. Burns died on January 28, 2010.

---

[6] Some witnesses characterized the stretcher as a hospital bed.  See e.g., Rompot Deposition, at 57.

Retherford testified that Rompot said that she lost control of the scene. Rompot said that the Deputies put Burns on the stretcher, not her.  Retherford Deposition, at 64.

Dr. Jessica H. Bowman, M.D., performed an autopsy on behalf of Sangamon County, Illinois' Coroner's Office.  Dr. Bowman noted that the hospital testing autopsy showed the presence of cocaine, marijuana, Prozac, and Wellbutrin in Burns' system.  Dr. Bowman opined that Burns died of excited delirium due to cocaine abuse.  Defendants' Summary Judgment Exhibits (d/e 148), Sangamon County Coroner's Autopsy Report No. CC-26-10 dated March 17, 2010, at 1-2.

The Estate disclosed Dr. John Ralston, M.D., as its medical expert witness. Dr. Ralston is a forensic pathologist.  Dr. Ralston performed a second autopsy on Burns.  Dr. Ralston opined that Burns' death was "due to anoxic brain injury due to restraint in a prone position while hogtied."  Defendants' Summary Judgment Exhibits (d/e 148), Exhibit 1, Deposition of John W. Ralston, M.D., dated November 28, 2012 (Ralston Deposition I), attached Deposition Exhibit 2, Report of Postmortem Examination of Patrick Burns dated August 20, 2010.

At his first deposition, Dr. Ralston testified that Burns died from an anoxic brain injury caused by a lack of oxygen to the brain.  Ralston Deposition I, at 26-27.  Dr. Ralston opined hogtying a person and placing such a person face down

will cause interference with the person's ability to breathe.  Dr. Ralston opined that this positional interference in breathing would be aggravated if the person was in a weakened condition.  Ralston Deposition I, at 49-52.  In this case, Burns was weakened physically by drugs, the lack of clothing in cold temperatures, shocks from the Tasers, and the struggle with the officers.  Dr. Ralston opined that the combination of the drugs and alcohol, the cold weather, the struggle with the officers, the shocks from the Tasers, and the restriction on his ability to breathe caused by the hogtying and placement in a prone position all contributed to causing Burns death.  Dr. Ralston opined that these factors caused Burns to suffer either: (1) a cardiac arrest which caused the lack of oxygen to the brain, and the resulting anoxic brain injury; or (2) a lack of oxygen to the brain which caused the anoxic brain injury and the resulting cardiac arrest.  See Ralston Deposition I, 52-58, 75-84, 120-24, 134-35.  Dr. Ralston testified that he could not tell which came first, the anoxic brain injury or the cardiac arrest.  Ralston Deposition I, at 26-27, 65.

The Estate disclosed Dr. Walt Stoy, Ph.D., as its expert on emergency medical services (EMS).  At his deposition, Dr. Stoy agreed with defense counsel that the Deputies controlled how Burns was restrained because the Deputies hogtied him before she was allowed to arrive on the scene, and the Deputies kept Burns in the hogtied position.  See Stoy Deposition, at 67-68, 78-79.  Dr.

Stoy also testified that the standards of care protocols for EMTs did not establish a correct position for a patient during transport.  Stoy Deposition, at 82.

Dr. Stoy further stated that, based on available information, he did not have any criticisms of Rompot's actions while Burns was actively resisting his restraints during most of the ambulance ride.  Stoy Deposition, at 92.  Dr. Stoy opined that once Burns became quiet for the last minute of the ambulance ride, Rompot should have performed a more thorough assessment of Burns, rather than just visually determining that he was breathing.  Rompot should have determined if Burns was alert and oriented; if not, she should have determined if he was responsive to pain.  She also should have assessed Burns' vital signs more thoroughly to assess matters such as pulse, respiration rate, and temperature.  Stoy Deposition, at 97, 108, 110-12.

Dr. Stoy testified that if Rompot would have done a more thorough assessment of Burns in the ambulance once Burns became passive, she would have learned that Burns was hypoxic and would have administered oxygen while still in the ambulance.  Stoy Deposition, at 135-36.

> If she would have determined that there was a change in the respiratory rate and quality and needed to intervene on that, whether it would be to any number of things:  One, simply supplement him with oxygen by a variety of devices that was, I assume, available to her on the EMS system that she works; or, if need be, even to intervene with a bag value mask, which I allude to in my report, to be able to bag the patient, and whether it's blow-by or an additional

supplemental intervention of the ventilation and oxygenation of the patient.

Stoy Deposition, at 139.

Dr. Stoy stated that he did not have any criticisms of Hampton's actions.

Stoy Deposition ,at 38-39.  Dr. Stoy relied on Dr. Ralston's opinion that Burns'

position caused positional asphyxia in reaching his opinions.  Stoy Deposition, at

83, 138.

Defendant Sangamon County had a written policy on the use of Tasers by

Sheriff's Deputies (Policy).  Relevant portions of the Policy stated:

The deployment of the X26 Taser will be reasonable and based on the totality of the circumstances known to the Deputy.

. . . .

[The Taser] should not be used on any person that is shackled or handcuffed, unless there is immediate threat to the Deputy/Officer, suspect or bystander.

X26 Taser will not be used as a tool for coercion or punishment.

Excessive use of the X26 Taser in subduing a subject is forbidden.

Policy, §§ 41.10, 41.32, 41.33, and 41.34, quoted at Response AMF

¶¶63-66.

## ANALYSIS

The Estate claims that the Individual Sangamon County Defendants used

excessive force on Burns in violation of his constitutional right under the Fourth

and Fourteenth Amendments to be free from unreasonable searches and seizures.  The Estate claims that Sheriff Williamson, in his official capacity, and Sangamon County violated Burns' constitutional rights by establishing a policy to use excessive force in the manner perpetrated on Burns by the Individual Sangamon County Defendants.  The Estate also brings state claims against all Defendants.  The Defendants seek summary judgment on all claims.

The Defendants move for summary judgment on all Counts.  At summary judgment, the Defendants must present evidence that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to the Estate.  Any doubt as to the existence of a genuine issue for trial must be resolved against the Defendants.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.  Once the Defendants have met their burden, the Estate must present evidence to show that issues of fact remain with respect to an issue essential to his case, and on which the Estate will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. at 322; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The Court addresses the § 1983 claims in Counts I and II first, and then the state law claims in Counts III, IV, and V.

1. Count I § 1983 Claims Against the Individual Sangamon County

   Defendants

Excessive force claims in the context of an arrest are measured by using a Fourth Amendment standard of "objective reasonableness," in which the officer's actions are viewed from, "the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." Graham v. Conner, 490 U.S. 386, 396-97 (1989). The use of force is unconstitutional if, "judging from the totality of circumstances at the time of the arrest, [the officer] used greater force then was reasonably necessary to make the arrest." Lester v. City of Chicago, 830 F.2d 706, 713 (7th Cir. 1987).

In addition, individuals may defend constitutional claims brought under § 1983 by asserting an affirmative defense of qualified immunity. Each Individual Sangamon County Defendant is entitled to qualified immunity unless the Estate can point to clearly established constitutional law existing at the time of the incident that put each such Individual Sangamon County Defendant on notice that his conduct was unconstitutional. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The Supreme Court recently summarized the definition of "clearly established:"

> To be clearly established, a right must be sufficiently clear that every
> reasonable official would have understood that what he is doing
> violates that right. When properly applied, [qualified immunity]
> protects all but the plainly incompetent or those who knowingly violate

the law.  We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.

Taylor v. Barkes, 575 U.S. __ , 2015 WL 2464055 (2015) (per curiam) (internal quotation marks, citations, and parenthetical statements omitted).

The Estate also must point to controlling authority.  In Illinois, controlling authority on federal constitutional matters are decisions from the Seventh Circuit Court of Appeals or the Supreme Court.  Abbott v. Sangamon County, Ill., 705 F.3d 706, 731 (7th Cir. 2013).[7]  In the alternative, the Estate may show that "there was such a clear trend in the case law that . . . the recognition of the right by a controlling precedent was merely a question of time."  Id. (quoting Phillips v. Community Ins. Corp., 678 F.3d 513, 528 (7th Cir. 2012) (quoting Estate of Escobedo v. Bender, 600 F.3d 770, 780, 781 (7th Cir. 2010)).  If no such controlling authority exists, this Court may determine that a defendant is entitled to qualified immunity without reaching the question of whether his actions violated constitutional standards.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

The undisputed facts show that the Individual Sangamon County Defendants are entitled to qualified immunity.  The Seventh Circuit has stated that, "Courts generally hold that the use of a taser against an actively resisting

---

[7] But see Taylor v. Barkes, 2015 WL 2464055 (questioning whether the Third Circuit Court of Appeals could rely on two of its own opinions alone as clearly establishing a right for qualified immunity purposes within its Circuit).  See also Carroll v. Carman, 574 U.S. __, 135 S.Ct. 348, 350 (2014) ("assuming for sake of argument" that a controlling Circuit precedent could "constitute clearly established federal law").

suspect either does not violate clearly established law or is constitutionally reasonable." Abbott, 705 F.3d at 727.  In Abbott, the suspect was handcuffed in the rear seat of a locked a police vehicle.  The suspect was kicking the window to try to escape.  The officer went to the car to stop the suspect from kicking.  The suspect and the officer fought.  The officer used his Taser during the fight even though the suspect was in handcuffs.  The Seventh Circuit held that the officer did not violate clearly establish law by using the Taser on the handcuffed suspect while the suspect "continued to resist."  Abbott, 705 F.3d at 728.

Similarly here, the Individual Defendants are entitled to qualified immunity for the multiple uses of their Tasers because Burns kept fighting and attempting to escape.  They stopped using the Tasers once Burns was hogtied.  At that point, he was not a threat to the officers.  They are entitled to qualified immunity for the use of the Tasers.

The Estate cites Cyrus v. Town of Mukwonago, 624 F.3d 856 (7th Cir. 2010), for the proposition that the Individual Sangamon County Defendants' use of Tasers constituted excessive force.  In Cyrus, the officers shot a mentally ill individual with Taser darts to incapacitate him.  The officers knew the individual and knew he was mentally ill.  The individual fell to the ground and rolled down a driveway.  The officers tried to handcuff the individual, but he lay face-down with his hand underneath him.  The officers used the Tasers repeatedly to get the

individual to put his hands behind his back.  The officers finally put the handcuffs on him; only then, the officers discovered that the individual stopped breathing. Cyrus, 624 F.3d at 859, 60.

The Seventh Circuit held that a jury could find that repeated use of the Taser may have become excessive after the individual "was on the ground, unarmed and unable to stand up on his own."  Cyrus, 624 F.3d at 863.  In this case, Burns never became unable to stand up or otherwise resist.  Rather, Burns never stopped his violent behavior at the scene.  He yelled and kicked and fought with a one or more of the Individual Sangamon County Defendants up until he was hogtied, and even after being hogtied, Burns continued to spin and yell and spit.  He never stopped his violent behavior.  In this context, the Seventh Circuit has held that the officers are entitled to qualified immunity.

The Estate attempts to distinguish the Abbott decision because the officer was in a one-on-one struggle with the suspect in Abbott.  The Seventh Circuit drew no such distinction.  The Seventh Circuit focused on the use of a Taser while the suspect is actively resisting.  Abbott, 705 F.3d at 727-28.  Burns was actively resisting throughout the time that the Individual Sangamon County Defendants used their Tasers, and for some time thereafter.   As noted above, the officers did not use their Tasers after Burns was hogtied.  The Individual

Sangamon County Defendants are entitled to qualified immunity for the use of the Tasers to control the violent suspect Burns in this case.

The Individual Sangamon County Defendants are also entitled to qualified immunity for hogtying Burns.  No Seventh Circuit or Supreme Court decision has held that it is improper to hogtie a suspect that is violently resisting.  The closest case is Sallenger v. Oakes, 473 F.3d 731 (7th Cir. 2007).  In Sallenger, the suspect was mentally ill.  He was acting violently in his mother's home.  The mother called the police.  The officers entered the home and fought with the suspect.  The officers finally handcuffed the suspect.  At that point, the suspect stopped fighting.  One of the officers then left the home, went to a police vehicle at the scene, and retrieved a hobble, a device used to hogtie a person.  The officers hogtied the suspect with the hobble.  The suspect died from asphyxiation.  Sallenger, 473 F.3d at 735.

The Seventh Circuit stated that hogtying a suspect in that situation may have been excessive force because the suspect had stopped fighting.  Sallenger, 473 F.3d at 740-41.  Here, Burns kept fighting and attempting to flee.  Burns did not stop fighting and resisting even after he was hogtied.  No controlling authority holds that use of hogtying a suspect constitutes excessive force when it is undisputed that a suspect continued fighting and resisting.  The Individual

Sangamon County Defendants are entitled to qualified immunity for hogtying Burns at the scene where they arrested Burns.

The Estate also argues that Osmer and Roderick used excessive force during the ambulance ride to the hospital.  The two Defendants are again entitled to qualified immunity.  Burns was continually fighting against his restraints for most of the trip to the hospital.  The Estate cites no controlling authority for the proposition that maintaining a person in a hogtied position while the person continues to actively resist a valid arrest constitutes excessive force.

Burns stopped resisting approximately a minute before the ambulance got to the hospital, about 6:45 a.m., according to the ambulance records.  Roderick and Osmer kept Burns hogtied, possibly, for nine additional minutes until approximately 6:54 a.m. when hospital personnel started to resuscitate Burns.  The ambulance and ER clocks were not coordinated, so the nine minute gap may reflect only differences in the settings of the clocks.  The Court must view the evidence favorably to the Estate for purposes of the Motion, and so must assume Burns was passive for nine minutes before he stopped breathing and was released from the hogtie.

Burns cites no controlling authority to put Osmer and Roderick on notice that failure to release a person who was actively resisting from a hogtied position within nine minutes of the time that the person stopped actively resisting

constitutes excessive force, particularly when two EMTs, Rompot and Guffey, were present and indicated that Burns was breathing.  The officers had probable cause to arrest him for home invasion.  He actively resisted their efforts to arrest him even after repeated Tasing and even after being hogtied.  He had stated that he was finished fighting and then continued to fight.  He continued to actively resist after being strapped to a stretcher and placed in an ambulance.  He continued to actively resist for five more minutes during the ambulance ride.  He then stopped resisting.  The EMTs indicated that Burns was breathing.  The two Deputies were not on notice from any controlling authority that waiting nine minutes under these circumstances would constitute excessive force in violation of the Fourth Amendment.  Osmer and Roderick are entitled to qualified immunity.

The Estate argues that one of the Individual Sangamon County Defendants used excessive force when he put his knee into Burns' back during the fight at the scene.  The Estate bases this theory on the case of Abdullahi v. City of Madison, 423 F.3d 763 (7th Cir. 2005).  In Abdullahi, an officer placed his knee on the back of a suspect in order to handcuff him.  The suspect died less than two and one-half minutes after the officer took his knee off of the suspect's back.  Abdullahi, 423 F.3d at 765-66.  Post mortem medical examinations and the coroner's autopsy showed that the suspect died from a crushing weight placed

on his back and neck.  The crushing weight imposed sufficient force to cause injuries consistent with strangulation.  <u>Abdullahi</u>, 423 F.3d at 766.  In light of this evidence, the officer's placement of his knee onto the suspect's back could have constituted excessive force.  <u>Abdullahi</u>, 423 F.3d at 772-73.

Here, the Estate has no evidence of a crushing force placed on Burns' back.  The autopsy showed that some force affected Burns' back.  <u>See</u> <u>Ralston Deposition I</u>, at 71 (autopsy showed hemorrhaging of muscles around Burns' spine).  There is no evidence of a crushing force that strangulated him.  Furthermore, Burns did not lose his ability to breathe after the knee was placed in his back.  Rather, he continued to scream and spit and writhe on the roadway, and then on the stretcher.  The Estate does not have evidence which shows that the knee in Burns' back could have constituted excessive force.

At a minimum, the Individual Sangamon County Defendants are entitled to qualified immunity with respect to using a knee in the back to wrestle with a fighting suspect.  The officers were not on notice that simply placing a knee in a person's back during an ongoing struggle without the use of crushing force would constitute excessive force.[8]  <u>See</u> <u>Catlin v. City of Wheaton</u>, 574 F.3d 361, 367

---

[8] The Estate also fails to present evidence identifying the Defendant who placed his knee in Burns' back.  Rompot is the only witness that remembers anyone placing a knee on Burns' back, but she could not identify the individual who did so.  Section 1983 imposes individual liability.  <u>See</u> <u>Ranscon v. Hardiman</u>, 803 F.2d 269, 273 (7th Cir. 1986).  Thus, the Estate would need evidence of the identity of the person who committed the act in order to recover.

(7th Cir. 2009) (use of a knee in the back may be reasonable use of force, depending on the circumstances, distinguishing Abdullahi).

The Estate also cites expert opinion evidence and published professional standards for police officers to establish that the Individual Sangamon County Defendants violated professional standard of care for law enforcement officials. Those standards are not controlling. The issue in the qualified immunity defense is whether a decision with controlling authority put the officers on notice that their actions violated the constitution. Professional standards of care are not relevant to this inquiry. The Individual Sangamon County Defendants are entitled to qualified immunity against the Estate's federal claims.[9]

## 2. Count II § 1983 Claims against Sangamon County

The claims in Count II against Sheriff Williamson in his official capacity, the Individual Sangamon County Defendants in their official capacities, and Sangamon County fail. All of these claims are really municipal liability claims against Sangamon County. Kentucky v. Graham, 473 U.S. 159, 165-66 (1985).[10]

---

[9]In addition, Defendant Bressan may be entitled to summary judgment, regardless of qualified immunity. The Estate has not presented evidence of Bressan's personal involvement in the use of force against Burns. A person is liable under § 1983 only if he was personally involved in the wrongful conduct. Ranscon v. Hardiman, 803 F.2d 269, 273 (7th Cir. 1986). A supervisor can be liable for the actions of his subordinates only if he "had some personal involvement in the constitutional deprivation, essentially directing or consenting to the challenged conduct." J.H. ex rel. Higgin v. Johnson, 346 F.3d 788, 793 (7th Cir. 2003) (quoting Doyle v. Camelot Care Centers, Inc., 305 F.3d 603, 614 (7th Cir. 2002)). The Estate does not present evidence that Lt. Bressan did anything except arrive at the scene. He did not use his Taser and he did not touch Burns. The Estate also does not present evidence that Bressan directed or consented any of the actions of the other Individual Sangamon County Defendants.

[10] The Sangamon County Sheriff's Office (Sheriff's Office) may be sued separately from Sangamon County. By suing Sheriff Williamson in his official capacity, the Estate effectively sued the Sheriff's Office. In such cases,

Municipalities are only liable under § 1983 if the municipality itself caused the

constitutional violation; there is no respondeat superior or other derivative

liability.  Monell v. Department of Social Services of City of New York, 436 U.S.

658, 691-94 (1978).   Sangamon County is only liable if the Individual Sangamon

County Defendants' actions violated Burns' rights and if the Individual Sangamon

County Defendants acted pursuant to a stated policy or established custom of

Sangamon County.  Monell, 436 U.S. at 690-91.[11]

The Estate fails to present evidence that a policy or custom of Sangamon

County or the Department caused a constitutional violation.  The Estate argues

that the quoted policies on Taser use caused a constitutional violation.  The

Court disagrees.  The quoted policies directed the Individual Sangamon County

Defendants to comply with constitutional standards.  The quoted policies stated

that Tasers were to be used in a manner that is "reasonable and based on the

totality of the circumstances known to the Deputy."  The quoted policies stated

that, "[The Taser] should not be used on any person that is shackled or

handcuffed, unless there is immediate threat to the Deputy/Officer, suspect or

---

Sangamon County may be liable to indemnify the Sheriff's Office.  See Carver v. Sheriff of LaSalle County,
Illinois, 324 F.3d 947, 948 (7th Cir. 2003); Carver v. Sheriff of La Salle County, 203 Ill.2d 497, 522, 787 N.E.2d
127, 141 (Ill. 2003).  The Court hereafter refers to the Sheriff's Office and Sangamon County collectively as
Sangamon County.
[11] Liability may also attach if the person who committed the violation had relevant policy making authority for the
Department.  See Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 417-18 (1997).  The
Estate makes no claim that any of the Individual Sangamon County Defendants had policy making authority.  The
Estate does not allege that Sheriff Williamson personally committed any constitutional violation.  The Estate sued
Sheriff Williamson in his official capacity only.

bystander."  Furthermore, the policies stated that the, "X26 Taser will not be used as a tool for coercion or punishment."  Finally, the policies stated that, "Excessive use of the X26 Taser in subduing a subject is forbidden."

These policies are consistent with the Fourth Amendment objective standard of reasonableness.  These policies would not authorize or cause a Deputy to use excessive force.  Indeed, a Deputy who used unconstitutional excessive force would be in violation of these policies.  Such a Deputy would be acting unreasonably under the circumstances, in direct violation of the policies.

The Estate argues that the policies are vague and inadequate.  The policies may or may not be vague, but vagueness by itself is insufficient to establish municipal liability.  The Estate must present evidence that a policy caused the wrongful conduct.  See City of Oklahoma City v. Tuttle, 471 U.S. 808, 824 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.").  The stated policy directed the Individual Sangamon County Defendants to use reasonable force, not excessive force.  The Estate presents no evidence that the policies caused the wrongful conduct.  The Sangamon County Defendants are entitled to summary judgment on official

capacity § 1983 claims and the § 1983 municipal liability claim against Sangamon County.

3. Counts III, IV, and V State Law Claims against all Defendants

Under Illinois law, each Individual Sangamon County Defendant can only be liable for personal injuries and death under the facts of this case if he acted in a willful and wanton manner.  745 ILCS 10/2-202.  Sangamon County can only be liable if an Individual Sangamon County Defendant is liable.  745 ILCS 10/2-109.  In addition, Lifestar is only responsible for the willful and wanton actions of its EMS personnel Rompot or Guffey (collectively Lifestar EMTs) under the circumstances of this case.  210 ILCS 50/3.150(a).  Thus, the Estate can only recover under the state law claims if one of the Individual Sangamon County Defendants or one of the Lifestar EMTs acted in a willful and wanton manner.

A claim for willful and wanton conduct is a claim for "an aggravated form of negligence."  Jane Doe-3 v. McLean County Unit Dist. No. 5 Bd. of Directors, 2012 IL 112479, ¶ 19, 973 N.E.2d 880, 887 (Ill. 2012).  At summary judgment, the Estate must present evidence of duty, breach of duty, proximate cause, injury, and also that an Individual Sangamon County Defendant or one of the Lifestar EMTs breached a duty in willful and wanton manner.  Id.[12]

_____

[12] The Estate must also present evidence on the additional element that the willful and wanton tort-feasor breached his or her duty was acting within the scope of employment in order to establish liability against Lifestar, Sangamon County, or the Department.  See Bagent v. Blessing Care Corp., 224 Ill.2d 154, 163, 862 N.E.2d 985,

The Defendants move for summary judgment on the grounds that the

Estate fails to show that any Individual Sangamon County Defendant or Lifestar

EMT acted willfully or wantonly.  Illinois law defines "Willful and wanton conduct"

as follows:

> "Willful and wanton conduct" as used in this Act means a course of
> action which shows an actual or deliberate intention to cause harm or
> which, if not intentional, shows an utter indifference to or conscious
> disregard for the safety of others or their property.

745 ILCS 10/1-210.  Whether a defendant's breach of duty constitutes willful and

wanton conduct is usually a question of fact.  Kirwan v. Lincolnshire-Riverwoods

Fire Protection Dist., 349 Ill.App.3d 150, 156, 811 N.E.2d 1259, 1264 (Ill. App. 2[d]

Dist. 2004).  The Seventh Circuit has stated that Illinois case law defining willful

and wanton is "not very helpful:"

> The definitions in the Illinois cases are not very helpful, in part
> because general statements often make a poor match with specific
> facts and in part because the definitions are not uniform.  In one case
> we read that "willful and wanton misconduct approaches the degree
> of moral blame attached to intentional harm, since the defendant
> deliberately inflicts a highly unreasonable risk of harm upon others in
> conscious disregard of it." *Burke v. 12 Rothschild's Liquor Mart, Inc.,*
> 148 Ill.2d 429, 170 Ill.Dec. 633, 593 N.E.2d 522, 530-31 (1992); see
> also *American National Bank & Trust Co. v. City of Chicago,* 192
> Ill.2d 274, 248 Ill.Dec. 900, 735 N.E.2d 551, 557 (2000); *Lynch v.*
> *Board of Education,* 82 Ill.2d 415, 45 Ill.Dec. 96, 412 N.E.2d 447, 457
> (1980). Similarly, *Pfister v. Shusta,* 167 Ill.2d 417, 212 Ill.Dec. 668,
> 657 N.E.2d 1013, 1016 (1995), defines "willful and wanton" as
> exhibiting "an utter indifference to or conscious disregard for" safety.

991 (Ill. 2007).  For purposes of summary judgment, the Defendants do not dispute that the Individual Sangamon
County Defendants and the Lifestar EMTs acted within the scope of their employment.

Yet in another case we find both language similar to the above and
statements that "willful and wanton" may be synonymous with "gross
negligence" and that "under the facts of one case, willful and wanton
misconduct may be only degrees more than ordinary negligence,
while under the facts of another case, willful and wanton acts may be
only degrees less than intentional wrongdoing." *Ziarko v. Soo Line
R.R.,* 161 Ill.2d 267, 204 Ill.Dec. 178, 641 N.E.2d 402, 406 (1994);
see also *Kirwan v. Lincolnshire-Riverwoods Fire Protection District,*
349 Ill.App.3d 150, 285 Ill.Dec. 380, 811 N.E.2d 1259, 1264-65
(2004).

Fagocki v. Algonquin/Lake-In-The-Hills Fire Protection Dist., 496 F.3d 623, 627

(7th Cir. 2007).

In the context of a law enforcement officer's use of force, a plaintiff must

also show that the officer's use of force was without legal justification in order to

show that the officer acted willfully and wantonly.  Wilson v. City of Chicago, 758

F.3d 875, 880 (7th Cir. 2014) (citing Davis v. City of Chicago, 2014 IL App (1st)

122427 ¶¶ 109-22, 8 N.E.3d 130, 144-45 (Ill. App. 1st Dist. 2014)).  Under Illinois

law, a law enforcement officer is justified in using "any force which he reasonably

believes to be necessary to effect the arrest and of any force which he

reasonably believes to be necessary to defend himself or another from bodily

harm while making the arrest."  720 ILCS 5/7-5(a).  The officer, however, may

only use force likely to cause death or great bodily harm in limited situations:

However, he is justified in using force likely to cause death or great
bodily harm only when he reasonably believes that such force is
necessary to prevent death or great bodily harm to himself or such
other person, or when he reasonably believes both that:

(1) Such force is necessary to prevent the arrest from being defeated by resistance or escape; and

(2) The person to be arrested has committed or attempted a forcible felony which involves the infliction or threatened infliction of great bodily harm or is attempting to escape by use of a deadly weapon, or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay.

720 ILCS 5/7-5(a)(1) and (2).

Here, the undisputed facts show that the Individual Sangamon County Defendants were legally justified in their use of force at the scene of the arrest. The Individual Sangamon County Defendants had probable cause to arrest Burns for home invasion. The crime of home invasion is a felony involving the wrongful entrance to a dwelling place and the use or threatened use of force against a person in the dwelling. 720 ILCS 5/19-6(a)(1)-(6).[13] Burns was actively resisting and trying to escape from the moment that Burns punched Roderick in the stomach until after he left the scene in the ambulance. Thus, even if the repeated use of Tasers and hogtying Burns may be considered deadly force, the use of that force was legally justified under § 5/7-5(a). The Individual Sangamon County Defendants and Sangamon County are entitled to summary judgment on Counts III and IV with respect to the Individual Sangamon County Defendants'

---

[13] The Estate concedes that Burns struck a person within the dwelling he entered. Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (d/e 178), at 32.

actions at the scene of the arrest.  The Estate's arguments to the contrary are not persuasive.[14]

Defendants Roderick and Osmer further were legally justified under § 5/7-5 in keeping Burns hogtied in the ambulance while he was actively resisting.  Roderick and Osmer still had probable cause to arrest Burns for home invasion, and Burns was still resisting.  Burns' persistent squirming, spitting, and yelling also confirmed that he had an open airway during this period.  Roderick, Osmer, and Sangamon County are entitled to summary judgment on Counts III and IV with respect to their actions in the ambulance while Burns was actively resisting.

Issues of fact exist regarding whether Defendants Roderick and Osmer were willful and wanton after Burns became passive.  Reading the evidence in the light most favorable to the Estate, Burns became passive at 6:45 a.m., about a minute before the ambulance arrived at the ER at 6:46 a.m.  Burns remained passive from that point in time until he was wheeled into the ER at 6:53 a.m., and then into ER Room 16 where he stopped breathing.

---

[14] The Estate's expert Dr. Michael D. Lyman, Ph.D., opined that: (1) the Individual Sangamon County Defendants' use of their Tasers was excessive and inconsistent with nationally recognized policing standards; and (2) hogtying Burns was dangerous, reckless and inconsistent with nationally recognized policing standards.  Exhibits to Response 178 (d/e 179), Exhibit 4, Expert Report of Michael D. Lyman, Ph.D., at 10, 14.  The Estate does not develop an argument based on Dr. Lyman's opinions (or cite Lyman's opinions) to establish that the Individual Sangamon County Defendants acted willfully or wantonly.  See Response 178, at 30-33.  Any such possible argument, therefore, is waived.  See e.g., Weinstein v. Schwartz, 422 F.3d 476, 476 n.1 (7th Cir. 2005).

Roderick and Osmer released Burns from the hogtie at this point in time.

Resuscitation began about 6:54 a.m.[15]

Reading the evidence favorably to the Estate, therefore, Roderick and Osmer left Burns in a potentially dangerous hogtied, prone position for approximately nine minutes after he stopped resisting.  "In cases of life-threatening emergencies, seven or eight minutes can be a significant delay that could amount to 'utter indifference' or 'conscious disregard' for decedent's safety."  Fagocki, 496 F.3d at 628 (quoting Kirwan, 811 N.E.2d at 1264.).  In Illinois, determining whether conduct was willful and wanton is a factual issue.  The quoted statement in Fagocki indicates that a seven or  eight minute delay in a dangerous situation may be willful and wanton.  In light of these principles, summary judgment must be denied as to Roderick, Osmer, and Sangamon County with respect to Roderick and Osmer's actions after Burns became passive in the ambulance.

Roderick and Osmer may act willfully and wantonly for purposes of the state law claims even though they are entitled to qualified immunity for the § 1983 excessive force claims.  In Illinois, "willful and wanton" depends on intent.  "Willful and wanton" describes intentional conduct and certain reckless conduct.

---

[15] Again, the Court recognizes that testimony indicates that two minutes or less elapsed from the moment when Burns became passive to the moment that he stopped breathing.  Any discrepancy in the times recorded on ambulance and hospital records is an issue of fact, and the Court must view the evidence favorably to the Estate at this juncture.

Qualified immunity depends on constructive notice.  Qualified immunity applies

unless controlling authority clearly established that the defendant's conduct

would violate a constitutional right.  The defendant's subjective intent is not an

issue in a qualified immunity defense.  See Anderson v. Creighton, 483 U.S. 635,

641 (1987); Harlow v. Fitzgerald, 457 U.S. 800, 816-20 (1982).  The Estate,

therefore, may prove that Osmer and Roderick acted willfully and wantonly after

Burns became passive even though they are entitled to qualified immunity on the

§ 1983 claims.[16]

Lifestar's request for summary judgment also must be denied based on

Rompot's actions after Burns became passive in the ambulance.

Dr. Stoy had no criticisms of Rompot's actions while Burns was resisting, and he

had no criticisms of Guffey's actions.  Dr. Stoy, however, found that Rompot

violated her professional standards of care by not conducting a more thorough

assessment of Burns after he became passive.  Reading the timing in the light

most favorable to the Estate, Rompot failed to perform a thorough assessment of

Burns after he became passive, but was still in a dangerous hogtied, prone

position (approximately nine minutes for purposes of the Motion).  Again, "In

cases of life-threatening emergencies, seven or eight minutes can be a

significant delay that could amount to 'utter indifference' or 'conscious disregard'

---

[16] The § 1983 claims and the state law claims also involve alleged violations of different standards of conduct.
The § 1983 claims allege violations of constitutional standards.  The state law claims allege violations of duties
defined by state law.

for decedent's safety."  <u>Fagocki</u>, 496 F.3d at 628.  In light of this statement in

<u>Fagocki</u>, the Court finds that an issue of fact exists regarding whether Rompot's

conduct was willful and wanton during this period.[17]

The Defendants argue that they are also entitled to summary judgment

because the Estate's expert Dr. Ralston's expert opinion should be rejected as

not admissible under Federal Rule of Evidence 702.

Dr. Ralston opined that hogtying Burns and placing him in a prone or semi-prone

position contributed to his death.  For the reasons stated in the accompanying

Opinion denying the Defendants' Motions in Limine to bar the opinions of

Estate's experts Dr. Ralston and Dr. Stoy (d/e 143 and 145), this Court finds that

the opinions of Dr. Ralston and Dr. Stoy are admissible.  Dr. Ralston's opinion

creates an issue of fact regarding whether hogtying Burns and placing him in a

prone or semi-prone position contributed to his death.

THEREFORE Defendant Lifestar Ambulance Service, Inc.'s Motion for

Summary Judgment (d/e 147) is DENIED, and the other Defendants' Motion for

Summary Judgment (d/e 149) is ALLOWED in part and DENIED in part.

---

[17] The Estate also argues that Rompot's conduct was willful and wanton because she did not put Burns on a backboard with a c-collar.  The Estate fails to cite admissible evidence to support this argument.  The Estate relies on nurse Retherford's testimony that Burns should have been on a backboard and fitted with a c-collar. Retherford treated Burns and may testify as a fact witness.  Retherford may not testify as an expert witness, however, because the Estate did not disclose her as an expert witness.  Fed. R. Civ. P. 26(a)(2)(A); <u>see</u> <u>Musser v. Gentiva Health Services</u>, 356 F.3d 751, 757 (7th Cir. 2004) (treating doctors and nurses must be disclosed as experts in order to give expert opinion evidence).  The Estate cannot rely on nurse Retherford's opinions about whether Rompot should have used a backboard and c-collar.  The Estate is limited to Dr. Stoy's disclosed opinions on the standards of care for Rompot's actions.
Dr. Stoy did not opine about backboards and c-collars.

Summary judgment is entered in favor of Defendants Brian Bressan, Andrew Brashear and Michael Harth and against the Plaintiff.  Partial summary judgment is entered on Counts I and II for the § 1983 claims in favor of Defendants former Sheriff Neil Williamson in his official capacity, Sangamon County, John Osmer, and Terrence Roderick and against the Estate.  The Motions are denied as to the Estate's state law claims against Defendant Lifestar Ambulance Services, Inc., former Sheriff Neil Williamson in his official capacity, Sangamon County, Osmer, and Roderick.  The Court further finds pursuant to Federal Rule of Civil Procedure 56(g) that the facts not genuinely in dispute establish that:

(1) no Defendant or agent or employee of a Defendant acted willfully or wantonly prior to the moment that the decedent Patrick Burns became passive during the last minute of the ambulance ride at approximately 6:45 a.m. on January 23, 2010; and (2) Lifestar employee Barbara Guffey (now Hampton) did not violate her professional standards of care in this incident.  Issues of fact remain for trial on the state law claims with respect to the actions of Defendants Osmer and Roderick, and Lifestar employee Jamie Rompot after the decedent Patrick Burns became passive during the said ambulance ride.

ENTER:   July 21, 2015

_s/ Tom Schanzle-Haskins_
UNITED STATES MAGISTRATE JUDGE